UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

IN RE:                                    )
                                          )          Case No. 13-21577-MER
WORLDWIDE ENERGY &                        )
MANUFACTURING USA, INC.                   )
EIN: 77-0423745                           )          Chapter 11
                                          )
        Debtor.                           )

## DISCLOSURE STATEMENT TO ACCOMPANY

## AMENDED PLAN OF REORGANIZATION DATED OCTOBER 28, 2013

### I.    INTRODUCTION

This is the Disclosure Statement ("Disclosure Statement") in the Chapter 11 case of Worldwide Energy & Manufacturing USA, Inc. ("Debtor" or "WEMU"). This Disclosure Statement contains information about the Debtor and describes the Chapter 11 Plan of Reorganization Dated October 28, 2013 ("Plan"), which was filed in the above-captioned Chapter 11 case. The Chapter 11 Plan may be further amended prior to confirmation. This Disclosure Statement is being provided to all creditors and interest holders of the Debtor. This Disclosure Statement has been approved by the United States Bankruptcy Court for the District of Colorado as containing adequate information to enable creditors and interest holders to determine whether to accept the Debtor's Plan. The Court's approval of this Disclosure Statement does not constitute a decision on the merits of the Plan. Objections to confirmation of the Debtor's Plan must be filed by _____. Issues related to the merits of the Plan and its confirmation will be the subject of a confirmation hearing which is scheduled for _____ at __:00 _.M. at the United States Bankruptcy Court, Byron Rogers Courthouse, Courtroom C502, at 1929 Stout Street, Denver, Colorado.

**THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION. THE COMMISSION HAS SIMILARLY NOT REVIEWED THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT.**

Your rights may be affected. You should read the Plan and Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.

The Plan of Reorganization is the governing document or contract with creditors once it is confirmed by the Court.  In the event of any inconsistencies between the Plan and this Disclosure Statement, the Plan supersedes the Disclosure Statement and will be the sole Court approved document that governs the post-confirmation relationship and agreements between the parties.

This Disclosure Statement is provided to you along with a copy of the Debtor's Plan and a Ballot to be used for voting on the Plan.  Please complete the Ballot according to the instructions contained on the Ballot if you intend to vote for or against the Debtor's Plan.  Each creditor or interest holder may vote on the Plan by completing the enclosed Ballot and returning it to counsel for the Debtor at the address below:

> Lee M. Kutner
> Kutner Brinen Garber, P.C.
> 303 East 17th Avenue
> Suite 500
> Denver, CO 80203

This Ballot must be received by Kutner Brinen Garber, P.C. no later than **5:00 p.m. on _____, 20__**, which is the date set by the Court as the last day to vote on the Plan.  Terms contained in this Disclosure Statement, which are defined in the Plan, have the same meaning as set forth in the definitional section of the Plan, Article II.

**Recommendation.**  As discussed more fully below, the Debtor firmly believes that the Plan represents the best alternative for providing the maximum value for creditors.  The Plan provides creditors with a distribution on their Claims in an amount greater than any other potential known option available to the Debtor.  **Again, the Debtor strongly believes that confirmation of the Plan is in the best interest of creditors and recommends that all creditors entitled to vote on the Plan vote to accept the Plan.**

**Voting Requirements.**  Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" under the Plan are entitled to vote to accept or reject the Plan.  Classes of Claims and Interests that are not impaired are not entitled to vote and are deemed to have accepted the Plan.  Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy

Rules, and a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting.

**Voting Classes.** Each holder of an Allowed Claim in Classes 2 and 3 shall be entitled to vote to accept or reject the Plan.

**Deemed Acceptance of Plan.** Unimpaired classes are conclusively presumed to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Class 1 is unimpaired by the Plan and is presumed to accept the Plan.

**Deemed Rejection of Plan.** Classes that receive and retain nothing under the Plan are deemed to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Classes 4 and 5 receive or retain nothing and are deemed to have rejected the Plan.

**One Vote Per Holder.** If a holder of a Claim holds more than one Claim in any one Class, all Claims of such holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting for or against the Plan.

## II.    CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 of the United States Bankruptcy Code is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals. Chapter 11 allows the Debtor to retain its assets during the administration of its Chapter 11 case as a debtor-in-possession. Following confirmation of the Plan, Chapter 11 allows the Debtor to retain its assets as a reorganized debtor or as otherwise provided in the Plan. If the Plan is approved by the Court, the Plan is the permanent restructuring of the Debtor's financial obligations. The Plan also provides a means through which the Debtor will restructure or repay its obligations. The Plan will provide the Debtor with an opportunity to maximize the return for creditors through continued operations.

The Plan divides creditors into classes of similarly situated creditors. All creditors of the same Class are treated in a similar fashion. All member Interests are also classified and treated alike. Each Class of creditors or interest holders is either impaired or unimpaired under the Plan. A Class is unimpaired if the Plan leaves unaltered the legal, equitable and contractual rights to which each creditor in the Class is entitled or if the Plan provides for the cure of a default and reinstatement of the maturity date of the claim as it existed prior to default.

The Debtor filed a Motion to Set Bar Date for Filing Claims and Requests for Allowance of Administrative Expense Claims Under Bankruptcy Code § 503(b)(9) ("Bar Date Motion"). On July 26, 2013, the Court entered an Order establishing September 9, 2013 as the as the last day: a) for filing of any Proof of Claim for a pre-petition claim or interest; and b) by which motions or requests for allowance of administrative expense claims pursuant to 11 U.S.C. §503(b)(9) must be filed ("Bar Date"). The Plan provides that Claims and Interests of all Classes shall be allowed only if such Claims are either: a) evidenced by a timely filed Proof of Claim or Interest; or b) appear in the Schedules filed by the Debtor and are not scheduled as disputed, contingent or unliquidated, unless subsequently allowed by the Court. Creditors may check as to whether or not their Claims are scheduled as disputed, contingent or unliquidated by reviewing the Schedules and the amendments thereto filed by the Debtor in the Bankruptcy Court for the District of Colorado. Alternatively, creditors may contact counsel for the Debtor or the Debtor directly in order to determine how their claim was scheduled.

Chapter 11 does not require that each holder of a Claim or Interest vote in favor of the Plan in order for the Court to confirm the Plan. The Plan, however, must be accepted by at least one impaired Class of Claims by a majority in number and two thirds in amount, without including insider acceptance of those Claims of such Class actually voting on the Plan. Assuming one impaired Class votes to accept the Plan, it may be confirmed over its rejection by other Classes if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under and has not accepted the Plan. The Bankruptcy Code requires that if interest holders retain an interest or receive anything under the Plan, then the unsecured creditor classes must either be paid the full value of their claims or vote to accept the Plan. In this case, the interest holders are neither receiving anything nor retaining their pre-petition interests under the Plan. Since the Debtor believes that the Plan provides the best alternative for creditors, all creditors are urged to vote to accept the Plan.

If all Classes of Claims and Interests vote to accept the Plan, the Court may confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation. Among other things, Section 1129 requires that the Plan be in the best interest of the holders of Claims and

Interests and be feasible through a showing that confirmation will not be followed by the need for further financial reorganization of the Debtor.

## III.     OVERVIEW OF THE PLAN AND MEANS OF EXECUTION

The Plan divides creditors and interest holders into the following 6 Classes.  Treatment of each of the Classes is discussed in greater detail below and in the Plan.  The following table summarizes the 6 Classes, whether or not each such Class is impaired, and, to the extent determinable, the treatment of each Class:

| CLASS | IMPAIRMENT | TREATMENT |
|---|---|---|
| 1: Priority Claims under §§ 507(a)(4) or (5) | Unimpaired | 100% distribution.    The Debtor believes these claims total $11,725. |
| 2: Allowed Secured Claim of VFC Partners 23, LLC | Impaired | The Class 2 Claim shall be allowed in the amount due on the Confirmation Date and paid in equal monthly installments based on an amortization term of 60 months at 6% interest. |
| 3:  Allowed Claims of Unsecured Creditors | Impaired | The Class 3 Claims will be entitled to choose any one of three options available for satisfaction of their claims.  **Option 1**- 20% of Allowed Claim paid within 90 days of Plan Effective Date; **Option 2**- claim paid in full on amortized basis at 1% interest per annum over 84 months from Plan Effective Date; or **Option 3**- claim may be exchanged for new common stock on a dollar for share basis. |
| 4:  Allowed Unsecured Claims of Securities Claimants | Impaired | The Class 4 Claims shall receive zero on account of their claims. |
| 5: Interests Held by Pre-Confirmation Shareholders | Impaired | The Class 5 Interests will be cancelled on the Effective Date. |

The "Effective Date" of the Plan shall mean the date on which the Order of Confirmation is entered or if a stay is entered pending appeal of the Order of Confirmation, the date on which the stay

is no longer in effect.  Pursuant to the Plan, the Debtor shall restructure its debts and obligations and will continue to operate in the ordinary course of business.  Funding for the Plan shall be drawn from the ongoing operations of the Debtor.  The Debtor believes the Plan is feasible based upon its existing business operations.

## IV.    BACKGROUND

**Description and History of the Debtor's Business**

The Debtor is an international manufacturing and engineering firm making various parts in China, including solar panels, aerospace parts, electronic parts, and various parts related to other industries.  The Debtor owns various interests in its subsidiary companies in China.  The Debtor's business includes being an intermediary between customers and subcontractors, as well as direct manufacturing of certain parts through its subsidiaries.  The subsidiaries have not sought bankruptcy protection.

The Debtor specializes in manufacturing and contract manufacturing.  Its products are manufactured in factories in China.  A contract manufacturer locates factories capable of producing customer parts according to desired specifications and quality standards imposed by the customer.  The contract manufacturer hires subcontractors (factories) that provide the plant, equipment, manufacturing, working capital, and factory labor.  WEMU provides sales, management, production control, and technical support.  WEMU's goal is to timely deliver high quality components at manufacturing costs that are at least fifty percent (50%) less than what WEMU's customers would pay for similar parts in the United States.  As a contract manufacturer WEMU does not manufacture customer parts, but subcontracts to factories that produce these parts.  WEMU's role is to ensure that the parts meet specifications and quality standards imposed by its customers.  WEMU's business operations are primarily located in the State of California and the People's Republic of China ("PRC").

WEMU provides its services to several companies in the United States, primarily in the aerospace, automotive, and electronics industries.  Although WEMU initially focused on manufacturing components for the high tech industry, it expanded its business model to include manufacture of products, parts, and components for a broad number of industries.  WEMU

6

currently arranges for the manufacture of components and products for a wide variety of customers in the United States and Europe.

## Events Leading to Filing

### Securities and Exchange Commission Investigation

The predecessor to the Debtor was founded by Jimmy Wang in 1996, as a privately held California corporation.  This privately held corporation merged with a publicly traded shell company on September 30, 2003.  On June 1, 2004, Debtor's common stock began trading on the OTC Bulletin Board Exchange.  In January and February of 2010, Debtor issued equity securities in two private placements for an aggregate cash investment of $8,869,307.  On April 15, 2010, the Debtor filed an S-1 registration statement with the Securities and Exchange Commission ("SEC"). The registration statement became effective on May 6, 2010.  The Debtor operated as a publicly traded company until the SEC opened an investigation regarding allegedly misleading statements or omissions contained in offering memoranda presented to investors in the January and February 2010 private placements.  As part of a voluntary settlement of the investigation and impending lawsuit, WEMU agreed to a $100,000 fine and revocation of its registration statement on May 16, 2012. Various officers and directors agreed to pay fines of $50,000.  Jeffrey Watson, Jimmy Wang, and Mindy Wang consented to lifetime bans from serving as officers or directors of a publicly traded company.

Legal fees incurred in connection with the SEC investigation were charged against WEMU's insurance policy issued by Great American Insurance Group ("Great American Policy").  Because the three individual defendants were owed indemnification by the Debtor, they too were covered parties under the Policy.  As a result, legal fees accrued in connection with the SEC investigation completely exhausted the $2,000,000 available under the Great American Policy.

### Securities Fraud Class Action Suit Filed in San Mateo, California

On December 4, 2012, Plaintiff Mathew Hayden ("Plaintiff") filed a purported class action lawsuit alleging common law and securities fraud violations under California law.  Styled as *Hayden v. Jimmy Wang, Mindy Wang, Worldwide Energy and Manufacturing USA Inc., Ladenburg Thalmann & Co, Inc.*, case no. 518333 (San Mateo Sup. Ct.), the suit seeks designation of Hayden

as lead plaintiff in a class consisting of approximately 66 investors who purchased WEMU equity securities in the January and February 2010 private placements. On February 11, 2013, Plaintiff filed an Amended Complaint in the same court, which added 6 additional WEMU directors and officers as individual defendants.

The Amended Complaint ("Complaint") restates the allegations made by the SEC, centering on alleged material misstatements or omissions contained in various offering memoranda circulated to WEMU stock purchasers in advance of the sale of securities in January and February of 2010. In particular, Hayden alleges that WEMU and certain members of the board knowingly entered into two transactions with managers of a Chinese subsidiary that should have been timely disclosed to the public, but were not. Plaintiff, on behalf of the purported class, alleges rescission damages in an amount equal to the purchase price paid for the securities, $8,869,307.

The offending transactions consisted of a profit sharing agreement whereby three managers of the Chinese WEMU-Nantong Solar Division were promised 49% of the division's profits. Moreover, if the managers reached certain revenue benchmarks, the profit sharing arrangement would be converted into an equity ownership of the same amount – 49%. Plaintiff alleges that the managers reached the performance benchmarks in 2010, at which time WEMU made the equity transfer as a performance based bonus.

The Plaintiff acknowledges that WEMU disclosed the basic terms of this proposed transaction on April 15, 2010, as follows:

> In connection with the review of the 2009 results of operations of the Nantong Solar division, the parties are negotiating for a transfer of 49% ownership of the Solar division to the management which would replace the current profit sharing arrangement. We expect that this transaction will not have a material impact on our financial statements.

Complaint at ¶ 95 (citing WEMU's 2009 Form 10-K at F-38). However, the Plaintiff alleges that this disclosure is insufficient because certain material terms such as "profit sharing" were not defined and the document was very long.

The Debtor believes that it has strong defenses to the class action suit. Namely, the disclosure referenced above was adequate and truthful. As predicted in that statement, the

8

conversion of a profit sharing agreement into an equity transfer had no material impact on WEMU's financials.

Furthermore, the Debtor alleges that the 2-year statute of limitations period for securities fraud claims in California has lapsed. Plaintiff and the class were placed on inquiry notice by virtue of the above referenced disclosure, originally published on April 15, 2010. Because the limitations period lapsed prior to the filing of the Complaint, the securities fraud claims should be time barred. Moreover, the Debtor has already procured signed objections from 18 of the 66 class members, objecting to the appointment of Hayden as lead plaintiff; to the appointment of Rosen Law as class counsel; and further objecting to Plaintiff's unwillingness to settle the suit for the remainder of the insurance policy (although Debtor's coverage has been exhausted, the individual directors and officers have additional coverage under an "A-Side" policy issued by Liberty Mutual). The Debtor believes that these objections definitively bar class certification.

Despite Debtor's strong defenses to the potential class action, the legal fees associated with the class action, including the indemnification obligation to the individual defendants and the broker Ladenburg Thalmann, were more than the Debtor could afford and contributed to the filing of this Chapter 11 petition on July 5, 2013.

**Deteriorated Market for Solar Industry**

The market conditions that previously led to a rise in the Debtor's sales and market for its products in the U.S. and Europe consisted of an expanding market for solar energy products. Chinese manufacturers were able to take advantage of an expanding market and the use of tax credits and other benefits available in the U.S. for implementing solar energy panels. However, the U.S. and Europe implemented high tariffs and ended a number of tax incentives in order to in part curtail what was perceived to be dumping of low cost solar panels from China. This had the effect of drastically reducing the sale of solar panels and severely impacted Chinese manufacturers. Since the Debtor's sales were based in part on the sale of solar panels in the U.S. and Europe and the import of Chinese panels, the Debtor's business was severely diminished.

As a result of the foregoing factors, the Debtor filed for protection under Chapter 11 of the Bankruptcy Code on July 5, 2013.

## V.      DESCRIPTION OF ASSETS

As of the Petition Date, the value of the Debtor's primary assets is set forth below:

| | |
|---|---|
| Cash | $ 0 |
| Checking account: | $ 275,603 |
| Shares in Chinese subsidiaries | $ 0 |
| Accounts Receivable: Related party receivable/deferred tax asset | $ 670,589 |
| Accounts receivable: customers | $ 484,797 |
| Claims against Moye White | $ 0 |
| Claims against Radiowaves, Inc. | $ unknown |
| Claims against Tomeii International | $ unknown |
| Drawings, tools, engineering designs | $ 1,872,801 |
| Software | $ 0 |
| Computers, monitors, office equipment | $ 1,117 |
| US Inventory | $ 940,672 |
| Advances to suppliers, prepaid income | $ 9,999 |
| | |
| **Total Assets** | **$ 4,255,578** |

**The asset values set forth above were listed on the Debtor's bankruptcy Schedule B, and amendments thereto, and represent a gross value for each asset, not a value net of liens.**

The Debtor is reserving the right to bring Avoidance Actions pursuant to 11 U.S.C. §§ 545 through 550 and state and bankruptcy fraudulent conveyance actions.  The Debtor is currently in the process of evaluating these claims to determine which, if any, claims are viable.  The Debtor made numerous payments to creditors within the 90 days prior to the Petition Date.  The total amount of payments made to insiders in the year prior to the Petition Date was approximately $120,000 in gross wages paid to Gary Koos, and the following in gross wages: $20,000 to John Ballard, $10,000 to Diane Thelen, $2,000 to Tiffany Liu, and $20,000 to Shui Shum.  Gary Koos was terminated from his positions as President, Chief Executive Officer, and Director of the Debtor's Board of Directors on February 28, 2013.  The Debtor's analysis indicates that, other than the payments to Gary Koos, these payments were likely made in the ordinary course of business and therefore are subject to

10

defense pursuant to 11 U.S.C. § 547(c)(2); were contemporaneous transfers and therefore subject to defense pursuant to 11 U.S.C. § 547(c)(1); or were setoffs and subject to defense pursuant to 11 U.S.C. § 553.  With respect to payments to insiders, with the exception of payments to Gary Koos, the compensation to the Debtor's officers was reasonable officer compensation for services rendered.  The Debtor has objected to the proof of claim filed by Gary Koos.  Wages were paid to Koos during the period of time in which Mr. Koos continually, and without any legitimate reason, delayed the shareholder meeting to elect officers and directors, and as a result, there could be a dispute with respect to compensation paid to Mr. Koos.  The Debtor expects that, with the exception of payments to Gary Koos, the recovery to creditors as proposed under the Plan will exceed any reasonable recovery that could be obtained solely from pursuit of the Avoidance Actions, if any.

**Description of the Chinese Subsidiaries**

All manufacturing activities are carried out through WEMU subsidiaries located in Shanghai and Ningbo, People's Republic of China ("China" or "PRC") which include:

1.  Shanghai Intech Electro-Mechanical Products Co. Ltd., wholly owned subsidiary of Worldwide Energy and Manufacturing USA, Inc., ("Intech");

2.  Shanghai Intech-Tron Electronic & Electronics Company Ltd., 55% owned by Worldwide Energy and Manufacturing USA, Inc.;

3.  Shanghai Dechuang Electric & Electronics Co., Ltd., 100% owned by Shanghai Intech-Tron Electronic and Electronics Co.;

4.  Shanghai Intech Precision Machinery Co., Ltd.,51% owned by Shanghai Intech Electro Mechanical Products Co. and 49% owned by Worldwide Energy and Manufacturing USA, Inc.;

5.  Shanghai Shutai Precision Casting Co., Ltd., 55% owned by Shanghai Intech Electro-Mechanical Products Co. and 45% owned by Worldwide Energy and Manufacturing USA, Inc.; and

6.  Worldwide Energy and Manufacturing (Nantong) Co., Ltd., 51% owned by Worldwide Energy and Manufacturing USA, Inc.

11

In addition to these production facilities, WEMU maintains its corporate headquarters in a leased facility in San Francisco, California. In this location, WEMU also warehouses Contract Manufacturing and Solar division inventory to support the Debtor's customers in North America on short flow deliveries.

Intech, WEMU's quality assurance arm located in Shanghai, China employs 13 engineers. As the engineering division and quality assurance arm of the Company, Intech provides technical advice, design, delivery, material procurement and manufacturing quality control services to companies in the United States seeking to manufacture or purchase components from manufacturers in China.

On August 18, 2005, WEMU established an electronics manufacturing division located in Shanghai, China. The Chinese subsidiary purchased approximately $250,000 worth of electronics production equipment from Opel Technology, a former WEMU electronics supplier, as the initial manufacturing equipment. In establishing this electronics factory, WEMU was able to compete more effectively in the PC board and cable assembly industry, as well as gain complete control over WEMU's electronics components production.

WEMU established Shanghai Intech Precision Mechanical Products Manufacturing Ltd. ("Precision") on November 1, 2005. Precision is 51% owned by Intech and 49% owned by WEMU. This factory performs die-casting and machining services for the automotive, motorcycle, telecommunications and home supply industries. Precision is located in the suburbs of Shanghai, China, and occupies an area of approximately 71,043 square feet. The factory contains three workshops: a die-casting shop, a machining shop, and a printing shop.

On October 14, 2008, through Intech, WEMU completed the acquisition of 55% of Shanghai De Hong Electric and Electronic Company Limited ("De Hong"). The terms of the Agreement dated February 3, 2008 were that Intech paid cash consideration of approximately $1 million dollars for a 55% interest in De Hong in two installments, with the first installment of $714,286 being paid in September 2008, and the second installment of $308,414 being paid in March 2009. The Company

funded the acquisition with some of the proceeds from WEMU's sale of 1,055,103 ($4,747,970) shares of unregistered common stock on June 23, 2008.

De Hong is the holding company for the operating subsidiary Shanghai Intech-Detron Electronic Co. ("Detron"). Therefore, WEMU received 55% control of the operating subsidiary Detron. Detron's management remained in place. Detron is a power supply factory in Shanghai, China with design and R & D capabilities.

**Valuation of Chinese Subsidiaries**

The Debtor's Chinese Subsidiaries have no liquidation value. The PRC government has broad discretion in dealing with violations of laws and regulations, including levying fines, revoking business and other licenses and requiring actions necessary for compliance. In particular, licenses and permits issued or granted to WEMU's subsidiaries by relevant governmental bodies may be revoked at a later time by higher regulatory bodies. WEMU cannot predict the effect of the interpretation of existing or new PRC laws or regulations on its businesses.

Termination of WEMU's operations and withdrawal of cash and other assets from the PRC would likely be found to be in breach of labor, tax and other statutory bodies of PRC law. As a result, WEMU may be subject to sanctions, including fines, and could be required to surrender some or all of the revenue generated by an asset sale or other exit from the PRC to the Chinese authorities.

Uncertainties relating to the application of PRC laws under a liquidation scenario would temper the interest of any investor seeking to purchase WEMU's assets in a liquidation scenario. This would put downward pressure on the sale price and, in management's opinion, reduce the sale price of any subsidiaries' assets to an amount which is less than the debt owed by those entities to the factories which manufacture the subsidiaries' orders.

For the foregoing reasons, the Debtor estimates that its Chinese subsidiaries have a liquidation value of $0.

## VI.    DESCRIPTION OF LIABILITIES

### A.    Priority Claims

#### 1.    Priority Claims, Class 1

Priority Claims are defined in the Plan as any pre-petition Claim entitled to a priority in payment under § 507(a) of the Code, excluding any Administrative Claim or Tax Claim.  Section 507(a) of the Code includes, but is not limited to, claims for: (a) wages, salaries and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $11,725 per employee earned within the 180 days prior to the Petition Date (§ 507(a)(4)); and (b) certain contributions to an employee benefit plan (§ 507(a)(5)).  On the Petition Date, the Debtor had 7 employees. The Debtor filed a motion to pay pre-petition employee wages, claims of independent contractors, reimbursable expenses, and related costs and expenses.  The Court granted the relief requested in that motion and all employee wages were brought current through the Petition Date.   The Debtor scheduled one creditor, Premeire Source LLC, as a priority creditor pursuant to 11 U.S.C. §507(a)(4).  The Debtor believes this is the only §507(a)(4) claim.  Premeire Source, LLC is an independent contractor who falls under the provisions of §507(a)(4).

#### 2.    Administrative Claims

Administrative Claims are those Claims for payment of an administrative expense of a kind specified in § 503(b) or § 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to § 507(a)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estates and operating the businesses of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) Professional Fee Claims; (c) all fees and charges assessed against the Estates under 28 U.S.C. § 1930; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under § 546(c)(2)(A) of the Bankruptcy Code.

14

The Debtor retained Kutner Brinen Garber, P.C. ("KBG") as its bankruptcy counsel. KBG requested and obtained approval of a retainer in the amount of $24,832 and establishment of an interim payment procedure. For the time period of July 5, 2013 through October 31, 2013, KBG incurred approximately $52,350 in fees and costs. KBG has not yet filed any interim fee applications. KBG estimates that an additional $20,000 in legal fees and costs to KBG will be incurred between November 2013 and confirmation of the Plan. The total amount of legal fees will depend on the level of litigation over the Plan and creditor claims.

The law firm of Onsager Staelin and Guyerson, LLC ("OSG") filed an application to be employed as counsel for the Official Committee of Unsecured Creditors. The Court approved the OSG application and ordered that Debtor is authorized and required to pay to Onsager, Staelin & Guyerson, LLC, as Counsel to the Official Committee of Unsecured Creditors, on a monthly basis, 75% of its fees and 100% of its allowable expenses as per the guidelines established by the Office of the United States Trustee. As of October 31, 2013, OSG has accrued approximately $8,130 in fees and costs.

### 3. Tax Claims

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. § 507(a)(8). The Debtor did not list any debt to taxing authorities on its Schedule E. The California Franchise Tax Board filed a claim in the amount of $821.97. No other taxing authorities filed proofs of claim.

### B. Secured Claims

### 1. VFC Partners 23, LLC, Class 2

Class 2 consists of the Allowed Secured Claim of VFC Partners 23, LLC ("VFC"). The Debtor scheduled VFC as a secured creditor in the amount of $356,410.44. On or about May 20, 2008 the Debtor entered into Promissory Note, Business Loan Agreement, and Commercial Security Agreement with Bank of the West under which a loan in the amount of $2,000,000 was extended to the Debtor. The Debtor paid down the loan pre-petition and the loan balance was approximately $367,000 as of the Petition Date. In order to secure the debt, the Debtor granted this creditor a lien on a portion of the Debtor's accounts receivable, and U.S. inventory. The lien is perfected by a

15

UCC-1 financing statement. The Loan was assigned VFC Partners on or about December 27, 2012. ("Assignee")  The value of the accounts receivable and U.S. inventory as of the Petition Date are substantially in excess of the VFC claim balance.

**C.     Non-Priority Unsecured Creditors, Class 3**

The Debtor has a number of unsecured pre-petition creditors, and several of these creditors filed proofs of claim.  The Debtor compiled a list of the Class 3 Unsecured Claims it scheduled in its bankruptcy case and the Claims filed by unsecured creditors.  To the extent that a creditor who was scheduled by the Debtor filed a Claim, the amount of the Claim as filed by the creditor is considered in the analysis.  The Claims list containing all known unsecured claims of the Debtor is attached to this Disclosure Statement as Exhibit A.  Based on the Debtor's books and records, the Debtor scheduled unsecured Claims in the total amount of $2.8 million.  The proofs of claim on file are, for the most part, consistent with the Debtor's Schedule F and books and records.

Plaintiff Matt Hayden did not file a proof of claim in the bankruptcy court prior to the bar claim date.  His claim against WEMU, and that of the class he purports to represent, is therefore extinguished by operation of the bankruptcy rules.  As further detailed below, the indemnification claims of individual defendants and Ladenburg Thalmann, including attorney's fees and other defense costs, will be subordinate to Class 3 unsecured creditors pursuant to 11 U.S.C. § 510(b). Accordingly, these claims will be treated as equity interests and shall receive no distribution under the Plan.

**D.     Securities Claimants, Class 4**

The Debtor has a number of creditors whose claims constitute Securities Claims.  The Plan defines Securities Claims as those unsecured claims arising from rescission of a purchase or sale of a security of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement, indemnification, or contribution allowed under Code section 502 on account of such a claim.  Class 4 claimants shall receive no distribution under the Plan.  A non-exhaustive list of Class 4 claimants is attached hereto as Exhibit B.

**E.**    **Leases and Executory Contracts**

The Debtor was a party to several pre-Petition Date leases or executory contracts.  Under the terms of the Plan, the Debtor is assuming all executory contracts and unexpired leases: (a) that were previously assumed by the Debtor pursuant to Court Order, (b) for which a motion to assume has been filed and is pending, and (c) are specifically listed on Exhibit A of the Plan.  The Debtor maintains the right to modify Exhibit A of the Plan through the Plan Confirmation Date. Confirmation of the Plan shall constitute a determination that the payments to be made to creditors of assumed leases or executory contracts pursuant to the Plan satisfies all conditions precedent set forth in 11 U.S.C. § 365.

The Debtor is rejecting all executory contracts and unexpired leases previously rejected by Court Order, subject to a pending motion to reject, or not specifically assumed in accordance with the Plan.  All proofs of Claim with respect to Claims arising from the rejection of any executory contract or unexpired lease shall be filed with the Court within twenty (20) days after the earlier of (i) the date of the Court order approving the Debtor's rejection of such executory contract or unexpired lease or (ii) the Confirmation Date.

The Debtor filed a motion to assume its existing office and warehouse lease with Rollins Road Commercial Center, LLC for its operations in California.  The Debtor does not anticipate that any objections will be filed and the lease for its California operations will be assumed. There will be no cure requirements upon assumption as the Debtor is current on its lease payments.  Also, the Debtor is a party to several executory contracts:

(1) Independent Sales Representation Agreement with Jimmy Wang;

(2) Consulting Agreement with Mindy Wang;

(3) Independent Contractor Agreement with Diane Thelen;

(4) Outside Independent Contractor Agreement with Tiffany Liu;

(5) Employment Agreement with John Ballard; and

(6) Agreement with Shui Shum. The Debtor will assume the contracts listed above pursuant to the Plan and does not expect to have any cure requirements as these agreements are current.

17

## VII.    DESCRIPTION OF THE PLAN

### A.    General Description

The Debtor filed its Plan of Reorganization with the United States Bankruptcy Court for the District of Colorado on October 28, 2013.  The Plan provides for the reorganization of the Debtor. Funding of the Plan will be derived from ongoing operations.

The Plan provides for the specification and treatment of all creditors and Interest holders of the Debtor.  The Plan identifies whether each Class is impaired or unimpaired.  A Class is unimpaired only if the Plan leaves unaltered the legal, equitable or contractual obligations between the Debtor and the unimpaired claimants or interest holders.  The following is a brief summary of the Plan.  The actual text of the Plan should be reviewed for more specific detail.  In the event of any conflict between the Plan and this Disclosure Statement, the terms of the Plan govern.

As provided in § 1123(a)(1) of the Bankruptcy Code, the Priority, Administrative and Tax Claims against the Debtors are not designated as classes. The holders of such Allowed Claims are not entitled to vote on the Plan and such claims will be paid in full.

The Plan divides the creditors in each case into separate classes.  The classes are set forth as follows:

Class 1 - All Allowed Unsecured Claims specified in Section 507(a)(4) and 507(a)(5) of the Code as having priority.

Class 2 - The Allowed Secured Claim held by VFC Partners 23, LLC.

Class 3 - The Allowed Claims held by unsecured creditors with the exception of those separately classified.

Class 4 - The Allowed Claims held by those unsecured creditors who hold claims defined as Securities Claims.

Class 5 - The Interests held by pre-petition shareholders and others.

### B.    Claims

#### 1.    Unclassified Priority Claims

18

### a.    Administrative Claims

The holders of Allowed Claims of the type specified in Section 507(a)(2) of the Code, costs and expenses of administration, shall receive cash equal to the Allowed amount of such Claim or a lesser amount or different treatment as may be acceptable and agreed to by particular holders of such Claims. Such Claims shall be paid in full on the Effective Date of the Plan, paid in the ordinary course of business, or treated as otherwise agreed.

The Debtor paid its administrative expenses in the ordinary course during the course of the bankruptcy case, and therefore does not believe that any material administrative claim exists against the bankruptcy estate, except for the administrative claims of professionals and the Office of the U.S. Trustee.

| Professional | Approximate fees & costs |
|---|---|
| Kutner Brinen Garber, P.C | $52,350 |
| Onsager Staelin and Guyerson, P.C. | $8,130 |

All Administrative Claims of professionals are subject to Court approval on notice to creditors with an opportunity for a hearing.  Certain professional fees may be paid pursuant to interim fee applications and upon Court allowance.  The fees set forth above are the approximate fees and costs through October 31, 2013.  Additional fees and costs will be incurred between October 2013 and confirmation of the Plan.

### b.    Tax Claims

The Allowed Claims of a type specified in Section 507(a)(8) of the Code, Tax Claims of governmental taxing authorities, shall be paid on the Effective Date of the Plan or in monthly payments on an amortized basis over a period that does not exceed five years from the Petition Date with interest at the appropriate rate set by applicable statute.  The Debtor has only one U.S. tax obligation to the California Franchise Tax Board in the amount of $821.97.

### c.    United States Trustee Fees

The Debtor will make all payments required to be paid to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) until the case is closed, converted, or dismissed.  All payments due to the U.S.

Trustee pursuant to 28 U.S.C. § 1930(a)(6) shall be paid on the Effective Date, and the U.S. Trustee shall thereafter be paid fees due on a quarterly basis until the case is closed, converted, or dismissed. The Debtor will request entry of a final decree closing the case on or before the later of the date all Claim objections and any pending litigation is concluded or 180 days after the Effective Date of the Plan. Post-confirmation payments due to the United States Trustee are estimated to be $6,500 per quarter until the case is closed.

      **2.**      **Class 1, Classified Priority Claims**

The Allowed Class 1 Priority Claims shall be paid in full on the Effective Date. The Class 1 Claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4) and 507(a)(5) of the Code. On the Petition Date, the Debtor had 7 employees, however, there are no remaining employee pre-petition claims. The Debtor anticipates only one Class 1 claim in the amount of $11,725.

      **3.**      **Class 2, Secured Claim of VFC Partners 23, LLC**

The Class 2 Secured Claim consists of the Allowed Secured Claim of VFC Partners 23, LLC. The Class 2 claim is secured by a lien encumbering the Debtor's accounts receivable and inventory. The Debtor believes that this claim is fully secured.

The Class 2 Allowed Secured Claim is impaired by the Plan. The principal amount of the Class 2 Claim will be allowed as a secured claim in the amount of the outstanding balance due on the claim as of the Confirmation Date. The Class 2 Claim will bear interest at the rate of: (i) 6% per annum commencing on the Effective Date of the Plan; or (ii) if the Class 2 claimant objects to such rate in writing in connection with their objection to confirmation of the Plan prior to the commencement of the confirmation hearing, such rate as will be determined by the Court as necessary to satisfy the requirements of 11 U.S.C. § 1129(b) of the Code; or (iii) such other rate as agreed by the Debtor and the Class 2 claimant. The Class 2 claimant's lien that secured its claim as of the Effective Date of the Plan shall continue to secure its claim until the Allowed Secured Claim is paid in accordance with this Plan.

The Class 2 claim shall be amortized and repaid in equal monthly installments over a period of sixty (60) months commencing on the Effective Date of the Plan. The Debtor estimates the

monthly payment to the Class 3 claimant will be approximately $6,516.

    **4.**        **Class 3, General Unsecured Creditors**

Class 3 consists of those unsecured creditors of the Debtor who hold Allowed Claims.  The Plan provides that Class 3 claimants shall be entitled to elect one of the following three options with respect to payment and satisfaction of their claims:

> **Option 1:**  Each Class 3 claimant may elect to receive a cash payment of 20% of their Allowed Claim and receive payment of the 20% within ninety (90) days of the Effective Date of the Plan in total satisfaction of their claim;
>
> **Option 2**:  Each Class 3 claimant may elect to receive full payment of their Allowed Claim payable in amortized monthly installments at 1% interest per year over the seven (7) years following the Effective Date of the Plan; or
>
> **Option 3**:  Each Class 3 claimant may elect to receive new common shares of stock in the reorganized Debtor issued on the Effective Date of the Plan or within ten days of such date, in full satisfaction and payment of their Allowed Claim.  Shares will be issued on a one share for each dollar of claim basis.  No shares will be issued with respect to the portion of any claim that is less than one dollar.

Each Class 3 claimant shall be entitled to elect one of the three payment options on a form that will be enclosed with their Ballot for voting on the Plan.  If a Class 3 claimant does not elect an option, they will receive Option 1 by default.

In addition to the distribution set forth above, Class 3 claimants who select Option 1 or 2 shall be entitled to receive the proceeds whether obtained by litigation or settlement, net of attorney fees, expert fees, and costs, obtained from any action undertaken by the Debtor to collect Avoidance Actions.  It shall be up to the Debtor's discretion, without need for any Court approval, to: a) pursue any Avoidance Actions; and b) settle any Avoidance Actions.  If any recoveries are made they will be prorated among all of the Allowed Claims electing Options 1 and 2.  Other than interest paid as stated, no Class 3 claimant shall receive more than payment of their Allowed Claim in full.

The Debtor is anticipating that Class 3 claimants holding approximately $679,952 in claims will chose Option 1, which requires payment in 90 days in the amount of 20% of their claims.  This

would require a lump sum payment by the Debtor in the amount of approximately $135,990.

The Debtor is anticipating that Class 3 claimants holding approximately $167,809 in claims will chose Option 2, which requires payment in full over 7 years. This amount does not include the claim of Shanghai Intech Electro-Mechanical, which has agreed to delay receipt of payments under the Plan for approximately one year, or until January 1, 2015. At that time the Debtor will begin making payments to Intech at the rate of $12,500 per month. The remaining Intech claim of $1,622,802 will be paid with interest at the rate of 6% per annum until paid. Intech will forego any payments during the year 2014.

The Debtor anticipates that the claimant holding the Moye White claim will elect Option 3, receipt of shares in exchange for its claim. Those creditors electing Option 3 will not receive cash distributions.

Based on historical financial information, operations during the Chapter 11 case, and changes made during the Chapter 11, the Debtor has prepared projections to show expected distributions to creditors during the term of the Plan. The projections are attached to this Disclosure Statement as Exhibit C.

### 5.      Class 4, Securities Claimants

Class 4 consists of those unsecured creditors who hold Securities Claims. Such claims are subordinated to the Class 3 and other secured and priority claims pursuant to 11 U.S.C. §510(b). Class 4 claimants shall receive zero on account of their Class 4 claims.

### 6.      Class 5, Interests in the Debtor

Class 5 includes the Interests in the Debtor. Interests are defined in the Plan as "any shareholder interest or any other instrument evidencing any ownership interest in the Debtor and any option, warrant or right of any nature, contractual or otherwise, to acquire an ownership interest in the Debtor." Class 5 is impaired by this Plan. On the Effective Date of the Plan all Class 5 interests shall be cancelled.

**C.     Means for Execution of the Plan and Management**

Pursuant to the Plan, the Debtor shall restructure its debts and obligations and continue to operate in the ordinary course of business. Funding for the Plan shall be from income derived from the Debtor's operations.

John Ballard will continue to manage the Debtor and oversee all aspects of the business. John Ballard is the CFO of the Debtor and Chairman of the Debtor's Board of Directors. He is responsible for the day-to-day operations and implementation of the Debtor's Plan. Mr. Ballard's educational background consists of a Bachelor of Science Degree in Management and Marketing from the University of Colorado where he graduated Magna Cum Laude. Mr. Ballard also holds a Masters of Business Administration from Regis University.

The Debtor's shareholders recently elected Mr. Ballard to the position of Chief Financial Officer and Board Member on February 08, 2013. Prior to February 2013, Mr. Ballard was Chief Financial Officer of the Debtor during the period September 2003 to 2009. During the years 2003-2009, the Debtor was a publicly traded company headquartered in California. Since February 2013 and during this Bankruptcy case, Mr. Ballard has been able to refocus the Debtor's operations, reduce unnecessary costs and expenses, and steer the Debtor toward profitability.

Mr. Ballard's prior experience includes the following:

-       Chief Financial Officer for Goliath Film and Media Holding, a publicly trading company involved in the Film industry since October, 2011.

-       Nearly two decades of business management, project management, and accounting experience.

-       From January 2002 to the present, Mr. Ballard has been a financial consultant and director of Reveal Systems, Inc., a software development company and Internet provider based in Longmont, Colorado.

-       Mr. Ballard was the Chief Financial Officer of Call Solutions Inc., a publicly traded company, from October 1999 to November 2002. Call Solutions was in the business of opening call centers.

Based on the foregoing, the Debtor believes Mr. Ballard is well qualified to manage the Debtor's operations.

23

D.    **Administrative Claim Bar Date**

If the Plan is confirmed, all applications for allowance and payment of Administrative Claims, including Professional Fees, must be filed within 45 days following the Effective Date of the Plan, unless additional time is timely requested. Administrative claims under 11 U.S.C. § 503(b)(9) must have been filed by the Bar Date of September 9, 2013 pursuant to the Bankruptcy Court's prior order.

## VIII.  PLAN FEASIBILITY

The Debtor's Plan is feasible based upon the Debtor's ability to achieve the various components of the Plan. The Debtor expects to have sufficient cash on hand on the Effective Date to meet all payments due at that time, or will seek funding at a reasonable market rate. The balance of the payments due under the Plan will be derived from the Debtor's ongoing business operations. Attached to this Disclosure Statement as Exhibit C is a projection of the Debtor's operations following confirmation of the Plan. In an effort to decrease expenses and increase profitability, the Debtor has restructured its secured debts, and reduced operating expenses. In particular, the Debtor has taken the following steps:

- Increased sales as a result of obtaining new customers through improved marketing and sales efforts.

- Improved communication with existing customers and successfully requested that customers purchase inventory which had been stored by the Debtor for over two years. This has reduced inventory previously marked as obsolete into active inventory which resulted in additional sales and profit for the company.

- Reduced expenses such as travel, rent, and other costs to increase profitability.

- Improved customer satisfaction through better communication and contacts which has allowed the Debtor to retain its existing customers.

These changes have resulted in a significant improvement in the Debtor's bottom line. This return to profitability can be illustrated through the profit and loss comparison of the last three

24

months, August to October 2013, compared to the three month period from May to July 31, 2013. The table below summarizes the results:

|  | Aug-Oct 2013 | May-July 2013 |
|---|---|---|
| Gross Sales | $1,426,461.30 | $1,161,457.22 |
| Cost of Goods | $1,123,472.31 | $ 931,247.67 |
| Gross profit | $302,988.99 | $230,209.55 |
| Total Expenses | $264,376.05 | $357,673.58 |
| **Net Ordinary Income** | **$38,612.94** | **(127,463.58).** |

WEMU has returned to profitability for the first time since 2011. Sales have increased approximately 23% in the August through October period along with expenses declining approximately 26% in same the period. Also, net ordinary income improved to $38,612.94 compared to a net loss of $127,643.58.

Based upon the projections, the Debtor will be able to meet all payment obligations under the Plan, and the amount paid into the Plan will far exceed any amount the creditors would have received under a Chapter 7 liquidation scenario. To provide further evidence and support for the Debtor's projections and feasibility of the Debtor's Plan a summary of the Debtor's post-petition monthly operating report filed since the commencement of this bankruptcy case is attached as Exhibit E showing operations improving and profitability.

## IX.    RISK TO CREDITORS

This Disclosure Statement contains statements that look into the future. There is no way to determine the accuracy of these statements. The Debtor used its best efforts based upon all the information available to the Debtor in making these statements. The Debtor attempted to be conservative in its analysis. However, the Debtor believes that the Plan as proposed offers the best option for creditors. As explained below in greater detail, the principal alternative to the Debtor's

reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. As indicated in the Debtor's liquidation analysis provided below, liquidation of the Debtor will result in the secured creditors foreclosing on their collateral, leaving no assets available to distribute to unsecured creditors.

Described below are risks associated with the Debtor's business and operations, which are divided into two sections: (1) overall risks inherent to the business of the Debtor; and (2) risks associated with doing business in China:

## Overall Risk Factors Inherent to the Debtor's Business

**1. Because the Debtor works under short-term contracts, the Debtor's financial budgets are subject to unanticipated fluctuations.**

Contract manufacturing service providers must provide increasingly rapid product turnaround for their customers. Customers may cancel their orders, change production quantities, or delay production because of consumer demand or technological changes; however, WEMU is often obligated to expend significant amounts for retooling or other start-up costs of manufacturing. Any costs due to cancellations, reductions, customer returns and/or delays by a significant customer or by a group of customers might not be recoverable. The loss could be greater than the Debtor's projected profit on the contract, resulting in a net loss for the contract. The short-term nature of WEMU's customers' commitments and the possibility of rapid changes in demand for their products reduce the Debtor's ability to estimate accurately future customer requirements. On occasion, customers may require rapid increases in production, which can stress  resources and reduce margins. Although WEMU has several manufacturing facilities in China that it does business with, there can be no assurances the Debtor will have sufficient capacity at any given time to meet all customers' demands. WEMU could lose orders or fail to complete orders in a timely manner. In addition, because many of the Debtor's costs and operating expenses are relatively fixed, any reduction in customer demand can adversely affect gross margins and operating income.

**2. A few customers and contract manufacturers account for a large percentage of the Debtor's business. Therefore, the loss of any one customer or contract manufacturer**

**could reduce sales significantly or impede the Debtor's ability to comply with its manufacturing contracts.**

**3. The Debtor is dependent on third parties to transport its products, so their failure to transport the products could adversely affect our earnings, sales and geographic market.**

The Debtor uses third parties for the vast majority of its shipping and transportation needs. If these parties fail to deliver products in a timely fashion, including lack of available trucks or drivers, labor stoppages or if there is an increase in transportation costs, including increased fuel costs, it would have a material adverse effect on the debtor's earnings and could reduce sales and its ability to serve its current geographic market

**<u>Risks Related To Doing Business In China</u>**

**1. Doing business in China subjects the Debtor to legal risks and political and economic changes over which the Debtor has no control.**

Under its current leadership, the Chinese government has been pursuing economic reform policies. Changes in these policies or political instability could affect our ability to operate, to repatriate funds from China, or increase our costs of doing business or our tax rate. The Chinese government could change its policies toward private enterprise or even nationalize or expropriate private enterprises, which could result in the total loss of Debtor's investment in that country.

WEMU periodically enters into agreements governed by Chinese law. Unlike the United States, China has a civil law system based on written statutes in which judicial decisions have little precedential value. The Chinese government has enacted some laws and regulations dealing with matters such as corporate organization and governance, foreign investment, commerce, taxation and trade. However, the government's experience in implementing, interpreting and enforcing these recently enacted laws and regulations is limited, and the Debtor's ability to enforce commercial claims or to resolve commercial disputes is uncertain. Furthermore, enforcement of the laws and regulations may be subject to the exercise of considerable discretion by agencies of the Chinese government, and forces unrelated to the legal merits of a particular matter or dispute may influence their determination. These uncertainties mean that the Debtor cannot rely on legal protections to

ensure that suppliers honor their contracts with the company. If the Debtor suffers a loss because of breach of contract by a Chinese supplier, the Debtor might not be able to recover the loss.

**2. The Debtor has limited business insurance coverage and potential liabilities could exceed the Debtor's ability to pay them.**

The insurance industry in China is still at an early stage of development. Insurance companies in China offer limited business insurance products. The Debtor does not have any business liability or disruption insurance coverage for its operations in the China. Any business disruption, litigation or natural disaster may result in substantial costs and the diversion of the debtor's resources.

**3. Currency fluctuations can cause significant losses.**

Some of the Debtor's costs such as payroll, material and equipment costs are denominated in Chinese Renminbi.    Changes in the exchange rate between the Renminbi, and the U.S. dollar will affect the Debtor's costs of sales and operating margins.

**4. Issues with the Chinese Taxing Authorities**

The Debtor's operations are predominantly located in China, where tax incentives have been extended to encourage foreign investment.  The Debtor's effective tax rate could increase if these tax incentives are not renewed upon expiration or tax rates applicable to the Debtor are increased. Tax authorities in jurisdictions in the United States could challenge the manner in which profits are allocated between US and Chinese subsidiaries and if the Debtor does not prevail in any such challenge it will be required to pay more taxes.

. Specifically, the Debtor's wholly owned subsidiary Shanghai Intech Electro-Mechanical Products Co. Ltd ("Intech") is an exporter as that term is defined in the PRC tax code.  An anti-fraud provision of the code also requires exporters who claim tax advantages under this exemption to file with the local tax office proof of payment for goods or services from an entity outside of PRC. Absent this proof of export, the tax office will conclusively presume that the entity which claimed the tax benefit engaged in fraud.  Potential penalties arising from such a finding include denial of the

tax benefit, seizure of assets and "black listing" of all officers and directors of the entity claiming the tax advantage without sufficient documentary proof.

Intech has enjoyed a significantly reduced tax liability under the exporter's tax benefit. Due to WEMU's financial distress, WEMU has been unable to remain current on its obligations to Intech. This has had a detrimental effect on Intech because Intech does not collect funds directly from customers and instead is entirely reliant on WEMU to pay Intech for cost of goods sold after WEMU receives payment from the customer. Because Intech has not received sufficient payments to justify the tax advantages conferred by PRC, it received two warnings from the tax office regarding its non-conformance with the tax code. Each of these warnings issued prior to WEMU filing the bankruptcy petition on July 5, 2013.

WEMU's filing a bankruptcy petition in the United States has no consequence under Chinese law and Intech remains fully liable to the tax office for failure to prove its exporter status under the PRC tax code. Intech has taken all reasonable steps to comply with the rules and regulations of the Chinese tax authority and anticipates that it will be able to satisfy the conditions and requirements of the Chinese taxing authorities.

On July 26, the Bankruptcy Court authorized a single $250,000 payment to Intech. WEMU executed a transfer of said amount within 7 days of the order. This transfer provided substantial relief, but did not fully resolve Intech's conflict with the tax office because WEMU still owes Intech approximately $1,600,000 at the time of filing the petition. Unless Intech can prove that this sum, as well, is timely paid by a foreign entity, Intech will remain under threat of seizure or other adverse government action.

Under the PRC legal system, seizures of assets for failure to comply with tax provisions are not uncommon and there is no guarantee that Intech will be allowed to continue doing business despite its continuing breach of the PRC tax code.


## X.    TAX CONSEQUENCE

The Debtor is not providing tax advice to creditors or interest holders. **U.S. Treasury Regulations require you to be informed that, to the extent this section includes any tax advice,**

29

**it is not intended or written by the Debtor or its counsel to be used, and cannot be used, for the purpose of avoiding federal tax penalties.** Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation. Generally, unsecured creditors should have no tax impact as a result of Plan confirmation. The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year in which case income may have to be recognized. Interest holders may have very complicated tax effects as a result of Plan confirmation.

## XI.    LIQUIDATION ANALYSIS UNDER CHAPTER 7

The principal alternative to the Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. Chapter 7 requires the liquidation of the Debtor's assets by a Trustee who is appointed by the United States Trustee's office. In a Chapter 7 case, the Chapter 7 Trustee would take over control of the assets. The assets would be liquidated and the proceeds distributed to creditors in the order of their priorities. Attached hereto as Exhibit D is the Debtor's liquidation analysis (the "Liquidation Analysis"). Based on the Liquidation Analysis, unsecured creditors would receive substantially less that they would receive under the Plan, or approximately 11% of their claims. Given the alternative under a Chapter 7 scenario, the Debtor's proposed Chapter 11 Plan provides a substantially better alternative for unsecured creditors, because it provides unsecured creditors an opportunity to be paid 20% of their claims within 90 days of the Effective Date of the Plan, 100% of their claims over time with interest, or stock in exchange for their claims. The claims will be paid through the Debtor's ongoing operations. Therefore, it is urged by the Debtor that all creditors vote in favor of the Plan.

## XII.    EFFECT OF CONFIRMATION OF PLAN

### A.    Discharge of Debtor

On the Effective Date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt

(i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B).  After the Effective Date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

**B.**  **Modification of Plan**

The Debtor may modify the Plan at any time before confirmation of the Plan.  However, the Court may require a new disclosure statement and/or revoting on the Plan.  The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

**C.**  **Final Decree**

The Debtor will request entry of a final decree closing the case on or before the later of the date all Claim objections and any pending litigation is concluded or 180 days after the Effective Date of the Plan.

DATED: November 12, 2013

WORLDWIDE ENERGY & MANUFACTURING USA, INC.

By: _____

(John Ballard, Chief Financial Officer

31

Kutner Brinen Garber, P.C. ("KBG") acted as legal counsel to the Debtor on bankruptcy matters during the Chapter 11 case.  KBG prepared this Disclosure Statement with information provided primarily by the Debtor.  The information contained herein has been approved by the Debtor.  KBG has not made any separate independent investigation as to the veracity or accuracy of the statements contained herein.

Counsel to the Debtor and
Debtor- In-Possession:

KUTNER BRINEN GARBER, P.C.

By: _____
        Lee M. Kutner (#10966)
        Jenny M.F. Fujii (#30091)
        303 East 17th Avenue, Suite 500
        Denver, CO 80203
        Telephone: (303) 832-2400
        Telecopier: (303) 832-1510

## CERTIFICATE OF SERVICE

The undersigned certifies that on November 12, 2013, I served by prepaid first class mail a copy of the foregoing **DISCLOSURE STATEMENT TO ACCOMPANY AMENDED PLAN OF REORGANIZATION DATED OCTOBER 28, 2013** on all parties against whom relief is sought and those otherwise entitled to service pursuant to the Fed. R. Bankr. P. and these L.B.R. at the following addresses:

Alan K. Motes, Esq.
United States Trustee's Office
999 18th Street, Suite 1551
Denver, CO 80202

James T. Burghardt, Esq.
Moye White, LLP
1400 16th Street
6th Floor
Denver, CO 80202-1473

Sonia Chae, Esq.
Securities and Exchange Commission
175 West Jackson Blvd.
Suite 900
Chicago, Illinois 60604

Carla B. Minckley, Esq.
Thomas D. Birge, Esq.
Birge & Minckley, P.C.
9055 East Mineral Circle
Suite 110
Centennnial, CO 80112-3457

Catherine Scholmann Robertson, Esq.
Pahl & McCay
225 West Santa Clara Street
Suite 1500
San Jose, CA 95113

Gary Koos
1864 Sannita Court
Pleasanton, CA 94566

Alan Chinn Group
An Accountancy Corporation
4301 Hacienda Drive
Suite 200
Pleasanton, CA 94588

Pahl & McCay, PLC
225 West Santa Clara Street
Suite 1500
San Jose, CA 95113-1752

Steve Baer
1045 Mission Street
Apt. 203
San Francisco, CA 94103

Crescent International, Ltd.
c/o Cantara (Switzerland) SA
84, Ave. Louis-Casai
CH-1216 Cointrin
Geneva Switzerland

Michael J. Guyerson, Esq.
1873 South Bellaire Street
Suite 1401
Denver, CO 80222

Phillip Pai
1462 Ferguson Way
San Jose, CA 95129-4919

Cletis E. Root
907 Trout Street
Johnston City, IL 62951

John Whitton
9 Sweetwater Court
Lake in the Hills, IL 60156

Kenneth J. Buechler, Esq.
1621 18th Street
Suite 260
Denver, CO 80202

Craig M.J. Allely, Esq.
Zane Gilmer, Esq.
Perkins Coie, LLP
1900 Sixteenth Street
Suite 1400
Denver, CO 80202-5255

**Vicky Martina**

**ATTACHMENTS TO DISCLOSURE STATEMENT**

EXHIBIT A:   Unsecured Claims List – Class 3

EXHIBIT B:   Securities Claimants – Class 4

EXHIBIT C:   Projection of Debtor's operations following confirmation of the Plan

EXHIBIT D:   Liquidation Analysis

EXHIBIT E:   Summary of Monthly Operating Reports, July 2013 through October 2013

**Worldwide Energy & Manufacturing, Inc.**

**Chapter 11 Bankruptcy Case No. 13-21577-MER**

**Class 3 General Unsecured Creditors**

**Exhibit A**

| Creditor | Claim | Assumptions<br>Option 2:<br>Full payment | Assumptions<br>Option 1:<br>20% payment | Notes |
|---|---|---|---|---|
| A.M.Z International Shipping Co. | $17,623.53 | $17,623.53 | | |
| ACG Accountancy | $3,040.00 | | $608.00 | |
| CIIC Investment Co., Ltd. | $228,927.71 | | $45,785.54 | A |
| CJ Holdings, LLC | $10,000.00 | $10,000.00 | | |
| Englert, Coffey, McHugh & Fantauzzi, LLP | $1,647.50 | $1,647.50 | | |
| Echo Global Logistics | $961.83 | $961.83 | | |
| Federal Express | $52.43 | $52.43 | | |
| Gary Koos | $0.00 | $0.00 | | |
| Getty Images | $1,508.00 | | $301.60 | |
| Kingwood Logistics, Ltd. - USD | $649.08 | $649.08 | | |
| Marco Polo Logistics (SFO), Inc. | $8,636.43 | $8,636.43 | | C |
| Michael H. Lewis | $3,395.00 | $3,395.00 | | |
| Michael Toups | $1,000.00 | | $200.00 | |
| Moye White, LLP | $400,000.00 | | | |
| Outlook United | $600.00 | | $120.00 | |
| Pahl & McCay, PLC | $6,232.66 | | $1,246.53 | |
| Premeire Source, LLC | $24,583.59 | $24,583.59 | | D |
| Scott D. Hampton | $1,820.00 | | $364.00 | |
| Shanghai Intech Electro-Mechanical | $1,622,801.80 | $1,622,801.80 | | B |
| Spencer Fane&Grimshaw | $962.50 | | $192.50 | |
| Underwriters Laboratories, Inc. | $1,156.25 | | $231.25 | |
| UPS | $712.88 | $149.53 | | |
| US Securities and Exchange Commission | $100,109.74 | $100,109.74 | | |
| Vibato, LLC | $4,583.33 | | $916.67 | |
| Windes & McClaughry Accountancy Corp. | $209,983.95 | | $41,996.79 | |
| Worldwide Energy and MFG Nantong | $212,362.15 | | $42,472.43 | |
| ZHEJIANG SHUQIMENG Photovoltaic | $1,831.81 | | $366.36 | |
| ZHEJIANG ZG-Cellings Co., Ltd. | $5,943.75 | | $1,188.75 | |
| **Total** | **$2,871,125.92** | **$1,790,610.46** | **$135,990.42** | |

Notes:

A. Received $70,000 as a critical vendor payment.

B. Received $250,000 as a critical vendor payment.

C. Received $5,000 as a critical vendor payment.

D. Claim reduced by $11,725 as this amount will be paid as a priority claim.

Exhibit B

**Worldwide Energy & Manufacturing, Inc.**
**Chapter 11 Bankruptcy Case No. 13-21577-MER**
**Class 4 Securities Claimants (non-exhaustive list)**

| Creditor | Claim |
|---|---|
| | |
| Gerald DeCiccio | unknown |
| Jehu Hand | unknown |
| Jeffrey F. Watson | unknown |
| Jennifer Maliar | unknown |
| Jimmy Wang | unknown |
| Ladenburg Thalmann | $    10,000,000.00 |
| Lauren Byrne/Lincoln & Creed, Inc. | unknown |
| Michael D. Steingrebe | unknown |
| Mindy Wang | unknown |
| | |
| | |

**WORLDWIDE ENERGY AND MANUFACTURING USA**
**SEVEN YEAR FORECAST**

| | Forecast Year 2014 | Forecast Year 2015 | Forecast Year 2016 | Forecast Year 2017 | Forecast Year 2018 | Forecast Year 2019 | Forecast Year 2020 | TOTAL Seven Year |
|---|---|---|---|---|---|---|---|---|
| **Beginning Cash** | 290,000 | 180,323 | 180,181 | 187,122 | 225,705 | 367,920 | 698,589 | |
| Sales | 5,400,000 | 5,832,000 | 6,298,560 | 6,802,445 | 7,346,640 | 7,934,372 | 8,569,121 | 48,183,138 |
| Cost of goods sold | 4,212,000 | 4,548,960 | 4,975,862 | 5,441,956 | 5,877,312 | 6,347,497 | 6,769,606 | 38,173,194 |
| Gross profit | 1,188,000 | 1,283,040 | 1,322,698 | 1,360,489 | 1,469,328 | 1,586,874 | 1,799,515 | 10,009,944 |
| **Operating Expenses** | | | | | | | | |
| Advertising | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Commission expense | 108,275 | 115,000 | 138,000 | 142,000 | 145,000 | 150,000 | 160,000 | 958,275 |
| Automobile expense | 7,200 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 58,200 |
| Bank charges | 5,784 | 5,784 | 5,784 | 5,784 | 5,784 | 5,784 | 5,784 | 40,488 |
| Contract labor | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 1,680,000 |
| Freight | 7,200 | 8,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 60,200 |
| Worker's comp | 13,668 | 13,668 | 13,668 | 13,668 | 13,668 | 13,668 | 13,668 | 95,676 |
| Insurance expense | 6,000 | 7,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 53,000 |
| Interest expense | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 252,000 |
| Licenses | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 8,400 |
| Office expense | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 7,000 |
| Payroll expense | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 2,100,000 |
| Employee Benefits | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 840,000 |
| Payroll taxes | 31,272 | 31,272 | 31,272 | 31,272 | 31,272 | 31,272 | 31,272 | 218,904 |
| Postage | 7,000 | 7,500 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 54,500 |
| Professional fees | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 105,000 |
| late fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Rent | 67,344 | 69,360 | 71,436 | 73,584 | 75,792 | 78,066 | 80,408 | 515,989 |
| Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Telephone | 13,344 | 13,344 | 13,344 | 13,344 | 13,344 | 13,344 | 13,344 | 93,408 |
| Tools | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Entertainment | 1,000 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 8,200 |
| Travel | 12,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 127,000 |
| Utilities | 15,840 | 15,840 | 15,840 | 15,840 | 15,840 | 15,840 | 15,840 | 110,880 |
| Misc expense | 5,000 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 38,000 |
| Stock compensation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Plan payments:** | | | | | | | | |
| Tax claims: CA | 822 | 0 | 0 | 0 | 0 | 0 | 0 | 822 |
| Class 1 | 11,725 | 0 | 0 | 0 | 0 | 0 | 0 | 11,725 |
| Class 2, VFC (337K +6% interest) | 78,182 | 78,182 | 78,182 | 78,182 | 78,182 | 0 | 0 | 390,909 |
| Class 3, option 1 (20%) | 135,990 | 0 | 0 | 0 | 0 | 0 | 0 | 135,990 |
| Class 3, option 2 (100% 7yr) | 24,831 | 174,831 | 174,831 | 174,831 | 174,831 | 174,831 | 174,831 | 1,073,820 |
| Kutner Brinen Garber, P.C. | 20,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| US Trustee Fees | 12,000 | | | | | | | 12,000 |
| Total operating expenses | 1,297,677 | 1,283,181 | 1,315,757 | 1,321,905 | 1,327,113 | 1,256,205 | 1,268,547 | 9,050,387 |
| Net operating income/(loss) | -109,677 | -141 | 6,940 | 38,584 | 142,215 | 330,669 | 530,968 | 959,558 |
| **Ending Cash** | 180,323 | 180,181 | 187,122 | 225,705 | 367,920 | 698,589 | 1,229,558 | |

Exhibit C

**Worldwide Energy & Manufacturing USA, Inc.**　　　　**Exhibit D**
**Chapter 11 Bankruptcy Case No. 13-21577-MER**

**LIQUIDATION ANALYSIS**

**ASSETS (as of Petition Date, except as otherwise noted)**

| Personal Property | Est. value | Costs of sale/recovery/liens | Net Value |
|---|---|---|---|
| Bank Accounts (as of 10/31/13) | $270,000 | $0 | $270,000 |
| Accounts receivable (as of 10/31/13) | $313,487 | | $0 |
|    Legal and accounting fees to recover amounts due | | ($35,000) | |
|    Lien held by VFC Partners 23, LLC | | ($356,000) | |
|    Net value | | *($77,513)* | $0 |
| Drawings, tools, engineering designs | unknown | | $0 |
| Computers, office equipment | $560 | ($84) | $476 |
| US inventory | $376,268 | | |
|    Costs of sale | | ($37,627) | |
|    Remaining Lien held by VFC Partners 23, LLC | | ($77,513) | |
| | | *$261,128* | $261,128 |

| | | |
|---|---|---|
| **Total Personal Property** | | **$531,604** |

\* Inventory value is estimated at 40% liquidation value
\*\* Marketability of drawings, tools and engineering designs are questionable
\*\*\* Computers, office equipment values estimated at 50% liquidation value.
\*\*\*\* Accounts receivable are estimated at 50% liquidation value

| | | |
|---|---|---|
| **Total Net Assets** | | **$531,604** |
| **Chapter 7 Administrative Expenses** | | |
|    Chapter 7 Trustee | $26,276 | |
|    Chapter 7 Accountant | $15,000 | |
|    Chapter 11 Bankruptcy fees | $50,000 | |
|    Chapter 11 ongoing post petition payables (est) | $300,000 | |
|    Chapter 11 Creditors Committee Counsel | $30,000 | |
|    Chapter 7 counsel | $10,000 | |
|    Total Chapter 7 expenses | $431,276 | |

| | | |
|---|---|---|
| **Net Assets after Payment of Secured Claims and Chapter 7 expenses:** | **$100,328** | |
|    Estimated Class 3 Creditors | $2,871,126 | |
| **Payment to unsecured creditors under the Plan** | **3%** | |

**Worldwide Energy & Manufacturing USA, Inc.**                                                      Exhibit E
**Chapter 11 Bankruptcy Case No. 13-21577-MER**

Summary of Monthly Operating Reports

|                      | Jul-13       | Aug-13       | Sep-13       | Oct-13       | **Total**          |
|----------------------|--------------|--------------|--------------|--------------|--------------------|
| Gross Sales          | $310,807.57  | $532,779.53  | $466,945.87  | $426,735.90  | **$1,737,268.87**  |
| Cost of Goods Sold   | $240,069.00  | $437,410.60  | $358,182.01  | $327,879.70  | **$1,363,541.31**  |
| Gross Profit         | $70,738.57   | $95,368.93   | $108,763.86  | $98,856.20   | **$373,727.56**    |
|                      |              |              |              |              |                    |
| Expenses             | $60,490.84   | $96,883.93   | $92,929.30   | $74,559.82   | **$324,863.89**    |
| **Net Ordinary Income** | **$10,247.73** | **($1,515.00)** | **$15,834.56** | **$24,296.38** | **$48,863.67**   |