UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 13-21577-MER |
| WORLDWIDE ENERGY AND | ) | |
| MANUFACTURING USA, INC. | ) | |
| EIN: 77-0423745 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**AMENDED DISCLOSURE STATEMENT TO ACCOMPANY
SECOND AMENDED PLAN OF REORGANIZATION DATED OCTOBER 28, 2013**

## I.    INTRODUCTION

This is the Disclosure Statement ("Disclosure Statement"), as amended, in the Chapter 11 case of Worldwide Energy and Manufacturing USA, Inc. ("Debtor" or "WEMU"). This Disclosure Statement contains information about the Debtor and describes the Chapter 11 Plan of Reorganization Dated October 28, 2013 ("Plan"), which was filed in the above-captioned Chapter 11 case. The Chapter 11 Plan may be further amended prior to confirmation. This Disclosure Statement is being provided to all creditors and interest holders of the Debtor. This Disclosure Statement has been approved by the United States Bankruptcy Court for the District of Colorado as containing adequate information to enable creditors and interest holders to determine whether to accept the Debtor's Plan. The Court's approval of this Disclosure Statement does not constitute a decision on the merits of the Plan. Objections to confirmation of the Debtor's Plan must be filed by _____. Issues related to the merits of the Plan and its confirmation will be the subject of a confirmation hearing which is scheduled for _____ **at ___:00 _.M. at the United States Bankruptcy Court, Byron Rogers Courthouse, Courtroom C502, at 1929 Stout Street, Denver, Colorado.**

**THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION. THE COMMISSION HAS SIMILARLY NOT REVIEWED THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT.**

Your rights may be affected. You should read the Plan and Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.

The Plan of Reorganization is the governing document or contract with creditors once it is confirmed by the Court. In the event of any inconsistencies between the Plan and this Disclosure Statement, the Plan supersedes the Disclosure Statement and will be the sole Court approved document that governs the post-confirmation relationship and agreements between the parties.

This Disclosure Statement is provided to you along with a copy of the Debtor's Plan and a Ballot to be used for voting on the Plan. Please complete the Ballot according to the instructions contained on the Ballot if you intend to vote for or against the Debtor's Plan. Each creditor or interest holder may vote on the Plan by completing the enclosed Ballot and returning it to counsel for the Debtor at the address below:

> Lee M. Kutner
> Kutner Brinen Garber, P.C.
> 303 East 17th Avenue
> Suite 500
> Denver, CO 80203

This Ballot must be received by Kutner Brinen Garber, P.C. no later than **5:00 p.m. on _____, 2014**, which is the date set by the Court as the last day to vote on the Plan. Terms contained in this Disclosure Statement, which are defined in the Plan, have the same meaning as set forth in the definitional section of the Plan, Article II.

**Recommendation.** As discussed more fully below, the Debtor firmly believes that the Plan represents the best alternative for providing the maximum value for creditors. The Plan provides creditors with a distribution on their Claims in an amount greater than any other potential known option available to the Debtor. **Again, the Debtor strongly believes that confirmation of the Plan is in the best interest of creditors and recommends that all creditors entitled to vote on the Plan vote to accept the Plan.**

**Voting Requirements.** Pursuant to the Bankruptcy Code, only Classes of Claims or Interests that are "impaired" under the Plan are entitled to vote to accept or reject the Plan. Classes of Claims and Interests that are not impaired are not entitled to vote and are deemed to have accepted the Plan. Voting on the Plan shall be pursuant to the provisions of the Bankruptcy Code and the Bankruptcy

2

Rules, and a Class shall have accepted the Plan if the Plan is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims of such Class actually voting.

**Voting Classes.** Each holder of an Allowed Claim in Classes 2 and 3 shall be entitled to vote to accept or reject the Plan.

**Deemed Acceptance of Plan.** Unimpaired classes are conclusively presumed to accept the Plan pursuant to Section 1126(f) of the Bankruptcy Code. Class 1 is unimpaired by the Plan and is presumed to accept the Plan.

**Deemed Rejection of Plan.** Classes that receive and retain nothing under the Plan are deemed to reject the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Classes 4 and 5 receive or retain nothing and are deemed to have rejected the Plan.

**One Vote Per Holder.** If a holder of a Claim holds more than one Claim in any one Class, all Claims of such holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting for or against the Plan.

## II.    CHAPTER 11 AND PLAN CONFIRMATION

Chapter 11 of the United States Bankruptcy Code is designed to allow for the rehabilitation and reorganization of financially troubled entities or individuals. Chapter 11 allows the Debtor to retain its assets during the administration of its Chapter 11 case as a debtor-in-possession. Following confirmation of the Plan, Chapter 11 allows the Debtor to retain its assets as a reorganized debtor or as otherwise provided in the Plan. If the Plan is approved by the Court, the Plan is the permanent restructuring of the Debtor's financial obligations. The Plan also provides a means through which the Debtor will restructure or repay its obligations. The Plan will provide the Debtor with an opportunity to maximize the return for creditors through continued operations.

The Plan divides creditors into classes of similarly situated creditors. All creditors of the same Class are treated in a similar fashion. All member Interests are also classified and treated alike. Each Class of creditors or interest holders is either impaired or unimpaired under the Plan. A Class is unimpaired if the Plan leaves unaltered the legal, equitable and contractual rights to which each creditor in the Class is entitled or if the Plan provides for the cure of a default and reinstatement of the maturity date of the claim as it existed prior to default.

3

The Debtor filed a Motion to Set Bar Date for Filing Claims and Requests for Allowance of Administrative Expense Claims Under Bankruptcy Code § 503(b)(9) ("Bar Date Motion"). On July 26, 2013, the Court entered an Order establishing September 9, 2013 as the as the last day: a) for filing of any Proof of Claim for a pre-petition claim or interest; and b) by which motions or requests for allowance of administrative expense claims pursuant to 11 U.S.C. §503(b)(9) must be filed ("Bar Date"). The Plan provides that Claims and Interests of all Classes shall be allowed only if such Claims are either: a) evidenced by a timely filed Proof of Claim or Interest; or b) appear in the Schedules filed by the Debtor and are not scheduled as disputed, contingent or unliquidated, unless subsequently allowed by the Court. Creditors may check as to whether or not their Claims are scheduled as disputed, contingent or unliquidated by reviewing the Schedules and the amendments thereto filed by the Debtor in the Bankruptcy Court for the District of Colorado. Alternatively, creditors may contact counsel for the Debtor or the Debtor directly in order to determine how their claim was scheduled.

Chapter 11 does not require that each holder of a Claim or Interest vote in favor of the Plan in order for the Court to confirm the Plan. The Plan, however, must be accepted by at least one impaired Class of Claims by a majority in number and two thirds in amount, without including insider acceptance of those Claims of such Class actually voting on the Plan. Assuming one impaired Class votes to accept the Plan, it may be confirmed over its rejection by other Classes if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under and has not accepted the Plan. The Bankruptcy Code requires that if interest holders retain an interest or receive anything under the Plan, then the unsecured creditor classes must either be paid the full value of their claims or vote to accept the Plan. In this case, the interest holders are neither receiving anything nor retaining their pre-petition interests under the Plan. Since the Debtor believes that the Plan provides the best alternative for creditors, all creditors are urged to vote to accept the Plan.

If all Classes of Claims and Interests vote to accept the Plan, the Court may confirm the Plan. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation. Among other things, Section 1129 requires that the Plan be in the best interest of the holders of Claims and

Interests and be feasible through a showing that confirmation will not be followed by the need for further financial reorganization of the Debtor.

## III.     OVERVIEW OF THE PLAN AND MEANS OF EXECUTION

The Plan divides creditors and interest holders into the following 5 Classes.  Treatment of each of the Classes is discussed in greater detail below and in the Plan.  The following table summarizes the 5 Classes, whether or not each such Class is impaired, and, to the extent determinable, the treatment of each Class:

| **CLASS** | **IMPAIRMENT** | **TREATMENT** |
| --- | --- | --- |
| 1: Priority Claims under §§ 507(a)(4) or (5) | Unimpaired | 100% distribution.  The Debtor believes these claims total $11,725. |
| 2: Allowed Secured Claim of VFC Partners 23, LLC | Impaired | The Class 2 Claim shall be allowed in the amount due on the Confirmation Date and paid in equal monthly installments based on an amortization term of 60 months at 6% interest. |
| 3:  Allowed Claims of Unsecured Creditors | Impaired | The Class 3 Claims will be entitled to choose any one of three options available for satisfaction of their claims.  **Option 1**- 20% of Allowed Claim paid within 90 days of Plan Effective Date; **Option 2**- claim paid in full on amortized basis at 1% interest per annum over 84 months from Plan Effective Date; or **Option 3**- claim may be exchanged for new common stock on a dollar for share basis. |
| 4:  Allowed Unsecured Claims of Securities Claimants | Impaired | The Class 4 Claims shall receive zero on account of their claims. |
| 5: Interests Held by Pre-Confirmation Shareholders | Impaired | The Class 5 Interests will be cancelled on the Effective Date. |

The "Effective Date" of the Plan shall mean the date on which the Order of Confirmation is entered or if a stay is entered pending appeal of the Order of Confirmation, the date on which the stay

5

is no longer in effect.  Pursuant to the Plan, the Debtor shall restructure its debts and obligations and will continue to operate in the ordinary course of business.  Funding for the Plan shall be drawn from the ongoing operations of the Debtor.  The Debtor believes the Plan is feasible based upon its existing business operations.

## IV.    BACKGROUND

**Description and History of the Debtor's Business**

The Debtor is an international manufacturing and engineering firm making various parts in China, including solar panels, aerospace parts, electronic parts, and various parts related to other industries.  The Debtor owns various interests in its subsidiary companies in China.  The Debtor's business includes being an intermediary between customers and subcontractors, as well as direct manufacturing of certain parts through its subsidiaries.  The subsidiaries have not sought bankruptcy protection.  Although the Debtor is a "publicly held company," the Debtor is no longer a publicly traded company since it is the subject of an SEC order revoking its registration under Section 12(j) of the Securities Exchange Act.

The Debtor specializes in manufacturing and contract manufacturing.  Its products are manufactured in factories in China.  A contract manufacturer locates factories capable of producing customer parts according to desired specifications and quality standards imposed by the customer.  The contract manufacturer hires subcontractors (factories) that provide the plant, equipment, manufacturing, working capital, and factory labor.  WEMU provides sales, management, production control, and technical support.  WEMU's goal is to timely deliver high quality components at manufacturing costs that are at least fifty percent (50%) less than what WEMU's customers would pay for similar parts in the United States.  As a contract manufacturer WEMU does not manufacture customer parts, but subcontracts to factories that produce these parts.  WEMU's role is to ensure that the parts meet specifications and quality standards imposed by its customers.  WEMU's business operations are primarily located in the State of California and the People's Republic of China ("PRC").

WEMU provides its services to several companies in the United States, primarily in the aerospace, automotive, and electronics industries. Although WEMU initially focused on

6

manufacturing components for the high tech industry, it expanded its business model to include manufacture of products, parts, and components for a broad number of industries. WEMU currently arranges for the manufacture of components and products for a wide variety of customers in the United States and Europe.

**Events Leading to Filing**

### Securities and Exchange Commission Investigation

The predecessor to the Debtor was founded by Jimmy Wang in 1996, as a privately held California corporation. This privately held corporation merged with a publicly traded shell company on September 30, 2003. On June 1, 2004, Debtor's common stock began trading on the OTC Bulletin Board Exchange. In January and February of 2010, Debtor issued equity securities in two private placements for an aggregate cash investment of $8,869,307. On April 15, 2010, the Debtor filed an S-1 registration statement with the Securities and Exchange Commission ("SEC"). The registration statement became effective on May 6, 2010. The Debtor operated as a publicly traded company until the SEC opened an investigation regarding allegedly misleading statements or omissions contained in offering memoranda presented to investors in the January and February 2010 private placements. The SEC alleged that Jimmy Wang, with the knowledge of Mindy Wang and Jeff Watson, entered into secret agreements transferring profits and equity of the solar division to various managers of that division. In April of 2011, in connection with the SEC investigation, Jimmy and Mindy Wang resigned from their roles as CEO and Treasurer, respectively, along with Michael Toupes, the interim CFO.

As part of a voluntary settlement of the investigation and impending lawsuit, WEMU agreed to a $100,000 fine and revocation of its registration statement on May 16, 2012. As a result, on May 16, 2012, the Commission entered an order revoking the registration of the Debtor's common stock pursuant to Section 12(j) of the Securities Exchange Act of 1934. The Debtor's securities are not publicly traded and cannot be traded by brokers in this country. Various officers and directors agreed to pay fines of $50,000. Jeffrey Watson, Jimmy Wang, and Mindy Wang consented to lifetime bans from serving as officers or directors of a publicly traded company. The SEC fined Mindy Wang $50,000. The SEC did not fine Jimmy Wang. The Wangs neither admitted nor denied

any wrongdoing in connection with the SEC lawsuit or the resulting settlement. Debtor does not intend to pursue any actions against the Wangs because the equity transfers at issue in the SEC and class action litigation did not have a material impact on the Debtor's financials. See Expert Report dated June 25, 2013, attached as Exhibit F.

Legal fees incurred in connection with the SEC investigation were charged against WEMU's insurance policy issued by Great American Insurance Group ("Great American Policy"). Because the three individual defendants were owed indemnification by the Debtor, they too were covered parties under the Policy. As a result, legal fees accrued in connection with the SEC investigation completely exhausted the $2,000,000 available under the Great American Policy.

### Securities Fraud Class Action Suit Filed in San Mateo, California

On December 4, 2012, Plaintiff Mathew Hayden ("Plaintiff") filed a purported class action lawsuit alleging common law and securities fraud violations under California law. Styled as *Hayden v. Jimmy Wang, Mindy Wang, Worldwide Energy and Manufacturing USA Inc., Ladenburg Thalmann & Co, Inc.*, case no. 518333 (San Mateo Sup. Ct.), the suit seeks designation of Hayden as lead plaintiff in a class consisting of approximately 66 investors who purchased WEMU equity securities in the January and February 2010 private placements. On February 11, 2013, Plaintiff filed an Amended Complaint in the same court, which added 6 additional WEMU directors and officers as individual defendants.

The Amended Complaint ("Complaint") restates the allegations made by the SEC, centering on alleged material misstatements or omissions contained in various offering memoranda circulated to WEMU stock purchasers in advance of the sale of securities in January and February of 2010. In particular, Hayden alleges that WEMU and certain members of the board knowingly entered into two transactions with managers of a Chinese subsidiary that should have been timely disclosed to the public, but were not. Plaintiff, on behalf of the purported class, alleges rescission damages in an amount equal to the purchase price paid for the securities, $8,869,307.

The offending transactions consisted of a profit sharing agreement whereby three managers of the Chinese WEMU-Nantong Solar Division were promised 49% of the division's profits. Moreover, if the managers reached certain revenue benchmarks, the profit sharing arrangement

8

would be converted into an equity ownership of the same amount – 49%. Plaintiff alleges that the managers reached the performance benchmarks in 2010, at which time WEMU made the equity transfer as a performance based bonus.

The Plaintiff acknowledges that WEMU disclosed the basic terms of this proposed transaction on April 15, 2010, as follows:

> In connection with the review of the 2009 results of operations of the Nantong Solar division, the parties are negotiating for a transfer of 49% ownership of the Solar division to the management which would replace the current profit sharing arrangement. We expect that this transaction will not have a material impact on our financial statements.

Complaint at ¶ 95 (citing WEMU's 2009 Form 10-K at F-38). However, the Plaintiff alleges that this disclosure is insufficient because certain material terms such as "profit sharing" were not defined and the document was very long.

The Debtor believes that it has strong defenses to the class action suit. Namely, the disclosure referenced above was adequate and truthful. As predicted in that statement, the conversion of a profit sharing agreement into an equity transfer had no material impact on WEMU's financials.

Furthermore, the Debtor alleges that the 2-year statute of limitations period for securities fraud claims in California has lapsed. Plaintiff and the class were placed on inquiry notice by virtue of the above referenced disclosure, originally published on April 15, 2010. Because the limitations period lapsed prior to the filing of the Complaint, the securities fraud claims should be time barred. Moreover, the Debtor has already procured signed objections from 18 of the 66 class members, objecting to the appointment of Hayden as lead plaintiff; to the appointment of Rosen Law as class counsel; and further objecting to Plaintiff's unwillingness to settle the suit for the remainder of the insurance policy (although Debtor's coverage has been exhausted, the individual directors and officers have additional coverage under an "A-Side" policy issued by Liberty Mutual). The Debtor believes that these objections definitively bar class certification.

Despite Debtor's strong defenses to the potential class action, the legal fees associated with the class action, including the indemnification obligation to the individual defendants and the broker

9

Ladenburg Thalmann, were more than the Debtor could afford and contributed to the filing of this Chapter 11 petition on July 5, 2013.

**Deteriorated Market for Solar Industry**

The market conditions that previously led to a rise in the Debtor's sales and market for its products in the U.S. and Europe consisted of an expanding market for solar energy products. Chinese manufacturers were able to take advantage of an expanding market and the use of tax credits and other benefits available in the U.S. for implementing solar energy panels. However, the U.S. and Europe implemented high tariffs and ended a number of tax incentives in order to in part curtail what was perceived to be dumping of low cost solar panels from China. This had the effect of drastically reducing the sale of solar panels and severely impacted Chinese manufacturers. Since the Debtor's sales were based in part on the sale of solar panels in the U.S. and Europe and the import of Chinese panels, the Debtor's business was severely diminished.

As a result of the foregoing factors, the Debtor filed for protection under Chapter 11 of the Bankruptcy Code on July 5, 2013.

**The Debtor's Main Employees**

Jimmy and Mindy Wang are independent contractors of the Company. Jimmy Wang serves as a sales representative. Mindy Wang is an office manager. Jimmy Wang is paid $6,750 per month ($6,000 for services, and $750 for expenses) and Mindy Wang is paid $6,000 per month. The Debtor anticipates that the Wangs will continue as independent contractors of the Company post-petition.

The Debtor reserves the right to adjust any compensation to employees or independent contractors based on the Company's performance and other relevant market forces. This is necessary for the Company to retain employees and independent contractors of adequate skill and experience as necessary to operate its business.

The Wangs are not professionals as defined under the Bankruptcy Code, and as a result, the Debtor has not sought Court approval of their retention. Payment to the Wangs as independent contractors is in the Debtor's ordinary course of business.

John Ballard was elected to the Board in February 2013 and currently serves as the CFO and Chairman of the Board. Mr. Ballard has previously served as CFO of Debtor during the period 2004 until 2009. Mr. Ballard was not an officer or director during the period of time that was the subject of the SEC investigation, which was during the period of January and February of 2010. Rather, Mr. Ballard invested $100,000 in Debtor at that time, when he participated as a purchaser of shares in the February 2010 private placement. Diane Thelen also invested $110,000 in the February 2010 offering. John Ballard currently holds 66,615 shares of stock and Diane Thelen holds 167 shares of restricted stock, all of which will be cancelled pursuant to the Debtor's Plan.

Ballard met the Wangs in connection with Debtor's transition into a public Company in 2003. Mr. Ballard and Ms. Thelen were involved with a publicly traded shell company, Tabatha III, which eventually became the vehicle by which Debtor would become public. The "reverse merger" was executed in 2003, as detailed *supra*, at page 7. Mr. Ballard and the Wangs served as officers or directors of the Debtor together for several years, until Mr. Ballard stepped down from the board in 2009. Mindy Wang resigned from the board in May of 2011.

Jimmy Wang stayed on as board member and CEO until he was voted out of the CEO position by the board in April of 2011, in the wake of the SEC investigation. Mr. Wang remained on the board throughout the SEC investigation and after deregistration of Debtor's securities on May 16, 2012. As of August 23, 2012, Wang was a nominee to serve on the Debtor's board of directors, along with the then sitting board, Todd Altman, Aaron Switz, and Gary Koos. On that day, Mr. Koos sent a letter to the shareholders inviting them to re-elect the sitting board of directors, including Mr. Wang. See Exhibit L, WEMU shareholder letter dated August 23, 2012. Mr. Wang remained on the board until September 20, 2012, at which time he resigned from the board.

Diane Thelen, presently executive assistant to Mr. Ballard, was also an investor in Tabatha III, the public shell through which the Debtor became a public company. Ms. Thelen was elected to the board of directors in February of 2013, and resigned from the board pre-petition. Ms. Thelen is presently compensated by Debtor in the amount of $2,500 per month for her services as executive assistant to Mr. Ballard. The Debtor intends to continue to retain Ms. Thelen in this capacity post-petition.

The current directors and officers include Mr. Ballard (CFO and Chairman of the Board), Tiffany Liu (Director), Shui Fong Shum (President), Carlos Duque (General Counsel & Secretary to the Board). The Wangs and Ms. Thelen are not insiders of the Debtor pursuant to the definition under the Bankruptcy Code. Ms. Thelen resigned her former position as member of the Board pre-petition. The Debtor does not employ any individuals who are insiders, other than Mr. Ballard, Ms. Liu, Ms. Shum and Mr. Duque. Leslie Yang, niece to Mindy Wang, has been employed by Debtor since 2003. Jimmy Wang's sister, Sondra Wang, has been employed by Debtor since 2005. Neither of them are insiders as that term is defined in the Bankruptcy Code. Lastly, for disclosure purposes, Director Tiffany Liu is married to the owner of A.M.Z. International Shipping Co., a California corporation and an unsecured creditor in the amount of $17,623.53. A.M.Z., however, is not considered an insider pursuant to the Bankruptcy Code, as this company is not a relative of Ms. Liu or any other insider, nor does it have any other relationship with the Debtor other than its owner being married to Ms. Liu. To the best of the Debtor's knowledge, there are no other claims that could be potentially owned by insiders. A list of all current and proposed members of the Board of directors and officers of the Debtor, with current salary information, is attached hereto as Exhibit H.

## V.   DESCRIPTION OF ASSETS

As of the Petition Date, the value of the Debtor's primary assets is set forth below:

| | |
|---|---|
| Cash | $ 0 |
| Checking account: | $ 275,603 |
| Shares in Chinese subsidiaries | $ 0 |
| Accounts Receivable: Related party receivable/deferred tax asset | $ 670,589 |
| Accounts receivable: customers | $ 484,797 |
| Claims against Moye White | $ 0 |
| Claims against Radiowaves, Inc. | $ unknown |
| Claims against Tomeii International | $ unknown |
| Drawings, tools, engineering designs | $ 1,872,801 |
| Software | $ 0 |
| Computers, monitors, office equipment | $ 1,117 |
| US Inventory | $ 940,672 |
| Advances to suppliers, prepaid income | $ 9,999 |
| | |

12

| Total Assets | $ 4,255,578 |
|---|---|

**The asset values set forth above were listed on the Debtor's bankruptcy Schedule B, and amendments thereto, and represent a gross value for each asset, not a value net of liens.**

The Debtor is reserving the right to bring Avoidance Actions pursuant to 11 U.S.C. §§ 545 through 550 and state and bankruptcy fraudulent conveyance actions. The Debtor is currently in the process of evaluating these claims to determine which, if any, claims are viable. The Debtor made numerous payments to creditors within the 90 days prior to the Petition Date. The total amount of payments made to insiders in the year prior to the Petition Date was approximately $120,000 in gross wages paid to Gary Koos, and the following in gross wages: $20,000 to John Ballard, $10,000 to Diane Thelen, $2,000 to Tiffany Liu, and $20,000 to Shui Shum.

Gary Koos was terminated from his positions as President, Chief Executive Officer, and Director of the Debtor's Board of Directors on February 28, 2013. The Debtor's analysis indicates that, other than the payments to Gary Koos, these payments were likely made in the ordinary course of business and therefore are subject to defense pursuant to 11 U.S.C. § 547(c)(2); were contemporaneous transfers and therefore subject to defense pursuant to 11 U.S.C. § 547(c)(1); or were setoffs and subject to defense pursuant to 11 U.S.C. § 553. With respect to payments to insiders, with the exception of payments to Gary Koos, the compensation to the Debtor's officers was reasonable officer compensation for services rendered. The Debtor has objected to the proof of claim filed by Gary Koos. Wages were paid to Koos during the period of time in which Mr. Koos continually, and without any legitimate reason, delayed the shareholder meeting to elect officers and directors, and as a result, there could be a dispute with respect to compensation paid to Mr. Koos. The Debtor expects that, with the exception of payments to Gary Koos, the recovery to creditors as proposed under the Plan will exceed any reasonable recovery that could be obtained solely from pursuit of the Avoidance Actions, if any. Moreover, given the high cost of bringing avoidance actions and the likelihood of encountering valid defenses, Debtor does not intend to bring any avoidance actions at this time, with the exception of the claim against Mr. Koos. Nor will any efforts be made to preserve the statute of limitations for future avoidance actions.

13

Former insiders Jennifer Maliar, Jeffrey Watson, Jimmy and Mindy Wang each hold indemnification claims against the estate for attorney's fees and any potential judgment awarded against them in the class action litigation discussed earlier in this Disclosure Statement. All of these claims have been subordinated as Class 4 claims pursuant to § 510(b) of the Bankruptcy Code and these creditors shall recover nothing on the basis of their indemnification claims. Jimmy and Mindy Wang have also filed proofs of claim for unpaid sick time and vacation leave which accrued from 2003 until 2011 in an aggregate amount of approximately $120,000. These unpaid sick and vacation wages will be treated as general unsecured claims and not priority claims. This is consistent with treatment offered to other officers such as Gary Koos, who received pre-petition compensation for unpaid sick days and vacation time upon request.

Debtor has objected to a claim filed by Gary Koos in the amount of $90,000. Mr. Koos has alleged that he is owed severance pay in the amount of $90,000, or six month's salary, allegedly arising out of an employment contract dated October 26, 2012. The contract was a "conflicting interest transaction" as defined in the Colorado statutes and case law governing transactions between corporations and their board members. See C.R.S. 7-108-501(1)(a)(III). According to Colorado law, such a transaction must be approved by the shareholders. The Koos contract was not approved by shareholders and it is therefore invalid. Mr. Koos has not provided the Debtor with any evidence that the shareholders approved his employment contract. Mr. Koos was also terminated for cause for refusing to act in the best interest of shareholders, creditors, and the Debtor as was his duty under Colorado law and for failing to exercise appropriate business judgment. Termination for cause also nullifies any severance obligation under the terms of the purported contract. See letter dated February 21, 2013 terminating Mr. Koos, attached as Exhibit G.

**Description of the Chinese Subsidiaries**

All manufacturing activities are carried out through WEMU subsidiaries located in Shanghai and Ningbo, People's Republic of China ("China" or "PRC") which include:

1. Shanghai Intech Electro-Mechanical Products Co. Ltd., wholly owned subsidiary of Worldwide Energy and Manufacturing USA, Inc., ("Intech");

14

2.  Shanghai Intech-Tron Electronic & Electronics Company Ltd., 55% owned by Worldwide Energy and Manufacturing USA, Inc.;

3.  Shanghai Dechuang Electric & Electronics Co., Ltd., 100% owned by Shanghai Intech-Tron Electronic and Electronics Co.;

4.  Shanghai Intech Precision Machinery Co., Ltd.,51% owned by Shanghai Intech Electro Mechanical Products Co. and 49% owned by Worldwide Energy and Manufacturing USA, Inc.;

5.  Shanghai Shutai Precision Casting Co., Ltd., 55% owned by Shanghai Intech Electro-Mechanical Products Co. and 45% owned by Worldwide Energy and Manufacturing USA, Inc.; and

6.  Worldwide Energy and Manufacturing (Nantong) Co., Ltd., 51% owned by Worldwide Energy and Manufacturing USA, Inc.

In addition to these production facilities, WEMU maintains its corporate headquarters in a leased facility in San Francisco, California. In this location, WEMU also warehouses Contract Manufacturing and Solar division inventory to support the Debtor's customers in North America on short flow deliveries.

Intech, WEMU's quality assurance arm located in Shanghai, China employs 13 engineers. As the engineering division and quality assurance arm of the Company, Intech provides technical advice, design, delivery, material procurement and manufacturing quality control services to companies in the United States seeking to manufacture or purchase components from manufacturers in China.

On August 18, 2005, WEMU established an electronics manufacturing division located in Shanghai, China. The Chinese subsidiary purchased approximately $250,000 worth of electronics production equipment from Opel Technology, a former WEMU electronics supplier, as the initial manufacturing equipment. In establishing this electronics factory, WEMU was able to compete more effectively in the PC board and cable assembly industry, as well as gain complete control over WEMU's electronics components production.

15

WEMU established Shanghai Intech Precision Mechanical Products Manufacturing Ltd. ("Precision") on November 1, 2005. Precision is 51% owned by Intech and 49% owned by WEMU. This factory performs die-casting and machining services for the automotive, motorcycle, telecommunications and home supply industries. Precision is located in the suburbs of Shanghai, China, and occupies an area of approximately 71,043 square feet. The factory contains three workshops: a die-casting shop, a machining shop, and a printing shop.

On October 14, 2008, through Intech, WEMU completed the acquisition of 55% of Shanghai De Hong Electric and Electronic Company Limited ("De Hong"). The terms of the Agreement dated February 3, 2008 were that Intech paid cash consideration of approximately $1 million dollars for a 55% interest in De Hong in two installments, with the first installment of $714,286 being paid in September 2008, and the second installment of $308,414 being paid in March 2009. The Company funded the acquisition with some of the proceeds from WEMU's sale of 1,055,103 ($4,747,970) shares of unregistered common stock on June 23, 2008.

De Hong is the holding company for the operating subsidiary Shanghai Intech-Detron Electronic Co. ("Detron"). Therefore, WEMU received 55% control of the operating subsidiary Detron. Detron's management remained in place. Detron is a power supply factory in Shanghai, China with design and R & D capabilities.

**Valuation of Chinese Subsidiaries**

The Debtor's wholly-owned Chinese Subsidiaries have no liquidation value. The PRC government has broad discretion in dealing with violations of laws and regulations, including levying fines, revoking business and other licenses and requiring actions necessary for compliance. In particular, licenses and permits issued or granted to WEMU's subsidiaries by relevant governmental bodies may be revoked at a later time by higher regulatory bodies. WEMU cannot predict the effect of the interpretation of existing or new PRC laws or regulations on its businesses.

Termination of WEMU's operations and withdrawal of cash and other assets from the PRC would likely be found to be in breach of labor, tax and other statutory bodies of PRC law. As a

result, WEMU may be subject to sanctions, including fines, and could be required to surrender some or all of the revenue generated by an asset sale or other exit from the PRC to the Chinese authorities.

Uncertainties relating to the application of PRC laws under a liquidation scenario would temper the interest of any investor seeking to purchase WEMU's assets in a liquidation scenario. This would put downward pressure on the sale price and, in management's opinion, reduce the sale price of any wholly-owned subsidiaries' assets to an amount which is less than the debt owed by those entities to the factories which manufacture the subsidiaries' orders.

In May of 2012, Ms. Thelen and Mr. Ballard offered the Debtor $150,000 in cash for the contract manufacturing division. As further consideration for the sale, Debtor would retain the revenue generated by the sale of 70% of the division's inventory existing at the time of the sale. Shortly thereafter, Mr. Ballard and Ms. Thelen discovered $720,000 in loss of business from Worldwide's contract manufacturing customers in addition to the fact that the inventory was largely impaired and that the division's financial condition was deteriorating rapidly. Mr. Ballard and Ms. Thelen promptly withdrew their offer on June 6, 2012 and the transaction was never consummated. See Exhibit K, Letter from Thelen to Debtor.

Further, the Company's management at that time solicited bids from other possible suitors for its business entities but their efforts were unsuccessful. See WEMU memorandum dated May 16, 2012 drafted by Messrs. Koos and Watson, attached as Exhibit I. In that memorandum, the Debtor's then CFO detailed negotiations conducted with 6 distinct persons or entities in the hopes of selling various subsidiaries. All of these efforts failed. The only serious offer came from Thelen/Ballard as detailed above, and was withdrawn on July 6, 2012, prior to being accepted by the Debtor. In short, no known market exists for the sale of Debtor's assets and subsidiaries. Consequently, any liquidation value is speculative and hypothetical.

Management believes that the the solar division, which is now a 51% owned subsidiary ("WEMU-Nantong"), has a positive net present value. The value of WEMU-Nantong has not been determined. Furthermore, the 49% minority stake is owned by the executive team that manages daily operations at WEMU-Nantong. Any purchaser who wishes to buy the Debtor's interest in the subsidiary must be willing to work closely with WEMU-Nantong's present management team as

17

they are also 49% owners.   Debtor's present management is unable to assess the sale value of the Debtor's 51% interest in WEMU-Nantong with any meaningful degree of certainty.  Further, the WEMU-Nantong operations have lost millions of dollars in the past three years.  The Debtor believes that any premium that may be attributable to the overall value of WEMU-Nantong is lost in the consideration of a 51% interest.

Debtor's management believes that, other than WEMU-Nantong, the other remaining subsidiaries have an aggregate market value of $0.  Management's opinion is confirmed by an expert report performed by independent accounting firm Scale Finance, which is attached to this disclosure statement as Exhibit J.  The Scale Finance Report estimates the Debtor's fair market value as a going concern is $1,268,884.  Under a bankruptcy liquidation scenario, the Company's assets would be sold and provide $0 to unsecured creditors, as further detailed in Exhibit D to this Disclosure Statement.  Under the Plan, unsecured creditors may recover 20% within 90 days from confirmation, or 100% over 7 years.  Both of these options under the Plan are markedly superior to a $0 recovery under a liquidation scenario.

## VI.   DESCRIPTION OF LIABILITIES

### A.   Priority Claims

#### 1.   Priority Claims, Class 1

Priority Claims are defined in the Plan as any pre-petition Claim entitled to a priority in payment under § 507(a) of the Code, excluding any Administrative Claim or Tax Claim.  Section 507(a) of the Code includes, but is not limited to, claims for: (a) wages, salaries and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $11,725 per employee earned within the 180 days prior to the Petition Date (§ 507(a)(4)); and (b) certain contributions to an employee benefit plan (§ 507(a)(5)).  On the Petition Date, the Debtor had 7 employees. The Debtor filed a motion to pay pre-petition employee wages, claims of independent contractors, reimbursable expenses, and related costs and expenses.  The Court granted the relief requested in that motion and all employee wages were brought current through the Petition Date.   The Debtor scheduled one creditor, Premiere Source LLC, as a priority creditor pursuant to 11 U.S.C. §507(a)(4).  The Debtor believes this is the

only §507(a)(4) claim.  Premiere Source, LLC is an independent contractor who falls under the provisions of §507(a)(4).

### 2.        Administrative Claims

Administrative Claims are those Claims for payment of an administrative expense of a kind specified in § 503(b) or § 1114(e)(2) of the Bankruptcy Code and entitled to priority pursuant to § 507(a)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual, necessary costs and expenses, incurred after the Petition Date, of preserving the estates and operating the businesses of the Debtor, including wages, salaries, or commissions for services rendered after the commencement of the Chapter 11 Case; (b) Professional Fee Claims; (c) all fees and charges assessed against the Estates under 28 U.S.C. § 1930; and (d) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under § 546(c)(2)(A) of the Bankruptcy Code.

The Debtor retained Kutner Brinen Garber, P.C. ("KBG") as its bankruptcy counsel. KBG requested and obtained approval of a retainer in the amount of $24,832 and establishment of an interim payment procedure.  For the time period of July 5, 2013 through October 31, 2013, KBG incurred approximately $52,350 in fees and costs.  KBG has not yet filed any interim fee applications.  KBG estimates that an additional $40,000 in legal fees and costs to KBG will be incurred between November 2013 and confirmation of the Plan.  The total amount of legal fees will depend on the level of litigation over the Plan and creditor claims.

The law firm of Onsager Staelin and Guyerson, LLC ("OSG") filed an application to be employed as counsel for the Official Committee of Unsecured Creditors.  The Court approved the OSG application and ordered that Debtor is authorized and required to pay to Onsager, Staelin & Guyerson, LLC, as Counsel to the Official Committee of Unsecured Creditors, on a monthly basis, 75% of its fees and 100% of its allowable expenses as per the guidelines established by the Office of the United States Trustee.  As of October 31, 2013, OSG has accrued approximately $8,130 in fees and costs.

### 3.        Tax Claims

Tax Claims are any Claim of a governmental unit for taxes entitled to priority pursuant to 11 U.S.C. § 507(a)(8).  The Debtor did not list any debt to taxing authorities on its Schedule E.  The California Franchise Tax Board filed a claim in the amount of $821.97.  No other taxing authorities filed proofs of claim.

**B.      Secured Claims**

**1.      VFC Partners 23, LLC, Class 2**

Class 2 consists of the Allowed Secured Claim of VFC Partners 23, LLC ("VFC").  The Debtor scheduled VFC as a secured creditor in the amount of $356,410.44.  On or about May 20, 2008 the Debtor entered into Promissory Note, Business Loan Agreement, and Commercial Security Agreement with Bank of the West under which a loan in the amount of $2,000,000 was extended to the Debtor. The Debtor paid down the loan pre-petition and the loan balance was approximately $367,000 as of the Petition Date.  In order to secure the debt, the Debtor granted this creditor a lien on a portion of the Debtor's accounts receivable, and U.S. inventory.  The lien is perfected by a UCC-1 financing statement.  The Loan was assigned to VFC Partners on or about December 27, 2012. ("Assignee")  The value of the accounts receivable and U.S. inventory as of the Petition Date are substantially in excess of the VFC claim balance.

**C.      Non-Priority Unsecured Creditors, Class 3**

The Debtor has a number of unsecured pre-petition creditors, and several of these creditors filed proofs of claim.  The Debtor compiled a list of the Class 3 Unsecured Claims it scheduled in its bankruptcy case and the Claims filed by unsecured creditors.  To the extent that a creditor who was scheduled by the Debtor filed a Claim, the amount of the Claim as filed by the creditor is considered in the analysis.  The Claims list containing all known unsecured claims of the Debtor is attached to this Disclosure Statement as Exhibit A.  Based on the Debtor's books and records, the Debtor scheduled unsecured Claims in the total amount of $2.8 million.  The proofs of claim on file are, for the most part, consistent with the Debtor's Schedule F and books and records.

The Debtor listed intercompany debt to "Worldwide Energy and Manufacturing Nantong" as Class 3 general unsecured debt in the amount of $212,362.15. This claim is the net claim of any

setoffs or other claims, and is a reduction from the $1.35 million claim initially listed on the Debtor's Schedule F. The Debtor has performed all the necessary due diligence regarding the validity of this claim and does not intend to object to this claim.

Plaintiff Matt Hayden did not file a proof of claim in the bankruptcy court prior to the bar claim date. His claim against WEMU, and that of the class he purports to represent, is therefore barred by operation of the bankruptcy rules. As further detailed below, the indemnification claims of individual defendants and Ladenburg Thalmann, including attorney's fees, other defense costs and any potential judgment, will be subordinate to Class 3 unsecured creditors pursuant to 11 U.S.C. § 510(b). Accordingly, these claims will be treated as equity interests and shall receive no distribution under the Plan.

**D.     Securities Claimants, Class 4**

The Debtor has a number of creditors whose claims constitute Securities Claims. The Plan defines Securities Claims as those unsecured claims arising from rescission of a purchase or sale of a security of the Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement, indemnification, or contribution allowed under Code section 502 on account of such a claim. Class 4 claimants shall receive no distribution under the Plan. A non-exhaustive list of Class 4 claimants is attached hereto as Exhibit B.

**E.     Leases and Executory Contracts**

The Debtor was a party to several pre-Petition Date leases or executory contracts. Under the terms of the Plan, the Debtor is assuming all executory contracts and unexpired leases: (a) that were previously assumed by the Debtor pursuant to Court Order, (b) for which a motion to assume has been filed and is pending, and (c) are specifically listed on Exhibit A of the Plan. The Debtor maintains the right to modify Exhibit A of the Plan through the Plan Confirmation Date. Confirmation of the Plan shall constitute a determination that the payments to be made to creditors of assumed leases or executory contracts pursuant to the Plan satisfies all conditions precedent set forth in 11 U.S.C. § 365.

The Debtor is assuming all executory contracts and unexpired leases not previously rejected by Court Order, subject to a pending motion to reject, or not specifically rejected in accordance with the Plan. All proofs of Claim with respect to Claims arising from the rejection of any executory contract or unexpired lease shall be filed with the Court within twenty (20) days after the earlier of (i) the date of the Court order approving the Debtor's rejection of such executory contract or unexpired lease or (ii) the Confirmation Date.

The Debtor filed a motion to assume its existing office and warehouse lease with Rollins Road Commercial Center, LLC for its operations in California. No objections were filed and the lease for its California operations has been  assumed. There were no cure requirements upon assumption as the Debtor is current on its lease payments.

The Debtor is a party to several other executory contracts:

(1) Independent Sales Representation Agreement with Jimmy Wang;

(2) Consulting Agreement with Mindy Wang;

(3) Independent Contractor Agreement with Diane Thelen;

(4) Outside Independent Contractor Agreement with Tiffany Liu;

(5) Employment Agreement with John Ballard; and

(6) Agreement with Shui Shum.The Debtor will assume the contracts listed above pursuant to the Plan and does not expect to have any cure requirements as these agreements are current.

## VII.   DESCRIPTION OF THE PLAN

### A.   General Description

The Debtor filed its Plan of Reorganization with the United States Bankruptcy Court for the District of Colorado on October 28, 2013. The Plan provides for the reorganization of the Debtor. Funding of the Plan will be derived from ongoing operations.

The Plan provides for the specification and treatment of all creditors and Interest holders of the Debtor. The Plan identifies whether each Class is impaired or unimpaired. A Class is unimpaired only if the Plan leaves unaltered the legal, equitable or contractual obligations between the Debtor and the unimpaired claimants or interest holders. The following is a brief summary of the

Plan.  The actual text of the Plan should be reviewed for more specific detail.  In the event of any conflict between the Plan and this Disclosure Statement, the terms of the Plan govern.

As provided in § 1123(a)(1) of the Bankruptcy Code, the Priority, Administrative and Tax Claims against the Debtors are not designated as classes. The holders of such Allowed Claims are not entitled to vote on the Plan and such claims will be paid in full.

The Plan divides the creditors in each case into separate classes.  The classes are set forth as follows:

Class 1 - All Allowed Unsecured Claims specified in Section 507(a)(4) and 507(a)(5) of the Code as having priority.

Class 2 - The Allowed Secured Claim held by VFC Partners 23, LLC.

Class 3 - The Allowed Claims held by unsecured creditors with the exception of those separately classified.

Class 4 - The Allowed Claims held by those unsecured creditors who hold claims defined as Securities Claims.

Class 5 - The Interests held by pre-petition shareholders and others.

## B.    Claims

### 1.    Unclassified Priority Claims

#### a.    Administrative Claims

The holders of Allowed Claims of the type specified in Section 507(a)(2) of the Code, costs and expenses of administration, shall receive cash equal to the Allowed amount of such Claim or a lesser amount or different treatment as may be acceptable and agreed to by particular holders of such Claims. Such Claims shall be paid in full on the Effective Date of the Plan, paid in the ordinary course of business, or treated as otherwise agreed.

The Debtor paid its administrative expenses in the ordinary course during the course of the bankruptcy case, and therefore does not believe that any material administrative claim exists against the bankruptcy estate, except for the administrative claims of professionals and the Office of the U.S. Trustee.

| Professional | Approximate fees & costs |
|---|---|
| Kutner Brinen Garber, P.C | $52,350 as of October 31, 2013 |
| Onsager Staelin and Guyerson, P.C. | $8,130 |

All Administrative Claims of professionals are subject to Court approval on notice to creditors with an opportunity for a hearing. Certain professional fees may be paid pursuant to interim fee applications and upon Court allowance. The fees set forth above are the approximate fees and costs through October 31, 2013. Additional fees and costs will be incurred between October 2013 and confirmation of the Plan.

**b.      Tax Claims**

The Allowed Claims of a type specified in Section 507(a)(8) of the Code, Tax Claims of governmental taxing authorities, shall be paid on the Effective Date of the Plan or in monthly payments on an amortized basis over a period that does not exceed five years from the Petition Date with interest at the appropriate rate set by applicable statute. The Debtor has only one U.S. tax obligation to the California Franchise Tax Board in the amount of $821.97.

**c.      United States Trustee Fees**

The Debtor will make all payments required to be paid to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) until the case is closed, converted, or dismissed. All payments due to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) shall be paid on the Effective Date, and the U.S. Trustee shall thereafter be paid fees due on a quarterly basis until the case is closed, converted, or dismissed. The Debtor will request entry of a final decree closing the case on or before the later of the date all Claim objections and any pending litigation is concluded or 180 days after the Effective Date of the Plan. Post-confirmation payments due to the United States Trustee are estimated to be $6,500 per quarter until the case is closed.

**2.      Class 1, Classified Priority Claims**

The Allowed Class 1 Priority Claims shall be paid in full on the Effective Date. The Class 1 Claims for certain pre-petition wages and employee Claims are more particularly described in Sections 507(a)(4) and 507(a)(5) of the Code. On the Petition Date, the Debtor had 7 employees,

however, there are no remaining employee pre-petition claims.  The Debtor anticipates only one Class 1 claim in the amount of $11,725.

### 3.   Class 2, Secured Claim of VFC Partners 23, LLC

The Class 2 Secured Claim consists of the Allowed Secured Claim of VFC Partners 23, LLC. The Class 2 claim is secured by a lien encumbering the Debtor's accounts receivable and inventory. The Debtor believes that this claim is fully secured.

The Class 2 Allowed Secured Claim is impaired by the Plan.  The principal amount of the Class 2 Claim will be allowed as a secured claim in the amount of the outstanding balance due on the claim as of the Confirmation Date.   The Class 2 Claim will bear interest at the rate of: (i) 6% per annum commencing on the Effective Date of the Plan; or (ii) if the Class 2 claimant objects to such rate in writing in connection with their objection to confirmation of the Plan prior to the commencement of the confirmation hearing, such rate as will be determined by the Court as necessary to satisfy the requirements of 11 U.S.C. § 1129(b) of the Code; or (iii) such other rate as agreed by the Debtor and the Class 2 claimant.   The Class 2 claimant's lien that secured its claim as of the Effective Date of the Plan shall continue to secure its claim until the Allowed Secured Claim is paid in accordance with this Plan.

The Class 2 claim shall be amortized and repaid in equal monthly installments over a period of sixty (60) months commencing on the Effective Date of the Plan.  The Debtor estimates the monthly payment to the Class 3 claimant will be approximately $6,516.

### 4.   Class 3, General Unsecured Creditors

Class 3 consists of those unsecured creditors of the Debtor who hold Allowed Claims.  The Plan provides that Class 3 claimants shall be entitled to elect one of the following three options with respect to payment and satisfaction of their claims:

**Option 1:**  Each Class 3 claimant may elect to receive a cash payment of 20% of their Allowed Claim and receive payment of the 20% within ninety (90) days of the Effective Date of the Plan in total satisfaction of their claim;

**Option 2**:  Each Class 3 claimant may elect to receive full payment of their Allowed Claim payable in amortized monthly installments at 1% interest per year over the

seven (7) years following the Effective Date of the Plan; or

**Option 3:**  Each Class 3 claimant may elect to receive new common shares of stock in the reorganized Debtor issued on the Effective Date of the Plan or within ten days of such date, in full satisfaction and payment of their Allowed Claim.  These securities are exempt from registration pursuant to 11 U.S.C. §1145(a)(1)(A).[1] Shares will be issued on a one share for each dollar of claim basis.  No shares will be issued with respect to the portion of any claim that is less than one dollar.

Each Class 3 claimant shall be entitled to elect one of the three payment options on a form that will be enclosed with their Ballot for voting on the Plan.  If a Class 3 claimant does not elect an option, they will receive Option 1 by default.

In addition to the distribution set forth above, Class 3 claimants who select Option 1 or 2 shall be entitled to receive the proceeds whether obtained by litigation or settlement, net of attorney fees, expert fees, and costs, obtained from any action undertaken by the Debtor to collect Avoidance Actions.  It shall be up to the Debtor's discretion, without need for any Court approval, to: a) pursue any Avoidance Actions; and b) settle any Avoidance Actions.  If any recoveries are made they will be prorated among all of the Allowed Claims electing Options 1 and 2.  Other than interest paid as stated, no Class 3 claimant shall receive more than payment of their Allowed Claim in full.  At this time Debtor does not foresee a significant recovery from avoidance actions.

The Debtor is anticipating that Class 3 claimants holding approximately $679,952 in claims will chose Option 1, which requires payment in 90 days in the amount of 20% of their claims.  This would require a lump sum payment by the Debtor in the amount of approximately $135,990.

The Debtor is anticipating that Class 3 claimants holding approximately $167,809 in claims will chose Option 2, which requires payment in full over 7 years.  This amount does not include the

---

[1] Creditors who receive securities under Section 1145(a)(1) may resell such securities without restriction unless any such holder is deemed to be an "underwriter" with respect to such securities, as defined in Section 1145(b)(1) of the Bankruptcy Code, which statute specifically includes as "underwriters" all persons directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect control with the issuer, as provided in Section 2(11) of the Securities Act of 1933.

claim of Shanghai Intech Electro-Mechanical, which has agreed to delay receipt of payments under the Plan for approximately one year, or until January 1, 2015. At that time the Debtor will begin making payments to Intech at the rate of $12,500 per month. The remaining Intech claim of $1,622,802 will be paid with interest at the rate of 6% per annum until paid. Intech will forego any payments during the year 2014.

The Debtor anticipates that the claimant holding the Moye White claim will elect Option 3, receipt of shares in exchange for its claim. Teresa McClaran is the holder of that claim. Ms. McClaran purchased the claim from Moye White for $110,000. Jimmy Wang and Diane Thelen, who is Teresa McClaran's sister, both loaned Ms. McClaran the funds to purchase the claim. Mr. Wang and Ms. Thelen each loaned Ms. McClaran $55,000 towards the purchase of the claim. Jimmy Wang and Diane Thelen are entitled to repayment of the funds from Ms. McClaran. Mr. Wang and Ms. Thelen are not entitled to any voting rights or other benefits under the loan agreement.

It is important to understand that the subsidiaries of the Debtor who hold unsecured claims, which include Worldwide Energy and Manufacturing Nantong ($212,362.15) and Shanghai Intech Electro-Mechanical ($1,622,801.80), will not be selecting Option 3. The Debtor purchases its products from Intech, a China corporation and subsidiary of the Debtor. In turn, Intech produces the products through subcontractors in China, which supplies the Debtor's inventory. Intech has already paid these subcontractors, and needs the cash to continue operations and pay their debts. Intech is obligated to pay the Chinese subcontractors pursuant to Chinese law. Likewise, Nantong is in the same situation as Intech, and needs the cash to continue operations. Chinese law does not allow Intech or Nantong to be relieved from any debt to their subcontractors.

Those creditors electing Option 3 will not receive cash distributions. Other than the Moye White claim, the Debtor is not entirely certain which Class 3 creditors will choose Option 3, as this election is made after the Disclosure Statement is approved and after the Plan and Disclosure Statement are sent out for voting. Teresa McClaran, who owns the $400,000 claim previously held by Moye White, is expected convert her claim into equity. Jimmy and Mindy Wang, former insiders, also hold $82,624.18 and $40,496.12 for sick time and vacation pay accrued over a decade from 2002 until their resignation in 2011. The Debtor anticipates that the Wangs will elect option 2 under

27

the plan, whereby they will collect 100% of the funds owed to them in even monthly distributions over 7 years. All of the other creditors who were either listed on the Debtor's Bankruptcy schedules or filed proofs of claims, aside from Mr. Koos, are either subordinated pursuant to 11 U.S.C. § 510 such that they collect nothing under the Plan, or they are trade creditors and service providers who are not in the business of making equity investments and are not expected to have any interest in holding shares of the reorganized Debtor. The Debtor has objected to Mr. Koos' claim and anticipates that this claim will be disallowed by the Court and that Mr. Koos will collect nothing as a result of his claim.

At this time the Company is not certain which creditors if any, other than Ms. McClaran, will accept payment in shares or option 3 under the Plan. A list of all unsecured creditors and any known relationship with the Debtor or any of its insiders is attached hereto as Exhibit A.

Based on historical financial information, operations during the Chapter 11 case, and changes made during the Chapter 11, the Debtor has prepared projections to show expected distributions to creditors during the term of the Plan. The projections are attached to this Disclosure Statement as Exhibit C. The projections anticipate a modest 8% annual growth of revenue based upon the Debtor's financial performance post-petition. This modest growth is not guaranteed as the projections represent the Debtor's best estimate of the Company's future financial condition based upon current actual knowledge and anticipated conditions. The actual income and expenses may increase or decrease and differ from the projections, however, based upon the Debtor's current knowledge, the projections are believed to be a reasonable estimate of future performance. The projections also include payment of fees for the Creditors Committee in the "Professional Fees" expense category.

The Projections are extrapolated from Debtor's post-petition performance to date, coupled with the industry knowledge of Mr. Ballard, who is familiar with the industry in which Debtor operates, based on his prior experience serving as CFO and board member for the Debtor between 2004 and 2009. As an additional backstop to assure plan feasibility, the Debtor retains on hand $275,603 in unrestricted cash to draw from as necessary to cure any deficiencies that would otherwise arise if the Debtor's revenue falls below its current projections at any point during the

28

repayment period.

### 5. Class 4, Securities Claimants

Class 4 consists of those unsecured creditors who hold Securities Claims. Such claims are subordinated to the Class 3 and other secured and priority claims pursuant to 11 U.S.C. §510(b). Class 4 claimants shall receive zero on account of their Class 4 claims.

### 6. Class 5, Interests in the Debtor

Class 5 includes the Interests in the Debtor. Interests are defined in the Plan as "any shareholder interest or any other instrument evidencing any ownership interest in the Debtor and any option, warrant or right of any nature, contractual or otherwise, to acquire an ownership interest in the Debtor." Class 5 is impaired by this Plan. On the Effective Date of the Plan all Class 5 interests shall be cancelled.

### C. Means for Execution of the Plan and Management

Pursuant to the Plan, the Debtor shall restructure its debts and obligations and continue to operate in the ordinary course of business. Funding for the Plan shall be from income derived from the Debtor's operations.

John Ballard will continue to manage the Debtor and oversee all aspects of the business. John Ballard is the CFO of the Debtor and Chairman of the Debtor's Board of Directors. He is responsible for the day-to-day operations and implementation of the Debtor's Plan. Mr. Ballard's educational background consists of a Bachelor of Science Degree in Management and Marketing from the University of Colorado where he graduated Magna Cum Laude. Mr. Ballard also holds a Masters of Business Administration from Regis University.

The Debtor's shareholders recently elected Mr. Ballard to the position of Chief Financial Officer and Board Member on February 8, 2013. Prior to February 2013, Mr. Ballard was Chief Financial Officer of the Debtor during the period September 2003 to 2009. During the years 2003-2009, the Debtor was a publicly traded company headquartered in California. Since February 2013 and during this Bankruptcy case, Mr. Ballard has been able to refocus the Debtor's operations, reduce unnecessary costs and expenses, and steer the Debtor toward profitability.

Mr. Ballard's prior experience includes the following:

- Chief Financial Officer for Goliath Film and Media Holding, a publicly trading company involved in the Film industry since October, 2011.

- Nearly two decades of business management, project management, and accounting experience.

- From January 2002 to the present, Mr. Ballard has been a financial consultant and director of Reveal Systems, Inc., a software development company and Internet provider based in Longmont, Colorado.

- Mr. Ballard was the Chief Financial Officer of Call Solutions Inc., a publicly traded company, from October 1999 to November 2002. Call Solutions was in the business of opening call centers.

Based on the foregoing, the Debtor believes Mr. Ballard is well qualified to manage the Debtor's operations.

**D.    Administrative Claim Bar Date**

If the Plan is confirmed, all applications for allowance and payment of Administrative Claims, including Professional Fees, must be filed within 45 days following the Effective Date of the Plan, unless additional time is timely requested.  Administrative claims under 11 U.S.C. § 503(b)(9) must have been filed by the Bar Date of September 9, 2013 pursuant to the Bankruptcy Court's prior order.

## VIII.    PLAN FEASIBILITY

The Debtor's Plan is feasible based upon the Debtor's ability to achieve the various components of the Plan.  The Debtor expects to have sufficient cash on hand on the Effective Date to meet all payments due at that time, or will seek funding at a reasonable market rate.  The balance of the payments due under the Plan will be derived from the Debtor's ongoing business operations. Attached to this Disclosure Statement as Exhibit C is a projection of the Debtor's operations following confirmation of the Plan.  In an effort to decrease expenses and increase profitability, the Debtor has restructured its secured debts, and reduced operating expenses.  In particular, the Debtor

has taken the following steps:

- Increased sales as a result of obtaining new customers through improved marketing and sales efforts.

- Improved communication with existing customers and successfully requested that customers purchase inventory which had been stored by the Debtor for over two years. This has reduced inventory previously marked as obsolete into active inventory which resulted in additional sales and profit for the company.

- Reduced expenses such as travel, rent, and other costs to increase profitability.

- Improved customer satisfaction through better communication and contacts which has allowed the Debtor to retain its existing customers.

The Debtor's recent profitability stands in stark contrast to the Company's performance during the tenure of Gary Koos as an officer and director, from 2011 through 2012. The Company's precipitous financial decline during that time can be summarized as follows:

### 2012 AND 2011 FINANCIAL PERFORMANCE

|  | Year 2012 | Year 2011 |
|---|---|---|
| Gross Sales | $4,443,009 | $28,580,702 |
| Cost of Goods | $3,861,791 | $25,660,540 |
| Gross profit | $581,218 | $2,920,162 |
| Total Expenses | $1,001,425 | $4,614,788 |
| **Net Ordinary Income** | **(420,207)** | **($1,694,626)** |

Mr. Koos was hired as CFO in May, 2011 and sales declined from $28,580,702 to $4,443,009 or 84.46% between 2011 and 2012. The Debtor believes this decline was due to solar sales in the U.S declining to zero along with sales in contract manufacturing declining 14% or $724,327. Additionally, in 2012, expenses rose as a percentage of sales to 23% from 17% in 2011. The balance sheet of the Company also declined significantly, current assets were $2,924,776 in 2012 compared to current assets of $3,728,185 in 2011 for the U.S operations. In addition current liabilities were $6,789,995 in 2012 compared to $7,386,895 in 2011 whereby current liabilities exceeded current assets by a margin of 2.3 to 1. This deterioration in financial performance helped force the Company

31

into Chapter 11 bankruptcy protection.

The changes adopted since Mr. Ballard became Chairman and CFO on February 8, 2013, have resulted in a significant improvement to the Debtor's bottom line. This return to profitability can be illustrated through the profit and loss comparison of the last three months, August to October 2013, compared to the three month period from May to July 31, 2013. The table below summarizes the results:

| | Aug-Oct 2013 | May-July 2013 |
|---|---|---|
| Gross Sales | $1,426,461.30 | $1,161,457.22 |
| Cost of Goods | $1,123,472.31 | $ 931,247.67 |
| Gross profit | $302,988.99 | $230,209.55 |
| Total Expenses | $264,376.05 | $357,673.58 |
| Net Ordinary Income | $38,612.94 | ($127,464.03) |

WEMU has returned to profitability for the first time since 2011. Sales have increased approximately 23% in the August through October period along with expenses declining approximately 26% in same the period. Also, net ordinary income improved to $38,612.94 compared to a net loss of $127,464.03.

Based upon the projections, the Debtor will be able to meet all payment obligations under the Plan, and the amount paid into the Plan will far exceed any amount the creditors would have received under a Chapter 7 liquidation scenario. To provide further evidence and support for the Debtor's projections and feasibility of the Debtor's Plan a summary of the Debtor's post-petition monthly operating reports filed since the commencement of this bankruptcy case is attached as Exhibit E, which demonstrates significant, sustained improvement in operations and profitability.

## IX.    RISK TO CREDITORS

This Disclosure Statement contains statements that look into the future. There is no way to determine the accuracy of these statements. The Debtor used its best efforts based upon all the information available to the Debtor in making these statements. The Debtor attempted to be

conservative in its analysis. However, the Debtor believes that the Plan as proposed offers the best option for creditors. As explained below in greater detail, the principal alternative to the Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. As indicated in the Debtor's liquidation analysis provided below, liquidation of the Debtor will result in the secured creditors foreclosing on their collateral, leaving no assets available to distribute to unsecured creditors.

Described below are risks associated with the Debtor's business and operations, which are divided into two sections: (1) overall risks inherent to the business of the Debtor; and (2) risks associated with doing business in China:

**Overall Risk Factors Inherent to the Debtor's Business**

**1. Because the Debtor works under short-term contracts, the Debtor's financial budgets are subject to unanticipated fluctuations.**

Contract manufacturing service providers must provide increasingly rapid product turnaround for their customers. Customers may cancel their orders, change production quantities, or delay production because of consumer demand or technological changes; however, WEMU is often obligated to expend significant amounts for retooling or other start-up costs of manufacturing. Any costs due to cancellations, reductions, customer returns and/or delays by a significant customer or by a group of customers might not be recoverable. The loss could be greater than the Debtor's projected profit on the contract, resulting in a net loss for the contract. The short-term nature of WEMU's customers' commitments and the possibility of rapid changes in demand for their products reduce the Debtor's ability to estimate accurately future customer requirements. On occasion, customers may require rapid increases in production, which can stress resources and reduce margins. Although WEMU has several manufacturing facilities in China that it does business with, there can be no assurances the Debtor will have sufficient capacity at any given time to meet all customers' demands. WEMU could lose orders or fail to complete orders in a timely manner. In addition, because many of the Debtor's costs and operating expenses are relatively fixed, any reduction in customer demand can adversely affect gross margins and operating income.

**2. A few customers and contract manufacturers account for a large percentage of the Debtor's business. Therefore, the loss of any one customer or contract manufacturer could reduce sales significantly or impede the Debtor's ability to comply with its manufacturing contracts.**

**3. The Debtor is dependent on third parties to transport its products, so their failure to transport the products could adversely affect our earnings, sales and geographic market.**

The Debtor uses third parties for the vast majority of its shipping and transportation needs. If these parties fail to deliver products in a timely fashion, including lack of available trucks or drivers, labor stoppages or if there is an increase in transportation costs, including increased fuel costs, it would have a material adverse effect on the debtor's earnings and could reduce sales and its ability to serve its current geographic market

**Risks Related To Doing Business In China**

**1. Doing business in China subjects the Debtor to legal risks and political and economic changes over which the Debtor has no control.**

Under its current leadership, the Chinese government has been pursuing economic reform policies. Changes in these policies or political instability could affect the Debtor's ability to operate, to repatriate funds from China, or increase the Company's costs of doing business or our tax rate. The Chinese government could change its policies toward private enterprise or even nationalize or expropriate private enterprises, which could result in the total loss of Debtor's investment in that country.

WEMU periodically enters into agreements governed by Chinese law. Unlike the United States, China has a civil law system based on written statutes in which judicial decisions have little precedential value. The Chinese government has enacted some laws and regulations dealing with matters such as corporate organization and governance, foreign investment, commerce, taxation and trade. However, the government's experience in implementing, interpreting and enforcing these recently enacted laws and regulations is limited, and the Debtor's ability to enforce commercial claims or to resolve commercial disputes is uncertain. Furthermore, enforcement of the laws and regulations may be subject to the exercise of considerable discretion by agencies of the Chinese government, and forces unrelated to the legal merits of a particular matter or dispute may influence their determination. These uncertainties mean that the Debtor cannot rely on legal protections to ensure that suppliers honor their contracts with the company. If the Debtor suffers a loss because of breach of contract by a Chinese supplier, the Debtor might not be able to recover the loss.

**2. The Debtor has limited business insurance coverage and potential liabilities could exceed the Debtor's ability to pay them.**

The insurance industry in China is still at an early stage of development. Insurance companies in China offer limited business insurance products. The Debtor does not have any business liability or disruption insurance coverage for its operations in the China. Any business disruption, litigation or natural disaster may result in substantial costs and the diversion of the debtor's resources.

### 3. Currency fluctuations can cause significant losses.

Some of the Debtor's costs such as payroll, material and equipment costs are denominated in Chinese Renminbi.   Changes in the exchange rate between the Renminbi, and the U.S. dollar will affect the Debtor's costs of sales and operating margins.

### 4. Issues with the Chinese Taxing Authorities

The Debtor's operations are predominantly located in China, where tax incentives have been extended to encourage foreign investment.  The Debtor's effective tax rate could increase if these tax incentives are not renewed upon expiration or tax rates applicable to the Debtor are increased. Tax authorities in jurisdictions in the United States could challenge the manner in which profits are allocated between U.S. and Chinese subsidiaries and if the Debtor does not prevail in any such challenge it will be required to pay more taxes.

Specifically, the Debtor's wholly owned subsidiary Shanghai Intech Electro-Mechanical Products Co. Ltd ("Intech") is an exporter as that term is defined in the PRC tax code.  An anti-fraud provision of the code also requires exporters who claim tax advantages under this exemption to file with the local tax office proof of payment for goods or services from an entity outside of PRC. Absent this proof of export, the tax office will conclusively presume that the entity which claimed the tax benefit engaged in fraud.  Potential penalties arising from such a finding include denial of the tax benefit, seizure of assets and "black listing" of all officers and directors of the entity claiming the tax advantage without sufficient documentary proof.

Intech has enjoyed a significantly reduced tax liability under the exporter's tax benefit.  Due to WEMU's financial distress, WEMU has been unable to remain current on its obligations to Intech. This has had a detrimental effect on Intech because Intech does not collect funds directly from customers and instead is entirely reliant on WEMU to pay Intech for cost of goods sold after WEMU receives payment from the customer.  Because Intech has not received sufficient payments to justify the tax advantages conferred by PRC, it received two warnings from the tax office regarding its non-conformance with the tax code.  Each of these warnings issued prior to WEMU filing the bankruptcy petition on July 5, 2013.

WEMU's filing a bankruptcy petition in the United States has no consequence under Chinese law and Intech remains fully liable to the tax office for failure to prove its exporter status under the PRC tax code. Intech has taken all reasonable steps to comply with the rules and regulations of the Chinese tax authority and anticipates that it will be able to satisfy the conditions and requirements of the Chinese taxing authorities.

On July 26, the Bankruptcy Court authorized a single $250,000 payment to Intech. WEMU executed a transfer of said amount within 7 days of the order. This transfer provided substantial relief, but did not fully resolve Intech's conflict with the tax office because WEMU still owes Intech approximately $1,600,000 at the time of filing the petition. Unless Intech can prove that this sum, as well, is timely paid by a foreign entity, Intech will remain under threat of seizure or other adverse government action.

Under the PRC legal system, seizures of assets for failure to comply with tax provisions are not uncommon and there is no guarantee that Intech will be allowed to continue doing business despite its continuing breach of the PRC tax code.

## X.    TAX CONSEQUENCE

The Debtor is not providing tax advice to creditors or interest holders. **U.S. Treasury Regulations require you to be informed that, to the extent this section includes any tax advice, it is not intended or written by the Debtor or its counsel to be used, and cannot be used, for the purpose of avoiding federal tax penalties.** Each party affected by the Plan should consult its own tax advisor for information as to the tax consequences of Plan confirmation. Generally, unsecured creditors should have no tax impact as a result of Plan confirmation. The recovery of each creditor is payment on account of a debt and generally not taxable, unless the creditor wrote off the debt against income in a prior year in which case income may have to be recognized. Interest holders may have very complicated tax effects as a result of Plan confirmation.

## XI.    LIQUIDATION ANALYSIS UNDER CHAPTER 7

The principal alternative to the Debtor's reorganization under Chapter 11 is a conversion of the case to Chapter 7 of the Bankruptcy Code. Chapter 7 requires the liquidation of the Debtor's

assets by a Trustee who is appointed by the United States Trustee's office. In a Chapter 7 case, the Chapter 7 Trustee would take over control of the assets. The assets would be liquidated and the proceeds distributed to creditors in the order of their priorities. Attached hereto as Exhibit D is the Debtor's liquidation analysis (the "Liquidation Analysis"). Based on the Liquidation Analysis, unsecured creditors would receive nothing under the Plan. Given the alternative under a Chapter 7 scenario, the Debtor's proposed Chapter 11 Plan provides a substantially better alternative for unsecured creditors, because it provides unsecured creditors an opportunity to be paid 20% of their claims within 90 days of the Effective Date of the Plan, 100% of their claims over time with interest, or stock in exchange for their claims. The claims will be paid through the Debtor's ongoing operations. Therefore, it is urged by the Debtor that all creditors vote in favor of the Plan.

## XII.    EFFECT OF CONFIRMATION OF PLAN

### A.    Discharge of Debtor

On the Effective Date of the Plan, the Debtor shall be discharged from any debt that arose before confirmation of the Plan, subject to the occurrence of the Effective Date, to the extent specified in § 1141(d)(1)(A) of the Code, except that the Debtor shall not be discharged of any debt (i) imposed by the Plan, (ii) of a kind specified in § 1141(d)(6)(A) if a timely complaint was filed in accordance with Rule 4007(c) of the Federal Rules of Bankruptcy Procedure, or (iii) of a kind specified in § 1141(d)(6)(B). After the Effective Date of the Plan your claims against the Debtor will be limited to the debts described in clauses (i) through (iii) of the preceding sentence.

### B.    Modification of Plan

The Debtor may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan. The Debtor may also seek to modify the Plan at any time after confirmation only if (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.

### C.    Final Decree

The Debtor will request entry of a final decree closing the case on or before the later of the date all Claim objections and any pending litigation is concluded or 180 days after the Effective Date of the Plan.

DATED: December 2, 2013

WORLDWIDE ENERGY AND MANUFACTURING USA, INC.

By: /s/ John Ballard
John Ballard, Chief Financial Officer

Kutner Brinen Garber, P.C. ("KBG") acted as legal counsel to the Debtor on bankruptcy matters during the Chapter 11 case.  KBG prepared this Disclosure Statement with information provided primarily by the Debtor.  The information contained herein has been approved by the Debtor.  KBG has not made any separate independent investigation as to the veracity or accuracy of the statements contained herein.

Counsel to the Debtor and
Debtor- In-Possession:

KUTNER BRINEN GARBER, P.C.

By:
Lee M. Kutner (#10966)
Jenny M.F. Fujii (#30091)
303 East 17th Avenue, Suite 500
Denver, CO 80203
Telephone: (303) 832-2400
Telecopier: (303) 832-1510

39

**ATTACHMENTS TO DISCLOSURE STATEMENT**

EXHIBIT A:   Unsecured Claims List – Class 3

EXHIBIT B:   Securities Claimants – Class 4

EXHIBIT C:   Projection of Debtor's operations following confirmation of the Plan

EXHIBIT D:   Liquidation Analysis

EXHIBIT E:   Summary of Monthly Operating Reports, July 2013 through October 2013

EXHIBIT F:   Expert Report dated June 25, 2013

EXHIBIT G:   Letter dated February 21, 2013 Terminating Mr. Koos

EXHIBIT H:   List of Officers and Directors

EXHIBIT I:   Debtor's Internal Memorandum Dated May 16, 2012

EXHIBIT J:   Expert Report on Debtor's Valuation Prepared by Scale Finance LLC

EXHIBIT K:   Letter From Diane Thelen to Debtor Dated June 6, 2012

EXHIBIT L:   Letter from Mr. Koos to Shareholders Dated August 23, 2013

**Worldwide Energy & Manufacturing, Inc.**                                      **Exhibit A**

**Chapter 11 Bankruptcy Case No. 13-21577-MER**

**Class 3 General Unsecured Creditors**

| Creditor | Claim | Assumptions Option 2: Full payment | Assumptions Option 1: 20% payment | Notes | Type of claim |
|---|---|---|---|---|---|
| A.M.Z International Shipping Co. | $17,623.53 | $17,623.53 | | E | Freight |
| ACG Accountancy | $3,040.00 | | $608.00 | | Accounting |
| CIIC Investment Co., Ltd. | $228,927.71 | | $45,785.54 | A | Freght |
| CJ Holdings, LLC | $10,000.00 | $10,000.00 | | | Landlord |
| Englert, Coffey, McHugh & Fantauzzi, LLP | $1,647.50 | $1,647.50 | | | Law firm |
| Echo Global Logistics | $961.83 | $961.83 | | | Freight |
| Federal Express | $52.43 | $52.43 | | | Freight |
| Gary Koos | $0.00 | $0.00 | | | Former employee |
| Getty Images | $1,508.00 | | $301.60 | | Copyright claim |
| Kingwood Logistics, Ltd. - USD | $649.08 | $649.08 | | | Freight |
| Marco Polo Logistics (SFO), Inc. | $8,636.43 | $8,636.43 | | C | Freight |
| Michael H. Lewis | $3,395.00 | $3,395.00 | | | Law firm |
| Michael Toups | $1,000.00 | | $200.00 | | Former CFO |
| Moye White, LLP | $400,000.00 | | | | Law firm |
| Outlook United | $600.00 | | $120.00 | | Information Technology |
| Pahl & McCay, PLC | $6,232.66 | | $1,246.53 | | Law firm |
| Premeire Source, LLC | $24,583.59 | $24,583.59 | | D | Sales |
| Scott D. Hampton | $1,820.00 | | $364.00 | | Computer |
| Shanghai Intech Electro-Mechanical | $1,622,801.80 | $1,622,801.80 | | B | Subsidiary |
| Spencer Fane&Grimshaw | $962.50 | | $192.50 | | Law firm |
| Underwriters Laboratories, Inc. | $1,156.25 | | $231.25 | | OSHA |
| UPS | $712.88 | $149.53 | | | Freight |
| US Securities and Exchange Commission | $100,109.74 | $100,109.74 | | | SEC |
| Vibato, LLC | $4,583.33 | | $916.67 | | Accounting |
| Windes & McClaughry Accountancy Corp. | $209,983.95 | | $41,996.79 | | Accounting |
| Worldwide Energy and MFG Nantong | $212,362.15 | | $42,472.43 | | Subsidiary |
| ZHEJIANG SHUQIMENG Photovoltaic | $1,831.81 | | $366.36 | | Supplier |
| ZHEJIANG ZG-Cellings Co., Ltd. | $5,943.75 | | $1,188.75 | | Supplier |
| | | | | | |
| **Total** | **$2,871,125.92** | **$1,790,610.46** | **$135,990.42** | | |

**Notes:**

**A. Received $70,000 as a critical vendor payment.**

**B. Received $250,000 as a critical vendor payment.**

**C. Received $5,000 as a critical vendor payment.**

**D. Claim reduced by $11,725 as this amount will be paid as a priority claim.**

**E. This creditor is a CA corporation owned by Tiffany Liu's husband.**

**Worldwide Energy & Manufacturing, Inc.**
**Chapter 11 Bankruptcy Case No. 13-21577-MER**
**Class 4 Securities Claimants (non-exhaustive list)**

| Creditor | Claim |
|---|---|
| | |
| Gerald DeCiccio | unknown |
| Jehu Hand | unknown |
| Jeffrey F. Watson | unknown |
| Jennifer Maliar | unknown |
| Jimmy Wang | unknown |
| Ladenburg Thalmann | $    10,000,000.00 |
| Lauren Byrne/Lincoln & Creed, Inc. | unknown |
| Michael D. Steingrebe | unknown |
| Mindy Wang | unknown |
| | |
| | |

Exhibit B

**WORLDWIDE ENERGY AND MANUFACTURING USA**
**SEVEN YEAR FORECAST**

Exhibit C

| | Forecast Year 2014 | Forecast Year 2015 | Forecast Year 2016 | Forecast Year 2017 | Forecast Year 2018 | Forecast Year 2019 | Forecast Year 2020 | TOTAL Seven Year |
|---|---|---|---|---|---|---|---|---|
| Beginning Cash | 290,000 | 180,323 | 180,181 | 187,122 | 225,705 | 367,920 | 698,589 | |
| Sales | 5,400,000 | 5,832,000 | 6,298,560 | 6,802,445 | 7,346,640 | 7,934,372 | 8,569,121 | 48,183,138 |
| Cost of goods sold | 4,212,000 | 4,548,960 | 4,975,862 | 5,441,956 | 5,877,312 | 6,347,497 | 6,769,606 | 38,173,194 |
| Gross profit | 1,188,000 | 1,283,040 | 1,322,698 | 1,360,489 | 1,469,328 | 1,586,874 | 1,799,515 | 10,009,944 |
| Operating Expenses | | | | | | | | |
| Advertising | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Commission expense | 108,275 | 115,000 | 138,000 | 142,000 | 145,000 | 150,000 | 160,000 | 958,275 |
| Automobile expense | 7,200 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 58,200 |
| Bank charges | 5,784 | 5,784 | 5,784 | 5,784 | 5,784 | 5,784 | 5,784 | 40,488 |
| Contract labor | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 1,680,000 |
| Freight | 7,200 | 8,000 | 9,000 | 9,000 | 9,000 | 9,000 | 9,000 | 60,200 |
| Worker's comp | 13,668 | 13,668 | 13,668 | 13,668 | 13,668 | 13,668 | 13,668 | 95,676 |
| Insurance expense | 6,000 | 7,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 53,000 |
| Interest expense | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 36,000 | 252,000 |
| Licenses | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 8,400 |
| Late fees | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 7,000 |
| Professional fees | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 105,000 |
| Postage | 7,000 | 7,500 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 54,500 |
| Payroll taxes | 31,272 | 31,272 | 31,272 | 31,272 | 31,272 | 31,272 | 31,272 | 218,904 |
| Employee Benefits | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 120,000 | 840,000 |
| Payroll expense | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 2,100,000 |
| Office expense | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 7,000 |
| Rent | 67,344 | 69,360 | 71,436 | 73,584 | 75,792 | 78,066 | 80,408 | 515,989 |
| Taxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Telephone | 13,344 | 13,344 | 13,344 | 13,344 | 13,344 | 13,344 | 13,344 | 93,408 |
| Tools | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Entertainment | 1,000 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 8,200 |
| Travel | 12,000 | 15,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 127,000 |
| Utilities | 15,840 | 15,840 | 15,840 | 15,840 | 15,840 | 15,840 | 15,840 | 110,880 |
| Misc expense | 5,000 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 5,500 | 38,000 |
| Stock compensation | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Plan payments: | | | | | | | | |
| Tax claims: CA | 822 | 0 | 0 | 0 | 0 | 0 | 0 | 822 |
| Class 1 | 11,725 | 0 | 0 | 0 | 0 | 0 | 0 | 11,725 |
| Class 2, VFC (337k +6% interest) | 78,182 | 78,182 | 78,182 | 78,182 | 78,182 | 0 | 0 | 390,909 |
| Class 3, option 1 (20%) | 135,990 | 0 | 0 | 0 | 0 | 0 | 0 | 135,990 |
| Class 3, option 2 (100% 7yr) | 24,831 | 174,831 | 174,831 | 174,831 | 174,831 | 174,831 | 174,831 | 1,073,820 |
| Kutner Brinen Garber, P.C. | 20,000 | 0 | 0 | 0 | 0 | 0 | 0 | |
| US Trustee Fees | 12,000 | 0 | 0 | 0 | 0 | 0 | 0 | 12,000 |
| Total operating expenses | 1,297,677 | 1,283,181 | 1,315,757 | 1,321,905 | 1,327,113 | 1,256,205 | 1,268,547 | 9,050,387 |
| Net operating income/(loss) | -109,677 | -141 | 6,940 | 38,584 | 142,215 | 330,669 | 530,968 | 959,558 |
| Ending Cash | 180,323 | 180,181 | 187,122 | 225,705 | 367,920 | 698,589 | 1,229,558 | |

**Worldwide Energy & Manufacturing USA, Inc.**          **Exhibit D**
**Chapter 11 Bankruptcy Case No. 13-21577-MER**

**LIQUIDATION ANALYSIS**

__ASSETS (as of Petition Date, except as otherwise noted)__

| Personal Property | Est. value | Costs of sale/recovery/liens | Net Value |
|---|---|---|---|
| Bank Accounts (as of 10/31/13) | $270,000 | $0 | $270,000 |
| Accounts receivable (as of 10/31/13) | $313,487 | | $0 |
|   Legal and accounting fees to recover amounts due | | ($35,000) | |
|   Lien held by VFC Partners 23, LLC | | ($356,000) | |
|   Net value | | | $0 |
| Drawings, tools, engineering designs | unknown | | $0 |
| Computers, office equipment | $560 | ($84) | $476 |
| US inventory | $376,268 | | |
|   Costs of sale | | ($37,627) | |
|   Remaining Lien held by VFC Partners 23, LLC | | $0 | |
| | | | $338,641 |

**Total Personal Property**                                                **$609,117**

\* Inventory value is estimated at 40% liquidation value
\*\* Marketability of drawings, tools and engineering designs are questionable
\*\*\* Computers, office equipment values estimated at 50% liquidation value.
\*\*\*\* Accounts receivable are estimated at 50% liquidation value

**Total Net Assets**                                                        **$609,117**

  **Chapter 7 Administrative Expenses**
    Chapter 7 Trustee                                    $26,276
    Chapter 7 Accountant                                 $15,000
    Chapter 11 Bankruptcy fees                           $50,000
    Chapter 11 ongoing post petition payables (est)      $300,000
    Chapter 11 administrative claim of landlord\*\*\*\*\*  $250,000
    Chapter 11 Creditors Committee Counsel               $30,000
    Chapter 7 counsel                                    $10,000
    Total Chapter 7 expenses                             $681,276

**Net Assets after Payment of Secured Claims and Chapter 7 expenses:**          **$0**
  Estimated Class 3 Creditors                                  $2,871,126

**Payment to unsecured creditors under the Plan**                              **0%**

  \*\*\*\*\*Based on Chapter 7 rejection of assumed lease.

**Worldwide Energy & Manufacturing USA, Inc.**                    Exhibit E
**Chapter 11 Bankruptcy Case No. 13-21577-MER**

Summary of Monthly Operating Reports

|  | Jul-13 | Aug-13 | Sep-13 | Oct-13 | **Total** |
|---|---|---|---|---|---|
| Gross Sales | $310,807.57 | $532,779.53 | $466,945.87 | $426,735.90 | **$1,737,268.87** |
| Cost of Goods Sold | $240,069.00 | $437,410.60 | $358,182.01 | $327,879.70 | **$1,363,541.31** |
| Gross Profit | $70,738.57 | $95,368.93 | $108,763.86 | $98,856.20 | **$373,727.56** |
|  |  |  |  |  |  |
| Expenses | $60,490.84 | $96,883.93 | $92,929.30 | $74,559.82 | **$324,863.89** |
| **Net Ordinary Income** | **$10,247.73** | **($1,515.00)** | **$15,834.56** | **$24,296.38** | **$48,863.67** |

Hartley Moore Accountancy Corporation

11801 Pierce Street, Suite 256                4685 MacArthur Ct., Suite 370
Riverside, CA 92505                           Newport Beach, CA 92660
Tel: (951) 710-3224                           Tel: (714) 876-3015



www.hartleymooreaccountancycorporation.com                    Hartley|Moore|Accountancy Corporation

June 25, 2013

John Ballard
Chairman of the Board of Directors
Worldwide Energy & Manufacturing, Inc.
408 North Canal Street, Unit A&B
South San Francisco, California 94080

We were engaged to assemble, from information the Company provided, the pro forma balance sheets and related statements of income of the Company as of December 31, 2011 and 2010 and the years then ended, under specified conditions and assumptions, for the purpose of determining the impact on financial statements of changes in an assumed set of parameters. An assembly of pro forma financial statements involves the computer and/or manual processing of, and the mathematical and other clerical functions related to, the presentation of the projection, which is based on management's assumptions as to results that may have varied from historical financial statements had certain events occurred differently, and the possible courses of action that may have occurred during the pro forma period assuming those altered historical results. The pro forma financial statements present the expected financial position and results of operations for the pro forma period based on these specified assumptions.

Management is responsible for the assumptions used in preparation of the pro forma financial statements. An assembly of a pro forma financial statement does not include evaluating the support for management's assumptions. Some assumptions used are based on revisions to historical events and are known to not have occurred; therefore, the pro forma results reflected during the pro forma period will certainly be different from actual historical results. We have no responsibility over the determination of the assumptions used in the preparation of the pro forma statements or the reasonableness of such assumptions.

We were also asked by management to address disclosure considerations related to the specified transactions, as discussed below, under the various scenarios and to discuss requirements and how they may apply to the applicable historical or pro forma results. It should be noted that there are certain disclosure rules and guidelines based on generally accepted accounting principles; however these guidelines are in most cases subject to interpretation, applicability and materiality parameters when actually determining whether disclosure is necessary. We will discuss some of these considerations below, however it is not intended to be an all-encompassing list of possible disclosure and will be subject to the context of the facts and assumptions used in the analyses laid out in this report.

### *About Hartley Moore Accounting Corporation*

Hartley Moore Accountancy Corporation (Hartley Moore) is a full service CPA firm with offices located in Riverside and Newport Beach, California offering accounting, tax consulting and compliance, bookkeeping, payroll, audit and assurance (including 1933 and 1934 Act SEC filings, IPO and other offering transactions), and professional consulting services to businesses and individuals. Our professional staff has over 20 years of experience serving both public and nonpublic corporate clients with their accounting and financial reporting needs and has extensive experience with mergers and acquisitions, public offerings, and complex debt and equity transactions.

### *About Worldwide Energy Manufacturing USA Inc.*

Worldwide Energy Manufacturing USA, Inc. (WEMU, or the Company) is an international manufacturing and engineering firm focused on photovoltaic ("PV") solar modules and contract manufacturing services. The Company services customers globally with their Solar Division and customers in both the U.S. and China within their Contract Manufacturing division. Amerisolar is the Solar Division of WEMU, which designs and manufactures advanced PV solar modules for the solar industry for a variety of electric power applications including residential, commercial, industrial, and public utility. The Company sells its modules under the "Amerisolar" brand to PV solar system integrators and distributors.

**EXHIBIT F**

Worldwide Energy & Manufacturing, Inc.
June 25, 2013
Page 2

WEMU offers turnkey contract assembly, test, cost reduction, and product improvement for customers' electronic and electro-mechanical products. WEMU can go from printed circuit board to final build, as well as test, burn-in, packaging and shipping of customers' products. The Company's engineers work to ensure customers' electronic production needs are set up and produced in the most cost effective manner that delivers the quality specified by customers. The power supplies WEMU manufactures are compatible with all kinds of electronic devices, especially for LED lighting and power grid applications.

*Background of Issue*

In August 2011, the Company filed a Form 8-K with the Securities and Exchange Commission (SEC) disclosing its findings and conclusions related to a transfer of equity in one of its subsidiaries, Worldwide Energy and Manufacturing (Nantong) Co. Ltd. ("Nantong"), to the management of Nantong.  As disclosed by the Company in this Form 8-K, during 2009 and 2010, the Company had been in negotiations with the Nantong management team regarding the transfer of 48.9% equity ownership in Nantong.  After a thorough investigation commenced by the Company's Audit Committee in April 2011, continued under a Special Committee of the Company's Board of Directors, and supplemented with information identified by a separate investigation by the SEC's Division of Enforcement, the following "facts" were established by the Company in this Form 8-K filed in August 2011:

1. Certain agreements regarding the equity transfer were signed during April 2010, with a supplemental agreement signed in April 2011;  and

2. The Company's independent public accountants were first made aware of the equity transfer in connection with their audit of the Company's financial statements as of and for the year ended December 31, 2010.

The April 2010 agreements were filed with the Rugao Bureau of Commerce in the People's Republic of China (the "Bureau of Commerce") in April 2010, and the Bureau of Commerce approved the three agreements on April 28, 2010. Accordingly, based upon the review and investigation performed, and the review and analysis by the Company's management at that time, the Company determined that effective April 28, 2010, the Company's ownership of Nantong was reduced from 99.9% to 51%.  The two supplemental agreements signed in April 2011 were not filed with or approved by the Bureau of Commerce.  Because the transfer of equity in Nantong was determined to be effective on April 28, 2010, before the supplemental agreements were signed, the Company determined that the provisions of the supplemental agreements that place conditions on the equity transfer did not change the April 28, 2010 effective date, however the Company had not yet made a determination regarding the effectiveness of the other provisions of the supplemental agreements.

The Company did not file its Annual Report on Form 10-K for the fiscal year ended December 31, 2010 due to the ongoing review of the agreements concerning the equity transfer.  The last audited financial statements filed were for the year ended December 31, 2009, which were filed April 15, 2010. The Company subsequently filed quarterly reports on Form 10-Q for the quarters ended March 31, 2010 (filed May 17, 2010), June 30, 2010 (filed August 16, 2010), and September 30, 2010 (filed November 22, 2010).  However, in this August 2011 Form 8-K, the Company advised the public that its financial statements for the year ended December 2009 and for the quarter ended March 2010 would need to be amended due to nondisclosure of the equity transaction described above in the footnotes to the financial statements and that its financial statements for the quarters ended June 2010 and September 2010 did not properly reflect the equity transfer described above and, as a result, could not be relied upon.  The Company stated that it was determining the proper accounting for these transactions and assessing whether the accounting for the transactions had an impact on other accounting periods and reports filed by the Company.  No subsequent amended or revised financial statements for any period were filed and audited financial statements for the year ended December 31, 2010 were never filed.  The Company's securities registration was revoked in May 2012.

Worldwide Energy & Manufacturing, Inc.
June 25, 2013
Page 3

**_Assumptions_**

Pro forma schedules were primarily based on historical financial data of the Company and on factual evidence in respect to the equity transfer, in both cases as provided by the Company's current management.  The following additional assumptions used are:

1. The Nantong subsidiary was originally established by the JV agreement declared effective on April 28, 2010, however the pro forma scenarios assume that the transaction either occurred at the beginning of the respective periods or did not occur at all within the respective periods.

2. The Nantong JV, when established in April 2010 had no preexisting assets and liabilities and no operations.  The JV agreement called for the capital infusion of $5.1 million by WEMU US and $4.9 million by the Nantong management.  The $4.9 million was never paid into the entity and through subsequent agreement was not due; rather the Nantong management was to earn its way into its equity ownership on a go-forward basis from inception.   There was discussion about the raising of funds for the entity, but as far as it is known, this did not occur.  Thus, for the purposes of these pro forma schedules, there was no equity to the entity other than in the capital account belonging to WEMU US.

3. The Company accrued commissions in 2010 in the amount of $781,000 related to the commissions agreement.  These commissions were never paid and were expected to be considered to be part of Nantong management's earning of its equity ownership interest.

**_Procedures_**

As discussed above, the Company had determined that a transfer of 49% equity ownership in the Nantong subsidiary did in fact occur in April 2010, however the remainder of the deal's parameters and when they were known, and by whom, were not as clearly specified.  Thus, management has asked that pro forma financial statements be generated to assess the difference in various periods between two scenarios: 1) the equity transfer did not occur at all during that period and 2) the equity transfer occurred as of the beginning of that period.  Within each of the scenarios, we will assess the impact on balance sheet and income statement captions and possible disclosure items.  See the summarized pro forma schedules as Exhibits A and B to this report.

The following outlines the procedures used in the preparation of the pro forma financial statements, the data and the source of data used in these procedures, and the assumptions used in this analysis as prescribed by Company's current management:

1. We are providing pro forma analysis on two periods for which a financial statement was never filed with the SEC, each of the years ended December 31, 2010 and 2011.  As such, the pro forma analyses use as a basis financial statements within consolidating schedules for each of these periods provided by the Company's current management.

2. The consolidating schedules for the year ended December 31, 2010 included an adjustment within WEMU US to reflect the transfer of the equity ownership, recorded as a reduction in Investment in Subsidiary and as a loss within Other Income (Expenses) of $4,890,000.  Per management, the shares to be transferred to the Nantong management team were always intended to either be acquired with a cash payment or through the application of the proportionate share in future net earnings of Nantong towards an established purchase price.  Through documents filed as attachments to the August 2011 Form 8-K, it is known that 1) the original document establishing the Nantong joint venture called for a cash payment, 2) there was a separate agreement that changed this to state that there would be no cash payment, and 3) there was a supplemental agreement establishing thresholds on future net earnings under which this equity ownership would be earned.  There was some discrepancy as to which of these agreements were recognized by the Bureau of Commerce as being effective.  However, management's assertion is that 1) these documents show an intent that the transfer was to be based on application of a share of earnings to the purchase price, and 2) that in fact a cash payment was never made.  Given these assumptions, there would be no entry to book at the inception of the agreement because the Nantong management team was to earn equity on a go-forward basis.  As such, there would be no loss recorded at inception of the agreement.  The entry in the consolidation was reversed in the pro forma statements, including an estimated tax impact at an estimated 35% effective rate for US corporate income taxes.

Worldwide Energy & Manufacturing, Inc.
June 25, 2013
Page 4

3.  The first scenario includes the assumption that the equity transfer did not occur at all during the period.  Management's assumption is that if the equity transfer did not occur, then the Nantong management team would have continued to earn commissions at a rate of 49% of the pretax income for the Company's Solar Division.  A pro forma adjustment was recorded to reflect an added expense for these commissions, offset by an estimated tax benefit due to the increase expense, at an estimated 35% effective rate for US corporate income taxes.

4.  Alternatively, scenario two assumes that the Nantong management team effectively exchanged their commission plan for the right of equity ownership in the Nantong joint venture.  Under this scenario, the adjustment in step 3 discussed above would not be necessary, and instead an entry was recorded to reflect the 49% Noncontrolling Interest in the net earnings of the Nantong subsidiary for the period upon consolidation.

### *Summary of Accounting Entries*

The following is the net effect of the pro forma accounting entries between the two assumed scenarios:

| | December 31, 2010 Pro Forma | | |
| --- | --- | --- | --- |
| | Commission Model | Equity Model | Variance |
| Accrued expenses | $ 5,664,504 | $ 2,993,703 | $ (2,670,801) |
| Tax payable | 1,898,648 | 2,824,788 | 926,140 |
| Total liabilities | 38,278,091 | 36,533,430 | (1,744,661) |
| Retained earnings | 9,935,588 | 10,378,902 | 443,315 |
| Total stockholders' equity | 18,005,326 | 18,448,641 | 443,315 |
| Noncontrolling interest | 1,548,356 | 2,849,703 | 1,301,347 |
| Total equity | $ 19,553,682 | $ 21,298,343 | $ 1,744,661 |
| | | | |
| Other selling, general and administrative expenses | $ 12,769,826 | $ 10,099,025 | $ (2,670,801) |
| Net Operating Income | 2,018,469 | 4,689,270 | 2,670,801 |
| Net Income Before Income Taxes | 5,619,325 | 8,290,126 | 2,670,801 |
| Income Tax | (1,373,611) | (2,299,751) | (926,140) |
| Net income Before Noncontrolling Interest | 4,245,714 | 5,990,375 | 1,744,661 |
| Profit Share by Noncontrolling Interest | (415,068) | (1,716,415) | (1,301,347) |
| Net Income | $ 3,830,646 | $ 4,273,960 | $ 443,315 |
| Earnings per share | $ 0.71 | $ 0.79 | $ 0.08 |

| | December 31, 2011 Pro Forma | | |
| --- | --- | --- | --- |
| | Commission Model | Equity Model | Variance |
| Retained earnings | $ 7,151,683 | $ 8,235,441 | $ 1,083,758 |
| Noncontrolling interest | 1,977,344 | 893,587 | (1,083,758) |
| Total equity | $ 16,307,838 | $ 16,807,838 | $ - |
| | | | |
| Profit Share by Noncontrolling Interest | $ (373,634) | $ 710,124 | $ 1,083,758 |
| Net Loss | $ (4,528,566) | $ (3,444,808) | $ 1,083,758 |
| Loss per share | $ (0.84) | $ (0.64) | $ 0.20 |

Worldwide Energy & Manufacturing, Inc.
June 25, 2013
Page 5


### Summary of Findings

After applying management's assumptions as described above to the data provided, the following represents the results and some analysis of the potential impact of the different scenarios:

1. The impact of changing from a commission based model to the equity model was an estimated positive increase in pro forma earnings of $443,000 for the year ended December 31, 2010, or an increase of $0.08 per weighted average common share outstanding for the period.  There are two reasons for this change in the pro forma model:  1) the commission model is based on the entire Solar Division, while the equity model is based on just the Nantong subsidiary since that is the entity in which the equity was transferred, and 2) the commissions by agreement were based on pretax earnings, while in the equity model the respective owners are entitled to their share of the net earnings after taxes.  Given these two factors, a conclusion can be drawn that for any period in which the portions of the Solar Division other than Nantong were in a pretax profit position, the net effect of making the switch to the equity method would result in increased net earnings for the Company.

2. The other change on the statement of income is in the classification.  Under the commission model, the expense is recorded within operating expenses and impacts the tax provision.  Under the equity model, the portion of net earnings allocated to the Nantong management is reported on a separate line just above net income.  So, for the year ended December 31, 2010, the net variance of $443,000 is comprised of an increase of $2.7 million in pretax earnings, a $0.9 million increase in tax provision, offset by the increase of $1.3 million in Noncontrolling Interest.

3. On the balance sheet, there is no change to assets between the two pro forma models.  There is an assumed decrease in accrued liabilities of $2.7 million reflective of eliminated commissions payable, the increase of $0.9 million in income taxes payable, a net increase in retained earnings of $0.4 million reflective of the increased earnings discussed above, and a Noncontrolling Interest of $1.3 million, reported as a separate caption of equity.

It is important to remember that the variances noted above are differences between two pro forma models under the assumption that the transfer of equity either occurred as of the beginning of the period or didn't occur at all.

### Conclusions

Based on the analysis performed, the change from a commission model to an equity model results in an improvement in the Company's pro forma net income (loss) for each of the pro forma periods presented.  This is largely due to the different base for each model, the commission model is based on net income (loss) before taxes for the solar division, while the equity model is based on the net income (loss) after taxes.  For pro forma 2010, the solar division, excluding Nantong, had income before taxes, thus the change in model eliminated Company liability on this income.  These savings were partially offset by an increased liability for Nantong, based on the compensation being based on pretax income as opposed to net income, however in net the total compensation decreased.  For pro forma 2011, the solar division as a whole, as well as the Nantong entity itself, incurred a net loss.  Under this scenario, no commissions would have been due under the commissions model, however the pro forma results still improved by the switch in model as a portion of the pro forma net loss would have been passed through to the Noncontrolling Interest.

### Disclosure Considerations

The final factor for consideration is whether the equity transfer agreement required disclosure, and when.  Under Item 1.01 of Form 8-K, a '34 Act reporting company is required to disclose "material definitive agreements" not made in the ordinary course of business.  The SEC last modified the requirements of Form 8-K in 2004, at which time the SEC had initially proposed requiring companies to disclose letters of intent and other non-binding agreements.  In the Final Rule Release dated August 23, 2004, the SEC did not enact the proposed rule change to Item 1.01, stating:

*"In particular, many commenters opposed our proposal to require disclosure of letters of intent and other non-binding agreements in addition to disclosure of definitive agreements that are material to the company.  They noted that disclosure of non-binding agreements could cause*

Worldwide Energy & Manufacturing, Inc.
June 25, 2013
Page 6

*significant competitive harm to the company and create excessive speculation in the market.  Several companies also stated that they use letters of intent extensively, but that few such letters culminate in a completed transaction.*

*In response to the commenters, we eliminated the requirement that companies disclose their entry into non-binding agreements from this item. We have further replaced the proposed definition of "agreement" with a definition of "material definitive agreement" and have moved this definition from a proposed instruction into Item 1.01(b). We have clarified that only agreements which provide for obligations that are material to and enforceable against a company, or rights that are material to the company and enforceable by the company against one or more other parties to the agreement by the company, are required to be disclosed pursuant to Item 1.01, regardless of whether the material definitive agreement is enforceable subject to stated conditions."*

Based on this interpretation, the SEC reaffirmed the position that only definitive, material agreements need be disclosed.  So, when would the equity transfer have been considered a definitive agreement?  Based on the facts as laid out by the Company in its Form 8-K from August 2011, the deal was finalized in April 2010, but was not specific as to the date; however the agreement was declared to be effective as of April 28, 2010, the date it was approved by the Bureau of Commerce in China.  Based on these dates, the transaction would have been a subsequent event transaction to both the year ended December 31, 2009 and the quarter ended March 31, 2010, and it would have been a current period equity transaction during the quarters ended June 30 and September 30, 2010, if the transaction were made known to those responsible for such disclosures.  As discussed above, the Company concluded that the transactions were not communicated to the auditors until their audit of the year ended December 31, 2010, so presumably the information did not get communicated until after the Form 10-Q for the quarter ended September 30, 2010 was already filed.  Thus, if the transaction were known, it would have been a likely disclosure in some form for each of the three quarters ended March 31, June 30, and September 30, 2010, but without the communication of a consummated transaction, there was presumably no event requiring disclosure.

We appreciate the opportunity to be of service and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign the enclosed copy and return it to us.

Very truly yours,

HARTLEY MOORE ACCOUNTANCY CORPORATION

*Hartley Moore Accountancy Corporation*

Riverside , CA
June 25, 2013

EXHIBIT A
2010 Pro Forma Schedules

| | December 31, 2010 Before Adjustments | Adjustments [1] | [2] | [3] | [4] | Commission Model December 31, 2010 Pro Forma |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ 9,400,991 | $ - | $ - | $ - | $ - | 9,400,991 |
| Restricted cash | 3,223,287 | - | - | - | - | 3,223,287 |
| Accounts receivable | 24,926,006 | - | - | - | - | 24,926,006 |
| Notes receivable | - | | | | | - |
| Inventories | 5,716,680 | - | - | - | - | 5,716,680 |
| VAT tax receivable | 392,512 | - | - | - | - | 392,512 |
| Advances to suppliers | 2,551,654 | - | - | - | - | 2,551,654 |
| Advance for buying the office building | 1,181,280 | - | - | - | - | 1,181,280 |
| Deferred tax asset | 418,475 | - | - | - | - | 418,475 |
| Note receivable from officer | - | | | | | - |
| Due from related party-short term | 163,924 | - | - | - | - | 163,924 |
| Other receivable | 1,377,571 | - | - | - | - | 1,377,571 |
| Prepaid and other current assets | 92,967 | - | - | - | - | 92,967 |
| Total current assets | 49,445,347 | - | - | - | - | 49,445,347 |
| Property, plant and equipment, net | 6,539,113 | - | - | - | - | 6,539,113 |
| Intangible assets | 1,101,000 | - | - | - | - | 1,101,000 |
| Goodwill | 285,714 | - | - | - | - | 285,714 |
| Investment at cost | | 5,095,451 | - | - | (5,095,451) | - |
| Deposits paid for contracts in process | - | | | | | - |
| Related party receivable - long term | 437,703 | - | - | - | - | 437,703 |
| Deferred tax-long term | 22,896 | - | - | - | - | 22,896 |
| Total assets | $ 57,831,773 | $ 5,095,451 | $ - | $ - | $ (5,095,451) | $ 57,831,773 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | $ 16,869,778 | $ - | $ - | $ - | $ - | 16,869,778 |
| Accrued expenses | 2,993,703 | - | - | 2,670,801 | - | 5,664,504 |
| Lines of credit | 4,042,198 | - | - | - | - | 4,042,198 |
| Warrant derivative liability | 2,985,945 | - | - | - | - | 2,985,945 |
| Tax payable | 1,129,108 | - | 1,695,680 | (926,140) | - | 1,898,648 |
| Due to related parties | 1,448,524 | - | - | - | - | 1,448,524 |
| Customer deposits | 5,245,365 | - | - | - | - | 5,245,365 |
| Current portion of long-term debt | - | - | - | - | - | - |
| Total current liabilities | 34,714,621 | - | 1,695,680 | 1,744,661 | - | 38,154,962 |
| Deferred tax liabilities-long term | 76,477 | | | | | 76,477 |
| Long term tax liabilities | 46,652 | | | | | 46,652 |
| Total liabilities | 34,837,750 | - | 1,695,680 | 1,744,661 | - | 38,278,091 |
| Stockholders' equity | | | | | | |
| Common stock | 6,476,033 | 10,000,000 | (4,890,000) | - | (5,110,000) | 6,476,033 |
| Deferred stock compensation | | | | | | |
| Retained earnings | 7,251,276 | 1,234,653 | 3,194,320 | (1,744,661) | - | 9,935,588 |
| Accumulated other comprehensive income | 1,458,802 | 120,354 | - | - | 14,549 | 1,593,705 |
| Total stockholders' equity | 15,186,111 | 11,355,007 | (1,695,680) | (1,744,661) | (5,095,451) | 18,005,326 |
| Noncontrolling interest | 7,807,912 | (6,259,556) | - | - | - | 1,548,356 |
| Total equity | 22,994,023 | 5,095,451 | (1,695,680) | (1,744,661) | (5,095,451) | 19,553,682 |
| Total liabilities and stockholders' equity | $ 57,831,773 | $ 5,095,451 | | $ (1,744,661) | $ (5,095,451) | $ 57,831,773 |

EXHIBIT A
2010 Pro Forma Schedules

| | Commission Model December 31, 2010 Pro Forma | Adjustments [5] | Adjustments [6] | Equity Model December 31, 2010 Pro Forma | Variance Between Models |
|---|---|---|---|---|---|
| ASSETS | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 9,400,991 | $ - | $ - | $ 9,400,991 | $ - |
| Restricted cash | 3,223,287 | | | 3,223,287 | - |
| Accounts receivables | 24,926,006 | | | 24,926,006 | - |
| Notes receivables | | | | | - |
| Inventories | 5,716,680 | | | 5,716,680 | - |
| VAT tax receivable | 392,512 | | | 392,512 | - |
| Advances to suppliers | 2,551,654 | | | 2,551,654 | - |
| Advance for buying the office building | 1,181,280 | | | 1,181,280 | - |
| Deferred tax asset | 418,475 | | | 418,475 | - |
| Note receivable from officer | | | | | - |
| Due from related party-short term | 163,924 | | | 163,924 | - |
| Other receivable | 1,377,571 | | | 1,377,571 | - |
| Prepaid and other current assets | 92,967 | | | 92,967 | - |
| Total current assets | 49,445,347 | - | | 49,445,347 | - |
| Property, plant and equipment, net | 6,539,113 | | | 6,539,113 | - |
| Intangible assets | 1,101,000 | | | 1,101,000 | - |
| Goodwill | 285,714 | | | 285,714 | - |
| Investment at cost | | | | | - |
| Deposits paid for contracts in process | | | | | |
| Related party receivable - long term | 437,703 | | | 437,703 | - |
| Deferred tax-long term | 22,896 | | | 22,896 | - |
| Total assets | $ 57,831,773 | $ - | $ - | $ 57,831,773 | $ - |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 16,869,778 | $ - | $ - | $ 16,869,778 | $ - |
| Accrued expenses | 5,664,504 | (2,670,801) | | 2,993,703 | (2,670,801) |
| Lines of credit | 4,042,198 | | | 4,042,198 | - |
| Warrant derivative liability | 2,985,945 | | | 2,985,945 | - |
| Tax payable | 1,898,648 | 926,140 | | 2,824,788 | 926,140 |
| Due to related parties | 1,448,524 | | | 1,448,524 | - |
| Customer deposits | 5,245,365 | | | 5,245,365 | - |
| Current portion of long-term debt | | | | | - |
| Total current liabilities | 38,154,962 | (1,744,661) | | 36,410,301 | (1,744,661) |
| Deferred tax liabilities-long term | 76,477 | | | 76,477 | - |
| Long term tax liabilities | 46,652 | | | 46,652 | - |
| Total liabilities | 38,278,091 | (1,744,661) | | 36,533,430 | (1,744,661) |
| Stockholders' equity | | | | | |
| Common stock | 6,476,033 | | | 6,476,033 | - |
| Deferred stock compensation | | | | | |
| Retained earnings | 9,935,588 | 1,744,661 | (1,301,347) | 10,378,902 | 443,315 |
| Accumulated other comprehensive income | 1,593,705 | | | 1,593,705 | - |
| Total stockholders' equity | 18,005,326 | 1,744,661 | (1,301,347) | 18,448,641 | 443,315 |
| Noncontrolling interest | 1,548,356 | | 1,301,347 | 2,849,703 | 1,301,347 |
| Total equity | 19,553,682 | 1,744,661 | | 21,298,343 | 1,744,661 |
| Total liabilities and stockholders' equity | $ 57,831,773 | $ - | $ - | $ 57,831,773 | $ - |

EXHIBIT A
2010 Pro Forma Schedules

| | For the 12 Months Ended December 31, 2010 Before Adjustments | Adjustments | | | | Commission Model For the 12 Months Ended December 31, 2010 Pro Forma |
|---|---|---|---|---|---|---|
| | | [1] | [2] | [3] | [4] | |
| **Revenue** | | | | | | |
| Regular sales | $ 170,821,191 | $ - | $ - | $ - | $ - | 170,821,191 |
| Cost of goods sold | 154,970,987 | - | - | - | - | 154,970,987 |
| Gross Profit | 15,850,204 | - | - | - | - | 15,850,204 |
| **Operating Expenses** | | | | | | - |
| Other selling, general and administrative expenses | 10,099,025 | - | - | 2,670,801 | - | 12,769,826 |
| Management and professional fees paid to shareholders | 360,000 | - | - | - | - | 360,000 |
| Stock based compensation | 157,357 | - | - | - | - | 157,357 |
| Depreciation | 405,873 | - | - | - | - | 405,873 |
| Loss on disposal of fixed assets | 138,679 | - | - | - | - | 138,679 |
| Total operating expenses | 11,160,934 | - | - | 2,670,801 | - | 13,831,735 |
| Net Operating Income | 4,689,270 | - | - | (2,670,801) | - | 2,018,469 |
| **Other income (expenses)** | | | | | | |
| Change in fair value of derivative financial instruments | - | - | - | - | - | - |
| Interest income | 25,098 | - | - | - | - | 25,098 |
| Interest expenses | (61,270) | - | - | - | - | (61,270) |
| Interest expense paid to shareholders | - | - | - | - | - | - |
| Other income | (1,002,920) | - | 4,890,000 | - | - | 3,887,080 |
| Other expenses | (133,758) | - | - | - | - | (133,758) |
| Dividend income | - | - | - | - | - | - |
| Exchange gain (loss) | (116,294) | - | - | - | - | (116,294) |
| Loss on disposal | - | - | - | - | - | - |
| Total other expenses | (1,289,144) | - | 4,890,000 | - | - | 3,600,856 |
| Net Income Before Income Taxes | 3,400,126 | - | 4,890,000 | (2,670,801) | - | 5,619,325 |
| Income Tax | (604,071) | - | (1,695,680) | 926,140 | - | (1,373,611) |
| Net Income After Income Tax | 2,796,055 | - | 3,194,320 | (1,744,661) | - | 4,245,714 |
| Income from Discontinued Operations | | | | | | |
| Net Income Before Noncontrolling Interest | 2,796,055 | - | 3,194,320 | (1,744,661) | - | 4,245,714 |
| Profit Share by Noncontrolling Interest | (1,649,365) | 1,234,297 | - | - | - | (415,068) |
| Net Income | $ 1,146,690 | $ 1,234,297 | 3,194,320 | (1,744,661) | $ - | $ 3,830,646 |
| **Other comprehensive income** | | | | | | |
| Foreign currency translation gain, net of tax | 107,833 | - | - | - | - | 107,833 |
| Comprehensive income attributable to the noncontrolling interest | (242,736) | - | - | - | - | (242,736) |
| Comprehensive income | $ 2,661,152 | $ - | 3,194,320 | (1,744,661) | $ - | 4,110,811 |
| Earnings per share | $ 0.21 | | | | $ | 0.71 |
| Weighted average shares outstanding | 5,409,477 | | | | | 5,409,477 |

EXHIBIT A
2010 Pro Forma Schedules

| | Commission Model For the 12 Months Ended December 31, 2010 Pro Forma | Adjustments | | Equity Model For the 12 Months Ended December 31, 2010 Pro Forma | Variance Between Models |
|---|---|---|---|---|---|
| | | [5] | [6] | | |
| Revenue | | | | | |
| Regular sales | $ 170,821,191 | $ - | $ - | 170,821,191 | $ - |
| | | | | | |
| Cost of goods sold | 154,970,987 | - | | 154,970,987 | - |
| Gross Profit | 15,850,204 | - | | 15,850,204 | - |
| | | | | | |
| Operating Expenses | - | | | | |
| Other selling, general and administrative expenses | 12,769,826 | (2,670,801) | | 10,099,025 | (2,670,801) |
| Management and professional fees paid to shareholders | 360,000 | - | | 360,000 | - |
| Stock based compensation | 157,357 | - | | 157,357 | - |
| Depreciation | 405,873 | - | | 405,873 | - |
| Loss on disposal of fixed assets | 138,679 | - | | 138,679 | - |
| Total operating expenses | 13,831,735 | (2,670,801) | | 11,160,934 | (2,670,801) |
| | | | | | |
| Net Operating Income | 2,018,469 | 2,670,801 | | 4,689,270 | 2,670,801 |
| | | | | | |
| Other Income (expenses) | | | | | |
| Change in fair value of derivative financial instruments | - | - | | - | - |
| Interest income | 25,098 | - | | 25,098 | - |
| Interest expenses | (61,270) | - | | (61,270) | - |
| Interest expense paid to shareholders | - | - | | - | - |
| Other income | 3,887,080 | - | | 3,887,080 | - |
| Other expenses | (133,758) | - | | (133,758) | - |
| Dividend income | - | - | | - | - |
| Exchange gain (loss) | (116,294) | - | | (116,294) | - |
| Loss on disposal | - | - | | - | - |
| | | | | | |
| Total other expenses | 3,600,856 | - | | 3,600,856 | - |
| | | | | | |
| Net Income Before Income Taxes | 5,619,325 | 2,670,801 | | 8,290,126 | 2,670,801 |
| Income Tax | (1,373,611) | (926,140) | | (2,299,751) | (926,140) |
| | | | | | |
| Net Income After Income Tax | 4,245,714 | 1,744,661 | | 5,990,375 | 1,744,661 |
| Income from Discontinued Operations | - | | | - | - |
| | | | | | |
| Net income Before Noncontrolling Interest | 4,245,714 | 1,744,661 | | 5,990,375 | 1,744,661 |
| Profit Share by Noncontrolling Interest | (415,068) | - | (1,301,347) | (1,716,415) | (1,301,347) |
| | | | | | |
| Net Income | $ 3,830,646 | 1,744,661 | (1,301,347) | $ 4,273,960 | $ 443,315 |
| | | | | | |
| Other comprehensive income | | | | | |
| Foreign currency translation gain, net of tax | 107,833 | - | - | 107,833 | - |
| Comprehensive income attributable to the noncontrolling interest | (242,736) | | | (242,736) | - |
| Comprehensive income | $ 4,110,811 | 1,744,661 | - | $ 5,855,472 | $ 1,744,661 |
| | | | | | |
| Earnings per share | $ 0.71 | | | $ 0.79 | $ 0.08 |
| | | | | | |
| Weighted average shares outstanding | 5,409,477 | | | 5,409,477 | 5,409,477 |

EXHIBIT A
2010 Pro Forma Schedules

[1]   Adjustment represents a reversal of the eliminating entry booked by the Company in originally consolidating Nantong into WEMU. Proper elimination will be made when the effects of the assumed accounting treatments are processed.

[2]   Adjustment is to reverse the loss recorded on the issuance of 48.9% equity interest. The assumption is that these shares were always intended to be either 1) purchased with cash infusion or 2) earned through a % of net earnings. It is now known that the cash infusion did not occur, so the assumption is that the equity was to be earned over time through equity in earnings. Thus, at the date of the supposed transfer, there should have been no loss or net equity issuance recorded. This loss reversal is booked net of the tax impact at the effective rate of 35% for WEMU US.

[3]   Assumption is made that the commission expense was not booked since the consolidation was prepared as if the equity ownership of 49% was in place. Thus, under the model of the commission structure, 49% of the pretax solar division income is recorded as a bonus expense. The following table represents the breakdown of the consolidated pretax income by segment:

|  | Solar | Other | Consolidated |
|---|---|---|---|
| WEMU US | (2,329,768) | 1,894,879 | (434,888) |
| China | 2,936,071 | 1,183,408 | 4,119,480 |
| Consolidating Adjustment | (34,543) | (249,923) | (284,466) |
|  | 571,761 | 2,828,365 | 3,400,125 |
|  |  |  | - |

Note that the WEMU US solar loss is net of the $4.9 million of Other Loss recorded in the comment for Adjustment 2 above. So, when calculating the commission expense based on the solar business, the effect of Adjustment 2 was added back to the pretax results for solar, resulting in pretax earnings of $5,461,761. In addition, the effect of this adjustment results in a reduced taxable income, thus tax expense is also reduced by this amount at the effective tax rate for WEM U  US of 35%.

[4]   This is a reposting of eliminating entries in consolidation.

[5]   This is a reversal of AJE 3, which was the posting of estimated commissions expense net of taxes. The assumption is that the third parties would accept equity ownership of 48.9% of Nantong solar business instead of the commissions expense.

[6]   Adjustment records the 48.9% noncontrolling interest in the Nantong subsidiary only.

EXHIBIT B
2011 Pro Forma Schedules

| | December 31, 2011 Before Adjustments | Adjustments [1] | [2] | [3] | [4] | Commission Model December 31, 2011 Pro Forma |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ 10,931,914 | $ - | $ - | $ - | $ - | 10,931,914 |
| Restricted cash | - | | | | | - |
| Accounts receivables, net of allowances of $196,356 and $312,000 at September 30, 2010 and December 31, 2009, respectively | 11,829,698 | - | - | - | - | 11,829,698 |
| Notes receivables | - | | | | | - |
| Inventories | 7,037,612 | - | - | - | - | 7,037,612 |
| VAT tax receivable | 63,947 | - | - | - | - | 63,947 |
| Advances to suppliers | 889,092 | - | - | - | - | 889,092 |
| Advance for buying the office building | - | | | | | - |
| Deferred tax asset | 473,257 | - | - | - | - | 473,257 |
| Note receivable from officer | - | | | | | - |
| Due from related party-short term | - | | | | | - |
| Other receivable | 665,187 | - | - | - | - | 665,187 |
| Prepaid and other current assets | 194,740 | - | - | - | - | 194,740 |
| Total current assets | 32,085,447 | - | - | - | - | 32,085,447 |
| Property, plant and equipment, net | 10,138,827 | - | - | - | - | 10,138,827 |
| Intangible assets | 100,000 | - | - | - | - | 100,000 |
| Goodwill | 285,714 | - | - | - | - | 285,714 |
| Investment at cost | - | 5,095,451 | - | - | (5,095,451) | - |
| Deposits paid for contracts in process | - | | | | | - |
| Related party receivable - long term | 447,158 | - | - | - | - | 447,158 |
| Deferred tax-long term | 41,146 | - | - | - | - | 41,146 |
| Total assets | $ 43,098,292 | $ 5,095,451 | $ - | $ - | $ (5,095,451) | 43,098,292 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | $ 17,237,666 | $ - | $ - | $ - | $ - | 17,237,666 |
| Accrued expenses | 1,529,603 | - | - | - | - | 1,529,603 |
| Lines of credit | 1,136,096 | - | - | - | - | 1,136,096 |
| Warrant derivative liability | 2,626,896 | - | - | - | - | 2,626,896 |
| Tax payable | 495,479 | - | 1,695,680 | - | - | 2,191,159 |
| Due to related parties | 1,504,761 | - | - | - | - | 1,504,761 |
| Customer deposits | 441,344 | - | - | - | - | 441,344 |
| Current portion of long-term debt | - | | | | | - |
| Total current liabilities | 24,971,645 | - | 1,695,680 | - | - | 26,667,325 |
| Deferred tax liabilities-long term | 76,477 | - | - | - | - | 76,477 |
| Long term tax liabilities | 46,652 | - | - | - | - | 46,652 |
| Total liabilities | 25,094,774 | - | 1,695,680 | - | - | 26,790,454 |
| Stockholders' equity | | | | | | |
| Common stock (No Par Value : 100,000,000 shares authorized; 5,657,215 and 3,671,611 shares issued and outstanding at September 30, 2010 and December 31, 2009, respectively; including 156,823 shares held in escrow subject to contingent future events as of September 30, 2010) | 6,587,498 | 10,000,000 | (4,890,000) | | (5,110,000) | 6,587,498 |
| Deferred stock compensation | - | | | | | - |
| Retained earnings | 3,808,684 | 148,679 | 3,194,320 | - | - | 7,151,683 |
| Accumulated other comprehensive income | 275,694 | 301,069 | - | - | 14,549 | 591,313 |
| Total stockholders' equity | 10,671,876 | 10,449,748 | (1,695,680) | - | (5,095,451) | 14,330,494 |
| Noncontrolling interest | 7,331,642 | (5,354,298) | - | - | - | 1,977,344 |
| Total equity | 18,003,518 | 5,095,451 | (1,695,680) | - | (5,095,451) | 16,307,838 |
| Total liabilities and stockholders' equity | $ 43,098,292 | $ 5,095,451 | $ - | $ - | $ (5,095,451) | 43,098,292 |

EXHIBIT B
2011 Pro Forma Schedules

| | Commission Model December 31, 2011 Pro Forma | Adjustments | | | Equity Model December 31, 2011 Pro Forma | Variance Between Models |
|---|---|---|---|---|---|---|
| | | [5] | [6] | [7] | | |
| **ASSETS** | | | | | | |
| Current assets: | | | | | | |
| Cash and cash equivalents | $ 10,931,914 | $ - | $ - | $ - | $ 10,931,914 | $ - |
| Restricted cash | - | | | | - | - |
| Accounts receivable, net of allowances of $196,356 and $312,000 at September 30, 2010 and December 31, 2009, respectively | 11,829,698 | - | - | - | 11,829,698 | - |
| Notes receivable | - | | | | - | - |
| Inventories | 7,037,612 | - | - | - | 7,037,612 | - |
| VAT tax receivable | 63,947 | | | | 63,947 | - |
| Advances to suppliers | 889,092 | - | - | - | 889,092 | - |
| Advance for buying the office building | - | | | | - | - |
| Deferred tax asset | 473,257 | - | - | - | 473,257 | - |
| Note receivable from officer | - | | | | - | - |
| Due from related party-short term | - | | | | - | - |
| Other receivable | 665,187 | - | - | - | 665,187 | - |
| Prepaid and other current assets | 194,740 | - | - | - | 194,740 | - |
| Total current assets | 32,085,447 | - | - | - | 32,085,447 | - |
| Property, plant and equipment, net | 10,138,827 | - | - | - | 10,138,827 | - |
| Intangible assets | 100,000 | | | | 100,000 | - |
| Goodwill | 285,714 | - | - | - | 285,714 | - |
| Investment at cost | - | | | | - | - |
| Deposits paid for contracts in process | - | | | | - | - |
| Related party receivable - long term | 447,158 | - | - | - | 447,158 | - |
| Deferred tax-long term | 41,146 | | | | 41,146 | - |
| Total assets | $ 43,098,292 | $ - | $ - | $ - | $ 43,098,292 | $ - |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | |
| Current liabilities: | | | | | | |
| Accounts payable | $ 17,237,666 | $ - | $ - | $ - | $ 17,237,666 | $ - |
| Accrued expenses | 1,529,603 | - | - | - | 1,529,603 | - |
| Lines of credit | 1,136,096 | | | | 1,136,096 | - |
| Warrant derivative liability | 2,626,896 | - | - | - | 2,626,896 | - |
| Tax payable | 2,191,159 | - | - | - | 2,191,159 | - |
| Due to related parties | 1,504,761 | - | - | - | 1,504,761 | - |
| Customer deposits | 441,144 | | | | 441,144 | - |
| Current portion of long-term debt | - | | | | - | - |
| Total current liabilities | 26,667,325 | - | - | - | 26,667,325 | - |
| Deferred tax liabilities-long term | 76,477 | - | - | - | 76,477 | - |
| Long term tax liabilities | 46,652 | | | | 46,652 | - |
| Total liabilities | 26,790,454 | - | - | - | 26,790,454 | - |
| | | | | | | |
| Stockholders' equity | | | | | | |
| Common stock (No Par Value : 100,000,000 shares authorized; 5,657,215 and 3,671,631 shares issued and outstanding at September 30, 2010 and December 31, 2009, respectively; including 156,823 shares held in escrow subject to contingent future events as of September 30, 2010) | 6,587,498 | - | - | - | 6,587,498 | - |
| Deferred stock compensation | - | | | | - | - |
| Retained earnings | 7,151,683 | - | 1,083,758 | - | 8,235,441 | 1,083,758 |
| Accumulated other comprehensive income | 591,313 | - | - | - | 591,313 | - |
| Total stockholders' equity | 14,330,494 | - | 1,083,758 | - | 15,414,251 | 1,083,758 |
| Noncontrolling interest | 1,977,344 | - | (1,083,758) | - | 893,587 | (1,083,758) |
| Total equity | 16,307,838 | - | - | - | 16,307,838 | - |
| Total liabilities and stockholders' equity | $ 43,098,292 | $ - | $ - | $ - | $ 43,098,292 | $ - |

EXHIBIT B
2011 Pro Forma Schedules

| | For the 12 Months Ended December 31, 2010 Before Adjustments | Adjustments | | | | Commission Model For the 12 Months Ended December 31, 2010 Pro Forma |
|---|---|---|---|---|---|---|
| | | [1] | [2] | [3] | [4] | |
| **Revenue** | | | | | | |
| Regular sales | $ 109,488,869 | $ - | $ - | $ - | $ - | 109,488,869 |
| Cost of goods sold | 101,087,334 | - | - | - | - | 101,087,334 |
| Gross Profit | 8,401,535 | - | - | - | - | 8,401,535 |
| **Operating Expenses** | | | | | | - |
| Other selling, general and administrative expenses | 11,407,937 | - | - | - | - | 11,407,937 |
| Management and professional fees paid to | 120,000 | - | - | - | - | 120,000 |
| Stock based compensation | (39,150) | - | - | - | - | (39,150) |
| Depreciation | 639,052 | - | - | - | - | 639,052 |
| Loss on disposal of fixed assets | 178,220 | - | - | - | - | 178,220 |
| Total operating expenses | 12,306,059 | - | - | - | - | 12,306,059 |
| Net Operating Income | (3,904,524) | - | - | - | - | (3,904,524) |
| **Other Income (expenses)** | | | | | | |
| Change in fair value of derivative financial instruments | - | - | - | - | - | - |
| Interest income | 40,293 | - | - | - | - | 40,293 |
| Interest expenses | (73,103) | - | - | - | - | (73,103) |
| Interest expense paid to shareholders (Note 16) | - | - | - | - | - | - |
| Other income | (185,784) | - | - | - | - | (185,784) |
| Other expenses | (26,724) | - | - | - | - | (26,724) |
| Dividend income | - | - | - | - | - | - |
| Exchange gain (loss) | 418,795 | - | - | - | - | 418,795 |
| Loss on disposal | - | - | - | - | - | - |
| Total other expenses | 173,477 | - | - | - | - | 173,477 |
| Net Income Before Income Taxes | (3,731,047) | - | - | - | - | (3,731,047) |
| Income Tax | (423,885) | - | - | - | - | (423,885) |
| Net Income After Income Tax | (4,154,932) | - | - | - | - | (4,154,932) |
| Income from Discontinued Operations | - | | | | | |
| Net Income Before Noncontrolling Interest | (4,154,932) | - | - | - | - | (4,154,932) |
| Profit Share by Noncontrolling Interest | 712,340 | (1,085,974) | - | - | - | (373,634) |
| Net Income | $ (3,442,592) | $ (1,085,974) | $ - | $ - | $ - | (4,528,566) |
| **Other comprehensive income** | | | | | | |
| Foreign currency translation gain, net of tax | - | - | - | - | - | - |
| Comprehensive income attributable to the noncontrolling | (236,070) | - | - | - | - | (236,070) |
| Comprehensive income | (4,391,002) | - | - | - | - | (4,391,002) |
| Earnings per share | $ (0.60) | | | | $ | (0.84) |
| Weighted average shares outstanding | 5,690,542 | | | | | 5,409,477 |

EXHIBIT B
2011 Pro Forma Schedules

| | Commission Model For the 12 Months Ended December 31, 2010 Pro Forma | Adjustments | | Equity Model For the 12 Months Ended December 31, 2010 Pro Forma | Variance Between Models |
|---|---|---|---|---|---|
| | | [5] | [6] | | |
| Revenue | | | | | |
| Regular sales | $ 109,488,869 | $ - | $ - | $ 109,488,869 | $ - |
| Cost of goods sold | 101,087,334 | | | 101,087,334 | |
| Gross Profit | 8,401,535 | - | | 8,401,535 | |
| Operating Expenses | | | | - | |
| Other selling, general and administrative expenses | 11,407,937 | - | - | 11,407,937 | - |
| Management and professional fees paid to | 120,000 | - | - | 120,000 | - |
| Stock based compensation | (39,150) | - | - | (39,150) | - |
| Depreciation | 639,052 | - | - | 639,052 | - |
| Loss on disposal of fixed assets | 178,220 | - | - | 178,220 | - |
| Total operating expenses | 12,306,059 | - | - | 12,306,059 | - |
| Net Operating Income | (3,904,524) | | | (3,904,524) | |
| Other Income (expenses) | | | | | |
| Change in fair value of derivative financial instruments | | - | - | - | |
| Interest income | 40,293 | - | - | 40,293 | |
| Interest expenses | (73,103) | - | - | (73,103) | - |
| Interest expense paid to shareholders (Note 16) | | - | - | - | - |
| Other income | (185,784) | - | - | (185,784) | - |
| Other expenses | (26,724) | - | - | (26,724) | - |
| Dividend income | | - | - | - | |
| Exchange gain (loss) | 418,795 | - | - | 418,795 | |
| Loss on disposal | - | | | - | |
| Total other expenses | 173,477 | - | | 173,477 | |
| Net Income Before Income Taxes | (3,731,047) | - | - | (3,731,047) | - |
| Income Tax | (423,885) | - | - | (423,885) | - |
| Net Income After Income Tax | (4,154,932) | - | - | (4,154,932) | - |
| Income from Discontinued Operations | | - | - | - | |
| Net income Before Noncontrolling Interest | (4,154,932) | - | - | (4,154,932) | - |
| Profit Share by Noncontrolling Interest | (373,634) | | 1,083,758 | 710,124 | 1,083,758 |
| Net Income | $ (4,528,566) | $ - | $ 1,083,758 | $ (3,444,808) | $ 1,083,758 |
| Other comprehensive income | | | | | |
| Foreign currency translation gain, net of tax | | - | - | - | |
| Comprehensive income attributable to the noncontrolling | (236,070) | - | - | (236,070) | - |
| Comprehensive income | $ (4,391,002) | $ - | $ - | $ (4,391,002) | $ - |
| Earnings per share | $ (0.84) | | | $ (0.64) | $ 0.20 |
| Weighted average shares outstanding | 5,409,477 | | | 5,409,477 | 5,409,477 |

EXHIBIT B
2011 Pro Forma Schedules

[1]    Adjustment represents a reversal of the eliminating entry booked by the Company in originally consolidating Nantong into WEMU.  Proper elimination will be made when the effects of the assumed accounting treatments are processed.

[2]    Adjustment is to reverse the prior year loss recorded on the issuance of 48.9% equity interest.  The assumption is that these shares were always intended to be either 1) purchased with cash infusion or 2) earned through a % of net earnings.  It is now known that the cash infusion did not occur, so the assumption is that the equity was to be earned over time through equity in earnings.  Thus, at the date of the supposed transfer, there should have been no loss or net equity issuance recorded.  This loss reversal is booked net of the tax impact at the effective rate of 35% for WEMU US.

[3]    Assumption is made that the commission expense was not booked since the consolidation was prepared as if the equity ownership of 49% was in place.  Thus, under the model of the commission structure, 49% of the pretax solar division income is recorded as a bonus expense.  The following table represents the breakdown of the consolidated pretax income by segment:

| | Solar | Other | Consolidated |
|---|---|---|---|
| WEMU US | (924,567) | (1,407,804) | (2,332,371) |
| China | (1,895,194) | 526,599 | (1,368,595) |
| Consolidating Adjustment | 23,331 | (53,411) | (30,080) |
| | (2,796,430) | (934,616) | (3,731,047) |
| | | | - |

Note that the WEMU US solar loss is net of the $1.0 million of Other Loss recorded as a result of the writeoff of the intangible assets related to the Amerisolar purchase.  Presumably, the commissions would be calculated before the effect of that writeoff.  So, when calculating the commission expense based on the solar business, the effect of this was added back to the pretax results for solar, resulting in pretax earnings of $76,433 for the US, however the consolidated solar business still incurred a loss of $1.7 million.

[4]    This is a reposting of eliminating entries in consolidation.

[5]    This is a reversal of AJE 3, which was the posting of estimated commissions expense net of taxes.  The assumption is that the third parties would accept equity ownership of 48.9% of Nantong solar business instead of the commissions expense.

[6]    Adjustment records the 48.9% noncontrolling interest in the Nantong subsidiary only.

February 21, 2013

<u>Via FedEx</u>

Mr. Gary Koos
1864 Sannita Ct.
Pleasanton, CA 94566

      Re:    Employment Agreement at Worldwide Energy and Manufacturing USA Inc.

Dear Gary:

      Please be advised that Worldwide Energy and Manufacturing USA, Inc. ("Worldwide") has reviewed your employment agreement dated October 26, 2012 and the Board of Directors has asked you to provide board resolutions authorizing this agreement. You have indicated that you do not have any resolutions authorizing your employment agreement and that you do not have any other agreements with Worldwide.

      We note that the date of your employment agreement is one day after the ruling by the Jefferson County District Court in Colorado ordering the shareholder meeting and authorizing Jimmy and Mindy Wang to vote their so-called "Make Good Shares," which created a high likelihood of a change of control of Worldwide. As you know, corporate counsel was directed to draft the agreement so that a "Change of Control" would include a circumstance in which "the members of the Board of Directors as of [October 26, 2012] cease for any reason to constitute a majority of the Board," ostensibly triggering a severance obligation upon the termination of your employment.

      Since you were a director at the time your employment agreement was executed, the agreement is a "conflicting interest transaction" under the Colorado Business Corporation Act (the "Act"). *See* C.R.S. § 7-108-501(1)(a)(III). Under the Act, the Employment Agreement is not valid and enforceable because neither the Board nor the shareholders approved the agreement and because it was not made in good faith based on the timing, i.e., one day after the change of control became imminent due to the number of proxies that had previously been submitted for the Thelen-Ballard alternative slate of directors. Accordingly, the employment agreement was not approved in good faith and was not "fair" to the corporation. *Kim v. Grover C. Coors Trust,* 179 P.3d 86, 90 (Colo.App. 2007). Based on this information, Worldwide has concluded that the employment agreement is not valid.

      In addition, Worldwide has sufficient evidence to prove your willful misconduct in the performance of your duties as an officer or director of Worldwide justifying a termination of your employment for "Cause" based on the following actions:

      a.      Failing to hold an annual meeting of shareholders despite repeated requests and forcing shareholders to commence litigation pursuant to C.R.S. §7-107-103 in

**Exhibit 6**

Mr. Gary Koos
February 20, 2013
Page 2

order to force the holding of the annual meeting as required by applicable Colorado law;

b.     Improperly postponing the meeting of shareholders set for October 4, 2012, less than 48 hours before the meeting, after proxies for the Thelen-Ballard slate of directors had been submitted which would have replaced you as a director of Worldwide;

c.     Contesting the Wangs' right to vote the Make Good Shares, despite clear language in the Escrow Agreements allowing them to vote such shares and a previous history of Worldwide allowing the Wangs to vote the Make Good Shares, after the Wangs decided not to support the incumbent directors, including yourself;

d.     Improperly delaying and impeding the rights of shareholders to inspect corporate records pursuant to C.R.S. §7-116-101(5);

e.     Failing to comply with the very specific findings made by Jefferson County District Court in its November 4, 2012 order;

f.     Instead of proceeding with the November 15, 2012 special meeting of shareholders, engaging attorneys on behalf of Worldwide in New York, and using corporate funds to file a baseless lawsuit in New York to obtain a temporary restraining order enjoining the Wangs from voting the Wang Shares and enjoining the November 15, 2012 shareholders meeting;

g.     Directing Worldwide to commence the New York lawsuit that was against the interests of the corporation on behalf of a certain group of shareholders and that the corporation had no standing to bring, as determined by the New York judge in denying Worldwide's motion for preliminary injunction; and

h.     attempting to vote the 350,002 "Company Make Good Shares" for the incumbent directors, including yourself, despite a history of Worldwide neither voting those shares nor treating them as being issued and outstanding on financial statements.

Accordingly, because your employment agreement is not valid, your employment with Worldwide is therefore at-will, and even assuming the employment agreement is somehow proven to be valid, your willful misconduct constitutes justification to terminate you for cause. Accordingly, you have left Worldwide with no choice but to terminate your employment effective February 28, 2013. You will remain on administrative leave until the termination is effective.

As you know, many aspects of the business of Worldwide involve confidential and proprietary information. During your employment by Worldwide, you had access to and have become acquainted with confidential information of Worldwide. You are well aware that much

Mr. Gary Koos
February 20, 2013
Page 3

of this information is clearly unique and proprietary to Worldwide.  Worldwide expects that you will honor your commitment not to use or disclose any of its confidential information or trade secrets. A breach of your trade secret and confidentiality obligations regarding this information would subject Worldwide to substantial and irreparable competitive harm.  In such circumstances, Worldwide would have no choice but to enforce its legal rights against you.

Please assemble and deliver to Worldwide each and every original and copy of any and all documents, compilations, recordings, and any other form of written, printed, recorded, typed and every other matter, thing, property, or material of any kind which you have in your possession, custody or control that is or was the property of Worldwide or relates in any way to the business of Worldwide.

Please contact Kaiser insurance directly regarding your right to elect continued medical coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA").

Worldwide is willing to pay you two weeks of severance pay at your current salary less deductions for payroll taxes and in return would ask that you sign a waiver and release of any and all claims related to your employment with Worldwide.  If you are interested in this proposal, we will provide you a written separation agreement and release for your consideration. Please let us know by the close of business on Friday February 22, 2013.

Worldwide does not acknowledge the validity of your employment agreement and assumes the nonexistence of any other agreements between you and Worldwide. However, Worldwide reserves all rights under the employment agreement and applicable laws. These rights include Worldwide's right to modify its position based upon any facts or documents not specifically referenced herein.

If you should have any questions please don't hesitate to call me at (303) 990-4268.

Sincerely,

Worldwide Energy and Manufacturing USA, Inc.


By: _Diane Thelen_____
     Diane Thelen, Acting Secretary and Director

WORLDWIDE ENERGY AND MANUFACTURING USA
COMPENSATION SUMMARY

| | Forecast 2014 | Forecast 2015 | Forecast 2016 | Forecast 2017 | Forecast 2018 | Forecast 2019 | Forecast 2020 | TOTAL Seven Year |
|---|---|---|---|---|---|---|---|---|
| Shui Shum President | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 420,000 |
| Carlos Duque Secretary | 66,000 | 66,000 | 66,000 | 66,000 | 66,000 | 66,000 | 66,000 | 462,000 |
| John Ballard Chief Financial Officer | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 60,000 | 420,000 |
| Tiffany Liu Director | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 42,000 |
| | 192,000 | 192,000 | 192,000 | 192,000 | 192,000 | 192,000 | 192,000 | 1,344,000 |
| Three employees | 108,000 | 108,000 | 108,000 | 108,000 | 108,000 | 108,000 | 108,000 | 756,000 |
| Total compensation | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 300,000 | 2,100,000 |
| Contract Labor | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 240,000 | 1,680,000 |

Raises will be given only if projections are
exceeded. The bonus will be determined by
the board based on performance. If objectives
are not made possible layoffs could occur. In
addition bonuses to employees could be a
combination of stock and cash.

EM

Page 1

EXHIBIT H



Worldwide Energy and Manufacturing USA, Inc
408 North. Canal Street, Unit A & B
South San Francisco, CA 94080
Tel:(650)794-9888
Fax:(650)794-9878
Web: www.wwmusa.com

# WORLDWIDE ENERGY AND MANUFACTURING USA INC.

Date:     May 16, 2012

To:       WEMU Board of Directors

From:   Jeff Watson and Gary Koos

The purpose of this memo is to document the process steps which led to the recommendation to sell some or all of the Contract Manufacturing divisions of Worldwide Energy and Manufacturing USA Inc. (WEMU).

<u>Background</u>

WEMU is running short on cash in the US and is currently having a difficult time paying its creditors. WEMU has incurred significant professional fee expenses related to the SEC investigation and other litigation (SEC enforcement settlement, Ann Cheng OSHA and civil cases) and also the IRS audit of its tax returns. The total amount of unpaid professional fees plus the IRS assessment is about $865,000. In addition, WEMU has a loan payable to the Bank of the West which is currently about $975,000. We have gone beyond the May 1, 2012 forbearance agreement term and are negotiating with the bank to extend this to September/October of 2012.

Therefore, WEMU needs to raise funds to pay off its bank loan, creditors and lawsuits. There are only a couple of options available - sell the solar division or sell some or all of the CM businesses. The sale of the solar division is on hold pending WEMU being de-listed.

The Company was in the process of selling its interest in the WEMU Nantong solar JV in January 2012 to raise funds to pay creditors and the bank. However, this process was delayed because we could not prepare or file the past financial statements and the SEC warned us of this requirement on February 14, 2012. Therefore, in mid to late February 2012 we began to look at other sources to provide the funds to pay off these debts. We began to look at the possible sale of some or all of our Contract Manufacturing businesses.

John Ballard, a previous CFO for WEMU, and Diane Thelen, an investor in WEMU, had previously expressed interest in buying the contract manufacturing division. We have received an offer from Thelen/Ballard to purchase the Intech EM division, inclusive of WEMU SSF, and also the Diecast businesses, Shutai and Precision.

<u>Process to find other buyers</u>

Jeff Watson and Gary Koos have actively tried to find other buyers for some or all of the CM businesses. The activities of Jeff and Gary are as follows:

Jeff contacted two Contract Manufacturing companies: one of which Jeff had a previous business relationship with and the other he had heard that Jimmy previously had discussions regarding possible M&A activities. The first firm, Billiontek, is operated by three partners, one of which Jeff has known for the last several years – Leo Zhang. While there was reasonable interest initially, this interest waned significantly as time went on with no real reason given. While the Billiontek model is very similar to the WEMU model, and we share a few customers, this effort did not yield any substantive discussions.

*Exhibit I*

The second firm that Jeff contacted is Highway Holdings, a company publicly trading under the symbol HIHO.  While most of Jeff's conversations were held with the CEO's business advisor in the US, Gary Maier, Jeff did make the pitch to the CEO, Roland Kohl.  While Roland understood the synergies that Intech EM and WEMU SSF could provide HIHO, he ultimately decided against pursuing the acquisition.  The only real reason, given by the before mentioned Gary Maier, was that with all of the HIHO operations in PRC or Hong Kong, Kohl felt uncomfortable with his ability to properly manage the SSF location.  While multiple concepts were discussed over the following two weeks to alleviate his concerns, ultimately HIHO declined to seriously pursue WEMU.


Through previous business contacts Gary contacted several potential leads. Gary contacted the CEO (Gary Fairhead) of Sigmatron, a contract manufacturing company with headquarters in Chicago. Sigmatron has operations in China which Gary thought would be complementary to WEMU's operations. Fairhead declined to look at a potential acquisition of WEMU citing the small size of WEMU, the current issues the company with the delinquency of filing its financial reports, and WEMU's business model. Fairhead did note that his company, which is public, was not doing so well and that he felt fortunate to keep his own business going and was not in a position to expand.  Fairhead gave Gary the contact of another contract manufacturing associate he knows and Gary contacted him.

Gary talked to Mr. Brian Dickstein, CEO of Trend Technologies, about a potential business partnership and acquisition of WEMU's CM businesses. After several talks, it was apparent that Mr. Dickstein was more interested in providing business to WEMU and was not interested in buying the CM division.

The other avenue Gary pursued was with bankers who Gary has worked with in the past. Unfortunately the bankers Gary knows did not have any interest in working on a deal this small. The fact that WEMU has most of its operations in China did not get any excitement from the bankers either.

<u>Evaluation of the offer from Thelen/Ballard</u>

We received an offer from two current investors in WEMU, John Ballard and Diane Thelen. John Ballard also was the CFO of WEMU until late 2009. The evaluation of the offer is presented in the board slides. In order to evaluate offers from Thelen/Ballard and any other offer we were trying to get, we first hired an independent business appraiser. The name of the principal of the appraisal firm is John Woodman, and his company name is Quadrant Solutions. Woodman previously did work for WEMU in 2005/2006 when they were trying to sell the CM business then so he was familiar with WEMU. Jeff and Gary had several meetings with Woodman to explain the current CM businesses, the financial performance of the businesses and the current issues that WEMU is facing.

Based on financial and business data which was supplied, Woodman then performed a business evaluation (Estimate of Value-EOV) on the three separate businesses that comprise Contract Manufacturing: 1. Intech EM, 2. Shutai/Precision and 3. Detron. The complete EOV has been previously provided to the board members. Also, in the board materials, summary tables and selected data from the EOV have been shown to compare the offer from Thelen/Ballard to the values that Woodman derived in his EOV. A summary of the offer from Thelen/Ballard and a summary of the range of values that Woodman computed are as follows:

|  | Thelen/Ballard<br>Offer (*) | Woodman<br>EOV Range (Low to High) |
| --- | --- | --- |
| Intech EM (China and US) | $2,023,764 | $1,248,371 to $1,863,259 |
| Shutai/Precision | Included in EM | $ (38,161)  to $ 908,208 |
| Detron | N/A | $  331,075 to $1,178,564 |

*   \* Note- the value of the Thelen/Ballard offer includes: the initial cash consideration paid, the future expected receipts from the WEMU inventory and accounts receivable and cash on-hand in EM business less trade payables.  The proceeds from inventory sales may be less due to excess and obsolete inventory that the customers do not purchase.  Not included in the $2.023M above is the  assumption of the WEMU real estate leases in the US and in China which are valued at $209,456.*

The low value of Intech EM and Diecast is $1,210,210 ($1,248,371 less (38,161)) and the high value is $2,771,467 ($1,863,259 plus $908,208). The value of the Thelen/Ballard offer of $2,023,764 is between the low and high range; in fact, it is 67% higher than the low range value, and it is 27% below the high range value.

<u>Offer Made by Thelen/Ballard</u>

The offer that Thelen/Ballard have made is as follows:

a. Purchase the fixed assets of the Intech EM business, in China and the US-South San Francisco locations for $150,000.

b. The existing inventory that WEMU owns (about $1.5 million) will be purchased by Thelen/Ballard to satisfy customer demand, and WEMU will be paid 70% of the value of the inventory that is shipped upon payment by the customer. The discount of 30% on the inventory covers the storage, handling, and possible disposal costs of excess inventory. This scheme will be in effect for the first 24 months after the transaction date.

c. The existing Accounts Receivable that WEMU has (about $760K) will be collected by Thelen/Ballard, and WEMU will be paid 80% of this amount. The discount of 20% on the accounts receivable will cover the collection costs.

d. Thelen/Ballard will assume all of the operating costs of running the Intech EM business, including labor, facility rents, insurance, supplier costs, etc. In effect, WEMU will be in a liquidation mode of its Intech EM business and will be able to use these proceeds to satisfy its creditors and bank loans. Any amount left after these amounts are paid can be available for shareholders.

e. The offer includes $50,000 for the Shutai/Precision Diecast businesses.  John Ballard will assume the Legal Representative role for the Diecast businesses – Shutai and Precision.

After the sale of the Intech EM business, WEMU will only have labor expenses and professional fees that it needs to keep to conclude the sale of WEMU's interest in the solar division and handle any remaining issues of the Detron business, and conclude any litigation matters for the company. At the conclusion of all these issues, WEMU will no longer have any business and can dissolve or otherwise conclude its business entity.

<u>Negotiation with Thelen/Ballard</u>

As explained above, Gary and Jeff have actively tried to find other purchasers for the CM businesses. These efforts have produced no offers that we could use to go back and negotiate with Thelen/Ballard. Therefore, our negotiations with Thelen/Ballard have been in trying to negotiate a better cash price for assets being sold, a better deal in terms of the percentage that WEMU receives for its inventory and accounts receivable, and finally, in the assumption of its liabilities. The efforts of these negotiations are described below.

It should be noted that Thelen/Ballard are at the end of their negotiations with WEMU, and in fact, they have stated that if the deal does not close soon, they may not go forward with the purchase. They are concerned that customer's will not stay with WEMU and that the business has suffered so much already. A major customer of WEMU, Sunbank, visited with WEMU last week. Sunbank is concerned that WEMU will not continue in business and may file bankruptcy and this will seriously injure their business (WEMU is Sunbank's largest supplier).Gary and Wendy (WEMU sales associate) met with Sunbank last week and tried to explain how WEMU would continue in its business operations. Jeff followed with a call to his contacts with senior management at Sunbank to further explain the situation, but Sunbank remains nervous.  Certainly the

explanation of a definitive direction and the purchase by new buyers will go a long way to calm the concerns of all of our customers.

There have been several iterations of the offer price and the terms and conditions with Thelen/Ballard. Initially, Thelen/Ballard wanted to include the Detron business in their offer, since this is the business that makes the most money. However, due to the poor relationship that WEMU has with its JV partner in the Detron business, in addition to the lawsuit that our partner has filed against WEMU, we had to exclude this business from the sale until we sort out the various legal issues. Removing the Detron business from the sale has reduced the value that Thelen/Ballard place on the CM businesses that they are proposing to buy.

The increases in the offer that we have negotiated are:

1. Thelen/Ballard will now pay $50,000 for Diecast (previously they had zero value on this business),
2. Ballard and Thelen have increased their offer by $10,000 on the Intech EM business, due to the fact that their offer was on the net book value of these assets and they have depreciated by $10,000 since their offer of February 29, 2012,
3. Thelen/Ballard will assume the obligation for the facility leases in the US( WEMU SSF) and China (Intech EM), and the value of these leases is $209,456.
4. John Ballard will assume the legal representative status of the Shutai/Precision businesses. This provision helps with an issue whereby Jimmy Wang is currently the legal rep for both of these businesses and he does not want to continue with this risk.
5. Thelen/Ballard will also provide indemnification for current officers, directors and employees for any liability associated with this transaction. Specifically, these individuals will not have any responsibility for the closure costs associated with the Shutai/Precision businesses.

The total increase to the value of the Thelen/Ballard offer from what we initially started with, as listed above, is $269,456. This is in addition to taking on the legal rep status of the Diecast businesses.

<u>Recommendation</u>

WEMU management, Gary and Jeff, have diligently tried to find competing offers for the sale of the CM businesses. Absent any other offers, WEMU has negotiated with its only possible buyer for the sale of the Intech EM and Shutai/Precision Diecast businesses. Due to the necessity of raising funds to pay off the bank and creditors, WEMU management believes that it is in the best interest of WEMU's creditors and shareholders to accept the offer that we have presently negotiated from Thelen/Ballard and move forward to close the deal.



**CONFIDENTIAL**

May 22, 2013

Attn:  Mr. John Ballard
Worldwide Energy Manufacturing USA INC
408 N Canal St. S San Francisco, CA 94080

Via email: j.ballard@q.com

**Re:  Determination of Fair Market Value for Worldwide Energy Manufacturing USA, Inc.**

Dear Mr. Ballard:

Thank you for the opportunity to provide professional financial advisory services to Worldwide Energy Manufacturing USA INC. ("WEMU" or the "Company").

Per our discussions, we understand that the Fair Market Value (FMV) of the Company's common equity must be determined, based on the Company's own facts and circumstances and by the application of a reasonable valuation method. We further understand that this determination is for the sole purpose of setting the exercise price for the issuance of ownership rights (i.e. incentive stock options) for the Company's employees and advisors. Our assessment of value is as of December 31, 2012.

<u>**Fair Market Value**</u>

SFAS No. 157 (also known as ASC 820 in the updated FASB Codification) defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." Of note, this Statement requires consideration of the exit price paid (if liability) or received (if asset) in a hypothetical transaction in an orderly market (i.e., not a forced liquidation or sold under duress).

In other words, FMV is an estimate of the market value of a property, based on what a knowledgeable, willing, and unpressured buyer would probably pay to a knowledgeable, willing, and unpressured seller in the market. An estimate of fair market value may be founded either on precedent or extrapolation. Fair market value differs from the *intrinsic value* that an individual may place on the same asset based on their own preferences and circumstances.

Since market transactions are often not observable for assets such as privately held businesses and most personal and real property, FMV must be estimated. An estimate of Fair Market Value is usually subjective due to the circumstances of place, time, the existence of comparable precedents, and the evaluation principles of each involved person. Opinions on value are always based upon subjective interpretation of available information at the time of assessment. This is in contrast to an imposed value, in which a legal authority (law, tax regulation, court, etc.) sets an absolute value upon a product or a service.[1]

---

[1] In <u>United States tax law</u>, the definition of *fair market value* is found in the <u>United States Supreme Court</u> decision in the *Cartwright* case:The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable

EXHIBIT J

## Worldwide Energy Manufacturing USA Inc.

As of December 31, 2012, Worldwide Energy Manufacturing USA, Inc. or WEMU was an international manufacturing and engineering firm focused on photovoltaic ("PV") solar modules and contract manufacturing services. The Company services customers globally with their Solar Division and customers in both the U.S. and China within their Contract Manufacturing division.

Amerisolar is the Solar Division of WEMU designs and manufactures advanced PV solar modules for the solar industry for a variety of electric power applications including residential, commercial, industrial, and public utility. The Company sells its modules under the "Amerisolar" brand to PV solar system integrators and distributors.

WEMU offers turnkey contract assembly, test, cost reduction, and product improvement for customers' electronic and electro-mechanical products. WEMU can go from printed circuit board to final build, as well as test, burn-in, packaging and shipping of customers' products. The Company's engineers work to ensure customers' electronic production needs are set up and produced in the most cost effective manner that delivers the quality specified by customers. The power supplies WEMU manufactures are compatible with all kinds of electronic devices, especially for LED lighting and power grid applications.

The Company has experienced increasing losses and substantial distress in recent periods. In 2012, the Company lost $4,569,836 on revenues of $52,394,836 compared to a net loss of $4,154,932 on revenues of $109,488,869 in year ending 2011.

Cash and cash equivalents with a maturity of three months or less and Restricted cash were $2,962,427 and $10,931,914 as of December 31, 2012 and 2011, respectively. A substantial amount of the Company's cash is held in bank accounts in China and is not protected by the Federal Deposit Insurance Corporation (FDIC) insurance or any other similar insurance. Cash held in China amounted to $2,795,123 and $10,610,572 at December 31, 2012 and 2011, respectively. Cash and the value of other assets held in China, when liquidated, are difficult or impossible to bring back to the US.

For year ending 2012, management has added a disclosure for "going concern" meaning that the Company is was formally reporting to shareholders that there was significant risk of going out of business as of December 31, 2012. As of December 31, 2012, the Company did not have significant cash or other current assets, nor did it have an established source of revenues sufficient to cover its operating costs and liabilities to allow it to continue as a going concern. Further, if the Company does not prevail in the Class Action litigation filed in December 2012, then Company will have to seek bankruptcy protection, according to management. This pending litigation as of December 31, 2012 can have a significant impact on the future of the Company, and its value.

## Valuation Methodology

ASC 820 establishes a framework for measuring FMV using certain valuation concepts and practices. In applying ASC 820 and Internal Revenue Code 409A Regulation, we considered the following:

- The unit of account — determining the characteristics of the item being valued for reporting purposes under applicable GAAP.

---

knowledge of relevant facts. *United States v. Cartwright*, 411 U. S. 546, 93 S. Ct. 1713, **1716**-17, 36 L. Ed. 2d 528, 73-1 U.S. Tax Cas. (CCH) ¶ 12,926 (1973) (quoting from U.S. Treasury regulations relating to Federal estate taxes, at 26 C.F.R. sec. 20.2031-1(b)).

The term *fair market value* is used throughout the <u>Internal Revenue Code</u> among other federal statutory laws in the USA including <u>Bankruptcy</u>, many state laws, and several regulatory bodies.

- The market – the exit market, principal market, or most advantageous market for assets or liabilities being valued.
- Market participants – identification of the buyers and sellers of an asset or liability
- The highest and best use or the non-performance risk of an asset or liability to market participants based on the value of the asset or liability to be used or exchanged.
- Valuation approach – Income, Market or Cost Approach including consideration of Company-specific factors, per 409A, such as:
  - ➢ The present value of the Company's projected future cash flows;
  - ➢ The readily determinable market value of similar entities engaged in a substantially similar business;
  - ➢ The value of the Company's tangible and intangible assets; and
  - ➢ Other relevant factors such as control premiums or discounts for lack of marketability.

We have considered the following valuation approaches when estimating the FMV of the Company's Assets and Liabilities of the Company: the Income Approach, the Market Approach, and the Cost Approach. Each of these approaches is described in detail below.

<u>Income Approach</u>

*Discounted Cash Flow*

This method estimates the FMV of an asset based on the cash flows that the asset can be expected to generate over its useful life. There are three basic steps in applying the discounted cash flow method. First, the annual after-tax cash flows the asset will generate over its remaining useful life are estimated. Next, these cash flows are discounted to their present value equivalents using a rate of return that accounts for the relative risk of the estimated future cash flows and the time value of money. Lastly, the present value equivalents of the estimated annual after-tax cash flows (including the residual value if applicable) are summed to obtain an estimate of the asset's FMV.

*Excess Earnings*

This method considers the use of other assets in the generation of the projected cash flows of a specific asset to isolate the economic benefit generated by the subject intangible asset. The contribution of other assets, such as fixed assets, working capital, workforce, and other intangible assets, to overall cash flows is estimated through contributory asset "capital charges." These capital charges represent the return an investor would require to fund or make an investment in the contributory assets, and can be considered a compensation for the risk and opportunity costs of not being able to use the capital for other means.

*Relief-from-Royalty*

The Relief-from-Royalty Method is a commonly used technique to value intangible assets when comparable licensing transactions are available to benchmark the royalty rate that could be expected to be generated by the subject asset. In the Relief-from-Royalty Method, the value of the Subject Assets and Liabilities is estimated by determining the royalties that are theoretically saved because the company owns the asset. In other words, the value of the asset is derived from the fact that the company could be willing to pay a royalty to license the subject asset.

<u>Market Approach</u>

The Market Approach estimates the fair value of an asset based on what other purchasers and sellers in the market have agreed to as prices for comparable assets. This approach is based on the principle of substitution, which states that the limits of prices, rents, and rates tend to be set by the prevailing prices, rents, and rates of equally desirable substitutes. In conducting the Market

Approach, we gather data on reasonably substitutable assets and make adjustments for such factors as market conditions, location, conditions of sale, income characteristics, etc. The resulting adjusted prices lead to an estimate of the price one might expect to realize upon sale of the asset.

<u>Cost Approach</u>

The Cost Approach is a valuation approach that uses the concept of replacement cost as an indicator of FMV. The premise of the Cost Approach is that a prudent investor would pay no more for an asset than the amount for which the asset could be replaced. Replacement cost new, which refers to the cost to replace the property with one of like utility using current material and labor rates, establishes the highest amount a prudent investor would pay for the subject asset. To the extent that an existing asset will provide less utility than a new one, the value of that asset is lower.

**Valuation Analysis**

Consequently, we have considered the following factors in making a determination of a reasonable FMV for WEMU as of the date of this memorandum:

1. Calculation of the present value of the WEMU's future cash flows projected as per the Company's pro forma financials (Income Approach)
2. The readily determinable market value of similar entities engaged in a substantially similar business. Includes available current market data for both:
   2.1 Guideline publicly traded companies engaged in a substantially similar business, and
   2.1 Comparable private company transactions reflecting solar energy equipment/materials/products and contract manufacturing company valuations (Market Approach)
3. Any prior or contemporaneous sale of the Company's equity or assets to investors/owners (Market Approach, if applicable)
4. Estimates of value of the Company's tangible and intangible assets (including net working capital) per the Company's balance sheet as of December 31, 2012 (Cost Approach)
5. Relevant discounts (e.g. lack of marketability and control, customer concentration, and incentive options versus shares, or other relevant factors, e.g. litigation contingency as applicable).

On the basis of this analysis leveraging a full range of methodologies, we exercise our best judgement in identifying the most relevant methodology for the determination of fair value.

*1.0 Calculation of the Present Value of the Company's Future Cash Flows (Income Approach):*

The present value of the Company's future after-tax cash flows (based on current forecasts provided by WEMU's management), is calculated over a 10-year time horizon, and discounted to reflect business risk, market uncertainty, litigation contingency, lack of marketability, and the value of options versus shares, among several other factors. This estimate of common equity value is **$185,275**, and also considers the Company's terminal value at the end of the 10-year time period and long term debt.

Important assumptions developed with management's guidance and a review of historical financials include the growth rate of revenue over the period, operating margins of the business over time, required capital expenditures, required working capital as a function of the size and growth of the business, the estimated tax rate, and other critical factors including the litigation contingency. This valuation reflects management's best available projections and our independent judgment in select areas based on communications with management, especially for the out years beyond management's current planning and forecasting horizon. Note that the business is expected to shrink dramatically versus 2012 while profitability of the business is forecast to recover and then grow steadily without interruption (e.g. major recession or other disruption in

demand). Significant profitability is anticipated in the medium to long term with these projections, i.e. over $1.0 million EBITDA in 2016. Note also that the discount rate (weighted average cost of capital or WACC) of 26% was used to reflect the blended return on investment expectations of both debt holders and equity investors.[2]

The relevance of this methodology is significant as the value of any enterprise is ultimately the discounted value of its future net cash flows, and the evaluated forecasts are timely and reflect management's best current understanding of the state of the business. However, relevance is somewhat limited by predictability challenges, the distress nature of the company's current situation, and the major impact on valuation of the uncertain litigation contingency.

### 2.1 Available Public Market Data for Comparable Company's Public Stock (Market Approach):

Comparison with publicly traded companies engaged in a substantially similar business is instructive as a reference point in this analysis, but the resulting valuations should be adjusted for any disparities in size and marketability between the Company and similar companies on the public markets.

Currently, guideline public companies (selected based on similar SIC code and solar/contract manufacturing activity as the subject company) are trading at valuations which reflect a median trailing Revenue multiple of **1.1X** and a median trailing EBITDA multiple of **10.1X**. This guideline publicly-traded company sample includes Advanced Energy Industries, GT Advanced Technologies, LDK Solar, Photronics, and Enphase among others for example. Applying these to the Company's 2012 financial performance discounting for debt, lack of marketability, and litigation contingency, the implied Company common equity valuation for options holders is **$24,826,853** based on 2012 Revenue of $52.3 million.

The corresponding current estimate of common equity value on the basis of EBITDA factors in WEMU's forecast for $1,315 million in 2014 (since 2012 is negative and 2013 EBITDA is potentially more volatile with distress/recovery), applies the **10.1X** multiple and discounts to present value. With similar adjustments for debt, discounting for lack of marketability, litigation contingency, and constraints on options holders, we estimate a common equity value as of December 31, 2012 of **$1,920,354.**

The relevance of these methodologies is impacted adversely by the distress of WEMU's business (i.e. making 2012 insufficiently relevant), the fact that guideline public companies are generally far larger with much stronger balance sheets, and the dependence on a single-year forecast of future profitability, among other factors.

### 2.2 Available Private (M&A) Market Data for Comparable Companies and Transactions (Market Approach):

For private companies involved in similar solar products and contract manufacturing activities, we have substantial reason to believe that a reasonable valuation multiple for acquisitions of companies is approximately **1.1X** trailing Revenue, based on a review of transactions completed in 2012. Valuations on the basis of trailing EBITDA are less prevalent, in our view, but we do have several examples of comparable private solar and contract manufacturing businesses which had traded in 2012 with profitability metrics publicly disclosed.[3] Based on a review of these precedent transactions and relative comparability, our analysis here applies a **9.6X** trailing EBITDA multiple.

---

[2] WACC calculation based on estimates of Risk Free Rate, Beta, Equity Risk Premium, Size Premium, Company Specific Premium, and Country Risk.

[3] Includes such transactions as Concurrent Manufacturing Solutions / Balmoral Funds LLC; MEMSIC / IDG Capital Partners; Integrated Device Technology / Fox Enterprises, Inc.; Watteredge / Coleman Cable, Inc.; Crossing

Accordingly, WEMU's implied common equity value based on 2012 Revenue multiple is **$25,762,688** after discounting for lack of marketability, litigation contingency, and options versus shares.

Using a valuation methodology based on forecast 2014 EBITDA, the corresponding guideline multiple, and discounting to present value as of the time of this valuation leads to an estimated common equity value of **$1,700,367**, after accounting for the same discount for lack of marketability, litigation contingency, and constraints on options holders.

The relevance of these methodologies is impacted adversely by the distress of WEMU's business (i.e. making 2012 insufficiently relevant), the fact that guideline private company transactions generally involve larger private companies with much stronger balance sheets, and the dependence on a single-year forecast of future profitability, among other factors.

### *3. Prior or Contemporaneous Equity or Asset Transactions (Market Approach):*

On May 15, 2012, the Company's stock was trading in public markets at a price of $0.12, reflecting a market value for common equity of $684,346 at that time.

After discounting for lack of marketability as of December 31, 2012 and for the constraints imposed on option holders per WEMU documents for Warrants and Options, we calculate adjusted value of common equity for options holders of **$338,067.**

This methodology is insufficiently relevant based on the timing of the last trade, the subsequent public stock delisting, dramatic changing of company circumstances in the interim period, deep distress both for the company and to a lesser extent the industry, and the litigation contingency which is not reflected.

### *4. Estimates of Value of the Company's Tangible and Intangible Assets (Cost Approach):*

The relevant balance sheet for the Company (unaudited December 31, 2012) records the tangilble and intangible assets and complete liabilities of the Company.

The Company's assets of $33.2 million include Current Assets of $22.1 million, Fixed Assets of $10.2 million, Other Assets of $836 thousand. Note that recorded net book values for the Company include allowances for depreciation and amortization.

The Company's liabilities of $17.5 million in Current Liabilities and $123 thousand in Long Term Liabilities (includes deferred tax obligations).

Our assessment of Net Asset Value includes both tangible and intangible asset value at net book value, subtracts the current and long-term liability obligations of the Company, and applies a minority control discount of 35% for the Company's Non-Controlling Ownership interest. Finally, considering discounts for lack of marketability, the litigation contingency, and options versus shares, leads to an estimate of **$2,352,493** for tangible and intangible book value, or Net Asset Value of the Company.

The relevance of this methodology is significant based on specific and timely values and is reinforced by pragmatic consideration of replacement cost. Note that estimates of an orderly liquidation scenario (e.g. value of cash on-hand, liquid Accounts Receivable value, Inventory at 50% of book value, full pay-off of Accounts Payable and 30% of book value of Fixed Assets), while somewhat related to this calculation, are made less useful in this case by the challenge of bringing cash and the value of liquidated assets back to the US.  One limitation of this methodology, of course, is that it does not reflect the value of future cash flows.

---

Automation / Brooks Automation, Inc.; Universe Group CEM Division / Custom Keyboards Electronics Ltd; Twin Creeks Technologies / GT Advanced Technologies, Inc. / TetraSun / First Solar, Inc. . *Sources: S&P Capital IQ*

*5. Discounts*

Four discrete discounts are appropriate in this analysis:

- **Discount for Lack of Marketability (DLOM)**
  A Discount for Lack of Marketability should be applied to minority positions in privately or closely held firms. Based on our research, the mean value of DLOM for unregistered and unmarketable minority ownership shares in a situation similar to the context for this FMV analysis (i.e. considering the absence of dividend payments, a relatively long expected holding period, and relatively high subject company risk) is assumed to be 35.0%.[4]

- **Discount for Lack of Control**
  A benchmark control premium adjustment of 35.0% is applied for the valuation methodology comparing guideline public companies equity valuation metrics. This premium reflects the fact that public markets price equity day to day based on a single share representing a minority stake (meaning purchasers of a single share lack certain critical, unrestricted decision rights). Note that no additional Discount for Lack of Control is applied later in the valuation process as we calculate the value of shares or options representing a minority stake in a private company. Following guidance in the newly updated AICPA Guidance for IRC 409A/ASC 718 Valuation, the DLOM discount model we have applied in this analysis incorporates this factor.

- **Discount for Customer Concentration**
  The Company reports that a relatively modest share of revenue or gross margin dollars comes from any single customer or handful of customers with coordinated decision-making over the full planning and forecast horizon.  Accordingly, and given the "stickiness" of contract manufacturing and key supplier customer relationships, no discount for customer concentration applies in this analysis.

- **Discount for Constraints on Options Holders**
  Per WEMU documents for Stock Option or Warrants, holders of incentive options or warrants are explicitly not afforded rights (voting rights, dividends or other rights) as stock holders until exercise and are subject to significant constraints including expiration, miscellaneous limitations, and restrictions on transfers. Accordingly, we have applied a 24% discount for the value of common equity incentive options versus shares.[5]


## Summary: Fair Market Value of the Company's Equity in the Form of Options

The Table on the next page summarizes the various methodologies and estimates considered in this analysis. As indicated there is highly substantial variability in the estimates based on the methodology applied, as is typical in company valuation assessments of this kind:

---

[4]  Tax Lawyer, Vol. 61, No. 1 – Robert F. Reilly; broad-based study of theoretical and empirical underpinnings of the Discount for Lack of Marketability (DLOM) and how it can and should be applied in valuation analyses. This meta study draws on restricted stock studies from prior to and after 1990 (when liquidity improved and a shorter required holding period came into being with SEC Rule 144), pre-IPO studies and "cost to obtain liquidity studies".

[5] Benchmark ranges for discounts based on constraints on options holders range from 18% to 24% typically depending on vesting provisions and other factors.

## Worldwide Energy and Manufacturing USA

### Summary Valuation Range ($)

| Methodology | Common Equity Value | Cumulative Discounts | Adj Value | Relevance Weighting | Comments |
|---|---|---|---|---|---|
| NPV of 10-Year Cash Flows | $ 375,050 | 49.4% | $ 185,275 | 50.0% | Significant relevance. Strongest theoretical base for valuation. Managements' best forecasts of future performance based on timely assumptions. Minimum consideration of circumstantial factors unrelated to future cash flows. Limited by predictability challenges and distress situation |
| Public Comparables - Revenue Multiple (2012) | $ 50,256,787 | 49.4% | $ 24,826,853 | 0.0% | Insufficientlyl relevant. Guideline public companies are generally far larger with much stronger balance sheets. Company restructuring and distress make 2012 insufficiently relevant |
| Public Comparables - EBITDA Multiple (2014 discounted) | $ 3,887,357 | 49.4% | $ 1,920,354 | 0.0% | Insufficiently relevant. Guideline public companies are generally far larger with much stronger balance sheets. Depends on single year forecast of future profitability. Restructuring and |
| Private M&A Precedent Transactions - Revenue Multiple (2012) | $ 52,151,191 | 49.4% | $ 25,762,688 | 0.0% | Insufficiently relevant. Guideline private companies/ transactions are generally larger with stronger balance sheets. Company restructuring and distress make 2012 insufficiently relevant |
| Private M&A Precedent Transactions - EBITDA Multiple (2014 discounted) | $ 3,442,039 | 49.4% | $ 1,700,367 | 0.0% | Signific relevant. Guideline private companies/ transactions are generally larger with stronger balance sheets. Depends on single year forecast of future profitability. Restructuring and distress |
| Prior Equity Transaction | $ 684,346 | 49.4% | $ 338,067 | 0.0% | Not sufficiently relevant. Timing, public stock delisting, dramatically changing company circumstances in interim period, and deep distress both company and the industry. |
| Tangible & Intangible Book Value (12/31/2012) | $ 4,762,131 | 49.4% | $ 2,352,493 | 50.0% | Significant relevance. Specific and timely values, reinforced by concept of replacement cost. Does not reflect value of future cash flows however, and relevance limited by going concern premise and difficulty ing bringing back cash from liquidated assets in China |
| | | | $ 1,268,884 | 100.0% | Significant consistency across selected and some non-selected methodologies |
| | | | $ 0.2225 | Value per common unit | |

*Conclusion*

For the reasons explained above, our overall estimate of valuation identifies the most relevant methodologies in this case as the calculations based on the Net Present Value of estimated future cash flows and the Tangible and Intangible Net Asset Value of the Company's assets and liabilities as of the date of this valuation – December 31, 2012. This selection is due to comparison across methodologies of the impact of the Company's recent distress and delisting; comparability issues with guideline public and private companies involved in similar business activities; the sensitivity to uncertain factors (e.g. future financial performance, discount rate, terminal value); the timing inherent in each methodology; the level of relevance or comparability to the Company's specific circumstances; the impact of the litigation contingency, and our pragmatic perspective and professional judgment based on cumulative experience with hundreds of M&A transactions and valuations.

Based on the consideration of the above factors, and for the purpose of setting the exercise price for the issuance of incentive options for the Company's employees and advisors, we have determined the current fair market value of the Company's common equity for options holders to be **$1,268,884** as of December 31, 2012. This valuation corresponds to **$0.2225 per Common Unit Option.**

Note again that this determination of FMV is premised as explained above in the definition of FMV and relies on the Company proceeding as a going concern. While this determination estimates market value, realized value could be considerably less if the Company were forced to liquidate or complete a distress sale, especially given that the majority of the Company's assets are in China.

Very truly yours,

Michael B. Rowe, Jr.
Director of Valuations (CPA, ABV, CMA, CFM, CGMA)
Scale Finance LLC
919-268-6386

David Gilroy
Managing Director
Scale Finance, LLC
704.258.6653

**Appendix A**

**Representations**

1. The conclusion of value arrived at herein is valid only for the stated purpose as of the date of the valuation.

2. Financial statements and other related information provided by Worldwide Energy and Manufacturing USA, or its representatives, in the course of this engagement, have been accepted without any verification as fully and correctly reflecting the enterprise's business conditions and operating results for the respective periods, except as specifically noted herein. Scale Finance has not audited, reviewed, or compiled the financial information provided to me and, accordingly, we express no audit opinion or any other form of assurance on this information.

3. Public information and industry and statistical information have been obtained from sources we believe to be reliable. However, we make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

4. We do not provide assurance on the achievability of the results forecasted by Worldwide Energy and Manufacturing USA, because events and circumstances frequently do not occur as expected; differences between actual and expected results may be material; and achievement of the forecasted results is dependent on actions, plans, and assumptions of management.

5. The conclusion of value arrived at herein is based on the assumption that the current level of management expertise and effectiveness would continue to be maintained, and that the character and integrity of the enterprise through any sale, reorganization, exchange, or diminution of the owners' participation would not be materially or significantly changed and unless noted in our report.

6. This report and the conclusion of value arrived at herein are for the exclusive use of our client for the sole and specific purposes as noted herein. They may not be used for any other purpose or by any other party for any purpose. Furthermore the report and conclusion of value are not intended by the author and should not be construed by the reader to be investment advice in any manner whatsoever. The conclusion of value represents the considered opinion of Scale Finance, based on information furnished to them by Worldwide Energy and Manufacturing USA, and other sources.

7. Neither all nor any part of the contents of this report (especially the conclusion of value, the identity of any valuation specialist(s), or the firm with which such valuation specialists are connected or any reference to any of their professional designations) should be disseminated to the public through advertising media, public relations, news media, sales media, mail, direct transmittal, or any other means of communication without the prior written consent and approval of Scale Finance.

8. Future services regarding the subject matter of this report, including, but not limited to testimony or attendance in court, shall not be required of Scale Finance unless previous arrangements have been made in writing.

9.  Scale Finance is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist, or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. Scale Finance does not conduct or provide environmental assessments and has not performed one for the subject property.

10. Scale Finance has not determined independently whether Worldwide Energy and Manufacturing USA, is subject to any present or future liability relating to environmental matters (including, but not limited to CERCLA/Superfund liability) nor the scope of any such liabilities. Scale Finance's valuation takes no such liabilities into account, except as they have been reported to Scale Finance by Worldwide Energy and Manufacturing USA, or by an environmental consultant working for Worldwide Energy and Manufacturing USA, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to me, Scale Finance has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

11. Scale Finance has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

12. The conclusion of value (or the calculated value) in this report deviates from the Statement on Standards for Valuation Services as a result of published governmental, judicial, or accounting authority.

13. No change of any item in this appraisal report shall be made by anyone other than Scale Finance, and we shall have no responsibility for any such unauthorized change.

14. Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future Federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

15. While prospective financial information approved by management has been used in this work, we have not examined or compiled the prospective financial information and therefore, do not express an audit opinion or any other form of assurance on the prospective financial information or the related assumptions. Events and circumstances frequently do not occur as expected and there will usually be differences between prospective financial information and actual results, and those differences may be material.

16. WEMU management, through conversations with Scale Finance, has provided their best professional opinions concerning the past, present, and prospective operating results of the company.

17. Except as noted, we have relied on the representations of the owners, management, and other third parties concerning the value and useful condition of all equipment, real estate, investments used in the business, and any other assets or liabilities, except as specifically stated to the contrary in this

report. We have not attempted to confirm whether or not all assets of the business are free and clear of liens and encumbrances or that the entity has good title to all assets.

Board of Directors of
Worldwide Energy and Manufacturing USA (WEMU)


We began the process to purchase the contract manufacturing operations of WEMU in November 2011. We have spent considerable time, effort and financial resources in an attempt to accomplish that task. We completed our due diligence in April 2012 and provided WEMU with a fair, firm offer valued at $2.2 million. As of the date of this writing, the Board of WEMU has yet to respond. We have negotiated in good faith and feel that the Board has no desire to act in a timely fashion despite the fact that the contract manufacturing division business continues to deteriorate as customers continue to search for other suppliers.

Based on the Board's unwillingness to act, we respectfully withdraw our firm offer.


*Diane Thelen*
Diane Thelen

June 6, 2012

EXHIBIT K



Worldwide Energy and Manufacturing USA, Inc
408 North. Canal Street, Unit A & B
South San Francisco, CA 94080
Tel:(650)794-9888
Fax:(650)794-9878
Web: www.wwmusa.com

# WORLDWIDE ENERGY AND MANUFACTURING USA INC.

August 23, 2012

To:  The Shareholders of Worldwide Energy
       and Manufacturing USA, Inc.

Re:   Special in Lieu of Annual Meeting of the Shareholders

Dear Shareholders,

Pursuant to the enclosed notice, Worldwide Energy and Manufacturing USA, Inc. (the "Company") has scheduled a special meeting of the shareholders in lieu of annual meeting to be held on Thursday, October 4, 2012, commencing at 1 p.m. Pacific Time (the "Annual Meeting"). The primary purpose of the Annual Meeting will be to vote on the election of the following nominees to serve as directors of the Company:

**Aaron Switz** – Mr. Switz has served as a director of the Company since June 3, 2011. Mr. Switz is a Senior Portfolio Manager and Partner at Pentwater Capital Management ("Pentwater") based in Chicago since October 2008. Pentwater is the beneficial owner of approximately 8.0% of the Company's common stock.  From 1998 to 2008, Mr. Switz was employed by Deephaven Capital Management as Portfolio Manager for the USA Event fund.  Prior to his employment at Deephaven Capital Management, Mr. Switz was a member of Royal Bank of Canada's trading and market making operation.  Mr. Switz graduated from the University of Arizona in 1996 with Bachelor of Science Business Administration degree.

**Todd Altman** – Mr. Altman has served as a director of the Company since June 3, 2011. Mr. Altman is currently the Western Region Sales Manager for Eurotech Inc., a computer hardware manufacturer. Previously, he worked at Intel for 11 years.  Mr. Altman holds a Bachelor of Science degree in Business Administration from the University of Arizona.

**Jimmy Wang** - Mr. Wang served as the President and CEO of the Company from September 2003 until April 2011, and has served as a director of the Company since September 2003.  From 1990 to 1995, Mr. Wang was the Sales Manager for MP World Manufacturing, Inc. From September 1993 to May 1996 Mr. Wang and Mindy Wang operated a sole proprietorship under the name Worldwide Manufacturing USA. In 1996, Mr. Wang incorporated the

EXHIBIT L

Company. In 1990, Mr. Wang earned a Masters Degree in Applied Economics from the University of Minnesota, and in 1982 received a Bachelors of Science Degree in Economics from the Shanghai Institute of Foreign Trade. Mr. Wang is the beneficial owner of approximately 29% of the Company's common stock.

**Gary Koos** – Mr. Koos was appointed to the positions of Chief Financial Officer and treasurer of the Company on May 30, 2011, and was appointed as CEO and a director on June 28, 2012. From 2010 to 2011, Mr. Koos was an independent consultant for various companies. From 2008 until 2010, Mr. Koos was the Chief Financial Officer and Chief Operations Officer of Intera Group, Inc. From 2005 to 2008 he was the Chief Financial Officer and a board member of BlockShield Plc. and Wavezero Inc. In these roles, he managed the operations, finance, accounting, regulatory reporting, corporate taxation, investor relations, treasury, human resources and legal departments. Mr. Koos also held senior financial roles at PolyStor Corporation and KLA-Tencor Corporation and was a Senior Tax Advisor for Arthur Andersen. He has also been a member of the Board of Directors and Audit Committee for the American Public Communications Council.

We encourage you to attend the meeting. At this time the Company is not soliciting proxies in connection with the Annual Meeting, however, the Company has received indications from holders of approximately 43% of the outstanding shares of the Company that they will vote for, or deliver proxies instructing that their shares be voted in favor of, the nominees listed above.

Prior to the date of the Annual Meeting, the Company anticipates providing to shareholders an update on the Company's operations and unaudited financial information.

Should you have any further questions concerning the upcoming shareholder meeting, you can reach me at (650) 794-9888, ext. 223.

We look forward to seeing you at the meeting.

Sincerely,

Gary Koos, Chief Executive Officer